## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 17-30132 |
| TSI HOLDINGS, LLC | ) | Chapter 7 |
| | ) | (Involuntary Proceeding) |
| Debtor. | ) | |

## PETITIONING CREDITORS' EMERGENCY MOTION FOR AN ORDER REQUIRING THE UNITED STATES BANKRUPTCY ADMINISTRATOR TO APPOINT AN INTERIM TRUSTEE UNDER 11 U.S.C. § 303(g) AND GRANTING EMERGENCY RELIEF; MOTION FOR HEARING ON SHORTENED NOTICE

Michael D'Agata, Charlotte Dreibelbis, and Anthony Packer (collectively referred to hereinafter as the "Petitioning Creditors"), hereby file this Emergency Motion for an Order Requiring the United States Bankruptcy Administrator to Appoint an Interim Trustee under 11 U.S.C. § 303(g), and Granting Emergency Relief (the "Motion"), and Motion for Hearing on Shortened Notice. In support hereof, the Court is shown the following:

### I. JURISDICTION AND VENUE

1.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.  The statutory basis for the relief requested herein is 11 U.S.C. §§ 105(a), 303(g), and 701 and Rule 2001 of the Federal Rules of Bankruptcy Procedure.

### II. BACKGROUND

3.  On January 27, 2017 (the "Petition Date"), the Petitioning Creditors filed an involuntary bankruptcy petition [Docket No. 1] seeking an order for relief against TSI Holdings, LLC (the "Alleged Debtor" or "TSI") under chapter 7, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of North Carolina, Charlotte Division (the "Court").

4.  Prior to the Petition Date, each of the Petitioning Creditors invested money in the Alleged Debtor. The Petitioning Creditors filed this involuntary bankruptcy upon their collective unpaid claims, which total $1,425,000.00, in order to preserve the Alleged Debtor's estate and to protect it from further diminution at the hands of its management and owners. The Petitioning Creditors hold unsecured claims that are neither contingent as to liability nor subject of a bona fide dispute.

5.      According to the records maintained by the North Carolina Department of the Secretary of State, the Manager of TSI as of the Petition Date was Richard C. Siskey ("Siskey") and the Registered Agent was Paul G. Porter ("Porter"). An undated copy of a document purporting to be the Operating Agreement of the Alleged Debtor states in part that "…the management of the Company shall be vested exclusively in the Manager acting as such and through the Company's officers."

6.      According to the Office of Vital Records of Mecklenburg County, North Carolina, Siskey died on December 28, 2016. Upon information and belief, Siskey's will named his spouse, Diane Siskey, as executrix of his estate. Diane Siskey is believed to be represented by Thomas G. Walker, Esq. ("Walker") and Matthew P. McGuire, Esq. ("McGuire").

7.      The Petitioning Creditors served a copy of the involuntary petition on Porter, Walker and McGuire via email on the Petition Date. The Clerk of the Court has not yet issued a summons in this case and there is no deadline to answer. The Petitioning Creditors do not know if Siskey's will has been filed in Mecklenburg County, if Diane Siskey has been issued Letters Testamentary, or if anyone is authorized to operate the Alleged Debtor.

8.      On December 21, 2016, a proceeding was opened bearing the caption *In re: 3545 Sharon Road, Charlotte, North Carolina and Richard C. Siskey*, Case No. 3:16-MC-00232-MOC-DSC, United States District Court for the Western District of North Carolina (the "Forfeiture Proceeding"). In the Forfeiture Proceeding, the United States of America, by and through Federal Bureau of Investigation Special Agent Timothy Stutheit ("Stutheit"), submitted an Affidavit (the "Affidavit") alleging that Siskey had engaged in violations of 18 U.S.C. Sections 1341 ("Frauds and swindles"), 1343 ("Fraud by wire, radio, television") and 1957 ("Engaging in monetary transactions in property derived from specified unlawful activity"). A copy of Stutheit's Redacted Affidavit is attached hereto as Exhibit "A" and incorporated by reference herein.

9.      The Affidavit alleges in part that:

   a.      "…from January 2011 through November 2015, approximately $31,000,000 in funds were deposited into the TSI Account. Of this $31,000,000, approximately $23,500,000 (approximately 75%) in deposits were from approximately 100 TSI Holdings, LLC, investors."

   b.      "During the same January 2011 through November 2015 time period, approximately $32,000,000 was withdrawn from the TSI Account. Of the $32,000,000 in withdrawals, approximately $16,000,000 (approximately 50%) in withdrawn funds were deposited into the Siskey Personal Account…".

   c.      "The largest source of deposits into the Siskey Personal Account during this time period were from the TSI Account, which, out of the $64,000,000 in deposits, contributed approximately $16,000,000 in gross deposits to the Siskey Personal Account."

   d.      "…after extensive analysis, it does not appear that the majority of $23,500,000 in investor funds deposited into the TSI Account have been used for actual investments."

   e.      "…it appears that Richard Siskey is operating what is commonly referred to as a "Ponzi" scheme. After extensive analysis, it appears that Siskey is taking investors' money and

doing little actual investing. Instead, Siskey is moving investor money back and forth between different entities that he controls and using investor money for personal expenses, gambling, and to pay other investors that request the return of their money (commonly referred to as 'Ponzi payments')."

         f.     "Other significant withdrawals from the Siskey Personal Account include approximately $4,000,000 to Met Life and approximately $1,400,000 to a Trust Company for the benefit of (FBO) various individuals."

10.     The Affidavit further states that "...after extensive analysis, it does not appear that the majority of investor funds have been used for actual investments...", but rather personal expenses, including:

         a.     Over $1,000,000 to American Express;

         b.     Over $800,000 to RL Liquid Assets, who advertises its business as a high-end wine provider in California;

         c.     Over $700,000 to Diamonds Direct;

         d.     Over $148,000 to a charter flight company;

         e.     Luxury real estate expenses;

         f.     $500,000 in automobile expenses to include expenses paid to Bentley Charlotte, Foreign Cars Italia, Motorama Classic Cars, Mercedes Benz, and others. North Carolina Department of Motor Vehicle Records show that Richard Siskey of 3545 Sharon Road, Charlotte, North Carolina, has registered to him a 2014 Bentley Continental GT, a 2013 Bentley Mulsanne, a 2013 Ferrari, a 2011 Mercedes Benz SLS AMG, a 2007 Mercedes Benz S65 AMG, a 1980 Chevrolet Corvette, a 1969 Chevrolet, and a 1996 Harley Davidson.

         g.     $15,000,000.00 to casinos.

11.     There is not yet an order for relief in this case. An interim trustee is necessary in this matter to preserve property of the Alleged Debtor's estate and to prevent further loss to the Alleged Debtor's estate and its creditors.

12.     The Petitioning Creditors request that the Court order the appointment of Joseph W. Grier III ("Grier") of the law firm Grier Furr & Crisp, PA as interim trustee. Grier is well known to this Court. Grier has served as a Chapter 7 Trustee and he has been involved in numerous cases involving financial crimes and/or Ponzi schemes, including:

     a.     Attorney for Examiner, Southeast Hotel Properties Limited Partnership, case No. 91-31737, United State Bankruptcy Court, Western District of North Carolina;

     b.     Receiver, Commodity Futures Trading Commission vs. James Harvey Mason, et al, No. 3:13-cv-196, U.S. District Court, Western District of North Carolina;

     c.     Receiver, Commodity Futures Trading Commission vs. Barki, et al., No. 3:09-cv-106; United States District Court, Western District of North Carolina; and

     d.     Receiver, State of North Carolina ex rel. Roy Cooper, Attorney General vs. Peerless Real Estate Services, Inc. et al., No. 07-cvs-9006, Wake County, NC, Superior Court.

## III. RELIEF REQUESTED

13.     By this Motion, the Petitioning Creditors seek the appointment of Grier as an interim trustee with all rights and duties under 11 U.S.C. §§ 303(g) and 701.

14.     The Petitioning Creditors therefore request that the Court enter an order appointing an interim trustee under 11 U.S.C. §§ 303(g) and 701 and granting emergency relief.

15.     The United States Bankruptcy Administrator for the Western District of North Carolina does not oppose the appointment of Grier as interim trustee.

## IV. APPLICABLE AUTHORITY

16.     Pursuant to section 105(a) of the Bankruptcy Code, the Court is authorized to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 COLLIER, BANKRUPTCY ¶ 105.01 (Alan N. Resnick and Henry J. Sommer eds., 2009).

17.     Section 303(g) of the Bankruptcy Code and Rule 2001 of the Federal Rules of Bankruptcy Procedure authorize the appointment of an interim trustee after a chapter 7 involuntary bankruptcy case is commenced. Section 303(g) of the Bankruptcy Code provides, in pertinent part, as follows:

> At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor.

11 U.S.C. § 303(g).

18.     In an involuntary case, as opposed to voluntary case, the order for relief is only entered if the petition is not successfully or timely controverted by the alleged debtor. This period of time before the order for relief is issued is known as the "gap" period. *In re Pucci Shoes, Inc.*, 120 F.3d 38, 41 (4th Cir. 1997). Pursuant to section 303(g), an interim trustee may be appointed during the "gap" period to prevent the debtor from dissipating his or her assets. *See In re The Centre for Mgmt. & Tech., Inc.*, 2007 WL3197221 (Bankr. D. Md. Oct. 26, 2007*); In re James Plaza Joint Venture*, 62 B.R. 959, 961 (Bankr. S.D. Tex. 1986) (appointing interim trustee in involuntary chapter 7 bankruptcy pursuant to section 303(g) standard).

19.     Similarly, Rule 2001 of the Federal Rules of Bankruptcy Procedure states that at any time following the commencement of an involuntary liquidation case and before an order for relief, the court on written motion of a party in interest may order the appointment of an interim trustee under section 303(g) of the Bankruptcy Code. FED. R. BANKR. PROC. 2001(a). Rule 2001 further provides that the motion shall set forth the necessity for the appointment and may be granted only after hearing on notice to the debtor, the petitioning creditors, the United States trustee, and other

parties in interest as the court may designate. *Id.*

20.     Additionally, an interim trustee may not be appointed under Rule 2001 unless the movant furnishes a bond in an amount approved by the court, conditioned to indemnify the debtor for costs, attorney's fees, expenses, and damages allowable under section 303(i) of the Bankruptcy Code. FED. R. BANKR. PROC. 2001(b).

21.     In this case, the Petitioning Creditors seek the immediate appointment of an interim trustee to protect the assets of the Alleged Debtor's estate, prevent concealment, waste, or loss of assets, and importantly, to avoid the irreparable harm. Petitioning Creditors will suffer if the Alleged Debtor is permitted to dissipate and deplete assets currently under its control.

22.     Due to the nature of the scheme set forth in the Affidavit, it is imperative that an interim trustee begin work immediately in coordination with the United States to marshal all of TSI's assets, as well as begin assessing whether suspected fraudulent transfers may be recovered and properly distributed to creditors. To prevent further loss to Petitioning Creditors, as well as other creditors, an interim trustee needs to be appointed.

23.     Courts install interim trustees in instances where it is necessary to protect and preserve the property of the debtor's estate. *See In re DiLorenzo*, 161 B.R. 752, 754 n.8 (Bankr. S.D.N.Y. 1993) (providing circumstances where courts have installed interim trustees). Specifically, interim trustees are appointed when necessary to protect the debtor's estate by preventing the concealment, waste, loss or conversion of the assets by the alleged debtor. *Id.; see also In re Rush*, 10 B.R. 518, 523 (Bankr. N.D. Ala. 1980). Simply put, an interim trustee needs to be appointed when the alleged debtor may cause irreparable harm to the estate during the gap period. *See, e.g., In re Lollipop, Inc.*, 205 B.R. 682, 684 (Bankr. E.D.N.Y. 19970 (interim trustee appointed where debtor's principals were depleting company's assets and converting the proceeds for personal use); *In re R.S. Grist Co.*, 16 B.R. 872, 873 (Bankr. S.D. Fla. 1982) (appointment of interim trustee was necessary to prevent diversion of assets from debtor's estate without adequate consideration); *In re Gems N' Things, Inc.*, 60 B.R. 288, 289 (Bankr. S.D.N.Y. 1986) (interim trustee installed where debtor posted notice that it was going out of business and liquidating assets and concern that debtor was diverting cash receipts and collections to improper use).

24.     Here, for the reasons set forth in the Affidavit as well as Siskey's death, there is an immediate need for an interim trustee.

25.     Finally, because the Alleged Debtor will not suffer harm when the interim trustee is appointed, there is no need for a bond to indemnify the Alleged Debtor. Furthermore, as demonstrated above, the Petitioning Creditors have met the involuntary petition requirements and therefore, the petition will not likely be dismissed and no damages will be assessed per section 303(i). Indeed, according to the Affidavit, the Petitioning Creditors and other investors hold unsecured claims against the Alleged Debtor in excess $19 million. The Affidavit states that "...an attempt was made to interview Richard Siskey. Siskey could not provide details of what the assets of TSI Holdings, LLC, were that could be used to pay back the over 100 investors approximately $19,000,000." Accordingly, Petitioning Creditors request the Court set the bond at $100.

26.     A copy of a proposed Order Requiring Appointment of Interim Trustee is attached hereto as Exhibit "B".

## V.    BASIS FOR EMERGENCY RELIEF AND SHORTENING THE NOTICE OF HEARING

27.     The Petitioning Creditors filed the involuntary petition in order to recover assets for the benefit of creditors. Upon information and belief, the payments by Siskey to Met Life were premiums for one or more life insurance policies on Siskey, claims have already been made by the beneficiaries of those policies, and Met Life has "processed" the claims. Upon information and belief, neither Met Life nor the attorneys for Diane Siskey have been willing to provide specific information about the alleged life insurance policies.

28.     The bankruptcy estate of the Alleged Debtor may have an interest in the proceeds of such life insurance policies. Funds in the hands of the beneficiaries of any life insurance funds are easily moveable, and an interim trustee is needed as soon as possible to obtain restraining orders or to assist the United States in the issuance of seizure warrants.

29.     An emergency exists because the Petitioning Creditors face immediate and irreparable harm to the estate absent the emergency consideration of the relief requested in this Motion. The Petitioning Creditors request that the Court set a hearing on this Motion for 2 p.m. on Thursday, February 2, 2016. The undersigned has conferred with known parties in interest about this date and time and he has received no objections thereto.

30.     The undersigned is in communication with, and will provide immediate notice of this motion to all known interested parties, including the United States.

WHEREFORE, the Petitioning Creditors request that this Court enter an order, in substantially the form filed herewith, granting the relief requested in this Motion, and such other and further relief as may be just and proper under the circumstances.

This 30th day of January, 2017.

THE HENDERSON LAW FIRM

James H. Henderson
State Bar No. 13536
1201 Harding Place
Charlotte NC 28204-2826
Telephone:    704.333.3444
Facsimile:     704.333.5003
Email:          henderson@title11.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE, NORTH CAROLINA

## REDACTED AFFIDAVIT IN SUPPORT OF
## SEIZURE WARRANTS AND ORDER AND LIS PENDENS

I, Special Agent Timothy Darin Stutheit with the Charlotte Field Office of the Federal Bureau of Investigation (FBI), Department of Justice, being duly sworn, state as follows:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since January 1997. I am therefore an "investigative or law enforcement officer" of the United States within the meaning of Title 18 United States Code, Section 2510(7). I am empowered by law to conduct investigations and to make arrests and seize assets for federal felony violations. I completed new agent training in Quantico, Virginia, and I have received additional training in the investigation of federal criminal matters. I am currently assigned to the Complex Financial Crime squad in Charlotte, North Carolina. I have extensive experience leading investigations involving wire fraud, mail fraud, and securities fraud. I have also been the case agent and investigated several cases involving investment fraud and "Ponzi" schemes. I am familiar through my training and experience with the habits and practices of persons engaged in "Ponzi" schemes in violation of wire fraud, mail fraud, and securities fraud statutes. Before becoming a Special Agent with the FBI, I was a Certified Public Accountant (CPA), a Certified Management Accountant (CMA), and had over three (3) years of public accounting experience. During this public accounting experience, I reviewed the financial records of companies, prepared and audited financial statements, and prepared and reviewed individual, partnership, and corporate tax returns.

1

2.      The information contained in this Affidavit is based on my own experience, investigation, and observations, as well as information relayed to me by others with knowledge of the investigation. Because this Affidavit is being submitted for the limited purpose of establishing probable cause in support of the requested Seizure Warrants and Order and Lis Pendens, I have not included every detail that I have learned over the course of this investigation.

3.      I make this Affidavit in support of Seizure Warrants and an Order and Lis Pendens for the following properties (collectively, "the Properties"):

      a.      A Seizure Warrant for all funds in the personal bank account of Richard Siskey at Community One Bank, Account XXXXX2470 (hereafter, "Siskey Personal Account");

      b.      A Seizure Warrant for all funds in the corporate bank account of TSI Holdings, LLC, at Bank of America, Account XXXXXXXX3191 (hereafter, "TSI Account"); and

      c.      An Order and Lis Pendens for the real property located at 3545 Sharon Road, Charlotte, North Carolina, more particularly described in a Deed to Richard C. Siskey and wife, Diane Siskey, recorded at Mecklenburg County Deed Book 10593 Page 515-517. This description was subsequently modified by a sale of Tract K at Mecklenburg County Deed Book 25225 Page 798. Thus, the correct description is "BEING all of Tracts G, H, and J of PROVIDENCE CORPORATION PROPERTY as shown on a map thereof as recorded in Map Book 6 at Page 725 in the Mecklenburg County Public Registry" (hereafter, "the Siskey Residence").

2

4.     Your Affiant has probable cause to believe that the Properties constitute, or are derived from, proceeds of mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343, and constitute property involved in one or more monetary transactions in violation of 18 U.S.C. § 1957. Therefore, the Properties are subject to civil and criminal forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) (civil forfeiture of fraud proceeds), 28 U.S.C. § 2461(c) (rendering criminal forfeiture available in any case in which civil forfeiture is also available), 18 U.S.C. § 981(a)(1)(C) (civil forfeiture of property involved in money laundering), and 18 U.S.C. § 982(a)(1) (criminal forfeiture of property involved in money laundering); and the funds in the Siskey Personal Account and TSI Account are subject to seizure pursuant to 18 U.S.C. § 981(b) (civil seizure warrants) and 21 U.S.C. § 853(f) (criminal seizure warrants).

## BACKGROUND

5.     In or about October 2015, law enforcement opened this investigation based upon suspicion that, in transactions involving casinos and his personal and business accounts, Richard Siskey ("Siskey") was co-mingling personal and business funds, including investor funds, and engaging in related party transfers. Based on review of those transactions, law enforcement suspected that Siskey was operating a "Ponzi" scheme.

6.     For example, an FBI Forensic Accountant reviewed account documents and transactions, and identified the following apparent transactions and trends:

    a.  Funds from an investor or multiple investors were received into a Siskey business account and then a different investor was paid;

3

b. Funds from an investor or multiple investors were received into a Siskey business account. Funds were then transferred from the business account into a Siskey personal account. Funds from the personal account were then wired to a casino;

c. Funds from an investor or multiple investors were received into a Siskey business account and the funds were then transferred between Siskey business and Siskey personal accounts. Those funds were then used to pay different investors. Some of the incoming funds in Siskey's accounts appeared to be investment related. For example, checks from Siskey's personal account were written to customer IRA accounts.

7.     Per North Carolina Secretary of State filings, the purposes of Siskey's businesses include "financial services," "investment companies," and "investing and trading in securities and financial instruments." Internet research shows Siskey as the Executive Officer of TSI Holdings, LLC. TSI Holdings, LLC firm filed a Form D - Notice of Exempt Offering of Securities on or about September 30, 2010. The notice included securities offered as a "Pooled Investment Fund".

8.     According to a United States Department of Labor news release in 2011, it was alleged that Wall Street Capitol and its president, Richard Siskey, violated the Employee Retirement Income Security Act (ERISA). According to the release, Siskey violated ERISA in his capacity as a fiduciary of two profit sharing plans. Siskey received funds from the profit sharing plans that were deemed to actually be "high-risk promissory notes." The fiduciaries of the companies' profit sharing plans were barred from acting as fiduciaries to any employee benefit plan covered by ERISA. Wall Street Capitol and Siskey agreed to restore approximately $243,000 to two retirement profit sharing plans as part of a settlement agreement with the Department of Labor related to these allegations. After law enforcement conducting this investigation contacted

4

the Department of Labor, the Department of Labor investigator familiar with the investigation
stated that it appeared that Siskey may be operating a "Ponzi" scheme. However, Siskey settled
the matter prior to any financial analysis.

## SUMMARY OF FINANCIAL ANALYSIS

9.      Based upon the foregoing, a more extensive analysis of Siskey-related bank
accounts was conducted by the Internal Revenue Service – Criminal Investigation (IRS-CI). IRS-
CI has reviewed and analyzed numerous bank accounts and tax returns, including documents
pertinent to the Properties identified for forfeiture herein. Based on that analysis and the other
information set forth herein, it appears that Richard Siskey is operating what is commonly
referred to as a "Ponzi" scheme. After extensive analysis, it appears that Siskey is taking
investors' money and doing little actual investing. Instead, Siskey is moving investor money
back and forth between different entities that he controls and using investor money for personal
expenses, gambling, and to pay other investors that request the return of their money (commonly
referred to as "Ponzi payments"). A summary of the financial analysis is set forth below.

## DEPOSITS OF PROCEEDS INTO THE TSI HOLDINGS ACCOUNT

10.     Richard Siskey is the authorized signer on the TSI Account at Bank of America.
Based upon analysis conducted to date, from January 2011 through November 2015,
approximately $31,000,000 in funds were deposited into the TSI Account. Of this $31,000,000,
approximately $23,500,000 (approximately 75%) in deposits were from approximately 100 TSI
Holdings, LLC, investors.

11.     During the same January 2011 through November 2015 time period, approximately
$32,000,000 was withdrawn from the TSI Account. Of the $32,000,000 in withdrawals,

5

approximately $16,000,000 (approximately 50%) in withdrawn funds were deposited into the Siskey Personal Account, which is discussed in more detail below. Another approximately $10,000,000 (approximately 33%), has been used to pay what appear to be individual investors.

12.     Thus, after extensive analysis, it does not appear that the majority of $23,500,000 in investor funds deposited into the TSI Account have been used for actual investments.

13.     As of October 31, 2016, the balance of the TSI Account was $9,121.66. The balance in the account on December 20, 2016, was verbally confirmed to be less than $10,000.

### DEPOSITS OF PROCEEDS INTO THE SISKEY PERSONAL ACCOUNT AND EXPENDITURES ON NUMEROUS LUXURY ITEMS

14.     Richard Siskey is the authorized signer on the Siskey Personal Account at Community One Bank. From January 2011 through November 2015, approximately $64,000,000 was deposited into the Siskey Personal Account.   Similarly, approximately $64,000,000 was withdrawn during the same time period.

15.     The largest source of deposits into the Siskey Personal Account during this time period were from the TSI Account, which, out of the $64,000,000 in deposits, contributed approximately $16,000,000 in gross deposits to the Siskey Personal Account ($12,000,000 in net deposits since $4,000,000 was deposited back from the Siskey Personal Account to the TSI Account).

16.     The second largest source of deposits, in the amount of approximately $12,000,000 deposited into the Siskey Personal Account, was from casinos. Similarly, casinos constituted the largest source of withdrawals from the Siskey Personal Account during this time period, constituting approximately $15,000,000 (approximately 23%) of the withdrawals. So, over $15,000,000 in funds were withdrawn from the Siskey Personal Account to casinos and over

6

$12,000,000 was deposited back to the account, resulting in a net outflow of approximately $3,000,000 from the Siskey Personal Account to casinos.

17.    Siskey is also an authorized signer on the bank accounts of WSC Holdings, LLC, Southpark Partners, LLC, Siskey Industries, LLC, and Sharon Road Properties, LLC. Siskey moves money back and forth between these other entities that he controls, with minimal net effect (less than $1,000,000) on the overall balance in the Siskey Personal Account as shown in the below summary analysis of the January 2011 through November 2015 time period:

| Account/Entity | Inflows to Siskey Personal Account | Outflows from Siskey Personal Account | Net Effect on Siskey Personal Account |
|---|---|---|---|
| WSC Holdings, LLC | $7,725,551.59 | $5,515,861.87 | $2,209,689.72 |
| Southpark Partners, LLC | $1,322,266.00 | $4,589,527.80 | ($3,267,261.80) |
| Siskey Industries,LLC | $2,312,422.34 | $2,585,300.44 | ($272,878.10) |
| Sharon Road Properties, LLC | $1,893,464.01 | $1,509,000.00 | $384,464.01 |
| Total: | $16,153,703.94 | $17,099,690.11 | ($945,986.17) |

18.    Other significant withdrawals from the Siskey Personal Account include approximately $4,000,000 to Met Life and approximately $1,400,000 to a Trust Company for the benefit of (FBO) various individuals. The Trust Company advertises itself as a leading custodian of Self-Directed IRAs. ███████████████████████████ ██████ these individuals appear to be investing their retirement plans in Siskey's "Ponzi" scheme. There do not appear to be any other net withdrawals over $1,000,000, other than what appear to

7

be numerous personal expenses. Thus, after extensive analysis, it does not appear that the majority of investor funds have been used for actual investments.

19.    Personal expenses funded by the Siskey Personal Account include the following:

    a.  Over $1,000,000 to American Express;

    b.  Over $800,000 to RL Liquid Assets, who advertises its business as a high-end wine provider in California;

    c.  Over $700,000 to Diamonds Direct;

    d.  Over $148,000 to a charter flight company;

    e.  Luxury real estate expenses set forth more fully below; and

    f.  Numerous other personal expenses.

In addition, Siskey has also made over $600,000 in payments to the Internal Revenue Service for his personal tax liability on his individual income tax returns, Form 1040, from the Siskey Personal Account.

20.    As to real estate expenses, bank records from the Siskey Personal Account show that over $400,000 was paid to a local builder in 2012, whose website has advertised numerous pictures of the Siskey Residence, including pictures of a pool area, building, and a space in which numerous luxury automobiles are stored and displayed. Public Tax records show one building added in 2011 and one building added in 2012 to the residence owned by Richard Siskey at 3545 Sharon Road, Charlotte, North Carolina. Additionally, based upon mortgage information received, on or around August 13, 2012, Siskey used funds from the Siskey Personal Account to make a $12,500 monthly payment on the $2,500,000 interest only mortgage on the Siskey Residence (although the payment on the mortgage ordinarily comes from another account).

8

21.     Further, bank records on the Siskey Personal Account reflect over $500,000 in automobile expenses to include expenses paid to Bentley Charlotte, Foreign Cars Italia, Motorama Classic Cars, Mercedes Benz, and others. North Carolina Department of Motor Vehicle Records show that Richard Siskey of 3545 Sharon Road, Charlotte, North Carolina, has registered to him a 2014 Bentley Continental GT, a 2013 Bentley Mulsanne, a 2013 Ferrari, a 2011 Mercedes Benz SLS AMG, a 2007 Mercedes Benz S65 AMG, a 1980 Chevrolet Corvette, a 1969 Chevrolet, and a 1996 Harley Davidson. Bank records show a beginning loan balance of over $300,000 on the 2013 Bentley. On December 13, 2016, agents observed ten (10) luxury automobiles at Siskey's residence in a detached garage/showroom, including some of the vehicles listed above.

22.     As previously stated, Siskey has sent over $15,000,000 to casinos from the personal account for a net outflow of approximately $3,000,000. Information has been received from numerous casinos showing a pattern of extensive high stakes gambling by Siskey, to include bets of as much as $70,000 per "hand."

23.     As of November 22, 2016, the balance of the ~~TSI~~ Siskey Personal Account was $83,668.03. The balance in the account on December 20, 2016, was verbally confirmed as less than $100,000.

### TAX INFORMATION





10



## SUMMARY OF INVESTOR INTERVIEWS

27.     On December 12, 2016, and after, law enforcement interviewed numerous investors in TSI Holdings, LLC. Several of the investors are admittedly unsophisticated investors and several of the investors are elderly. The investors were told, and believed, that their investments in TSI Holdings, LLC, would be invested by Siskey. Investors, and others, were told a variety of things, to include that their investments were "safe" in a "guaranteed" fixed rate of return investment, and that their investments were "asset backed." Some investors were told to, and did, invest the life insurance or retirement account proceeds of deceased family members. Some investors were told that they should take loans against the value of their life insurance policies to invest in TSI Holdings, LLC. Others invested their Individual Retirement Account (IRA) funds.

28.     Investments with TSI Holdings, LLC, and Siskey were often transmitted by means of wire communications in interstate commerce and/or mail sent or delivered by the Postal Service. Further, many investors received TSI Holdings, LLC, quarterly statements transmitted by means of wire communications in interstate commerce and/or mail sent or delivered by the Postal Service. These statements showed "Current Interest" and an increase in their "Investment Valuation Total", commensurate with their fixed rate of return. Based upon extensive financial analysis, it does not

11

appear that the investor funds were placed in investments that could generate the fixed rate of returns that Siskey promised and represented.

29.     After several of the investors were interviewed, the money they invested in TSI Holdings, LLC, was traced through the financial records. It appears that in addition to spending the money personally, gambling, and paying other TSI Holdings, LLC, investors back, Siskey has also used a substantial portion of investor money to send to his other related entities, not for investment, but to repay what appear to be other investors in those entities.

## EXAMPLES OF SPECIFIC INVESTOR TRANSACTIONS

30.     On December 12, 2016, law enforcement interviewed TSI Holdings, LLC, investor U.W. Siskey told U.W. that Siskey had some good investments that guaranteed a 20% return within a year. On February 4, 2015, U.W. invested $150,000 into the TSI Account (along with $70,000 from investor M.D.). On February 5, 2015, $210,000 was sent from the TSI Account to the Siskey Personal Account. Later, on February 5, 2015, $1,000,000 was sent from the Siskey Personal Account to the Seminole Hard Rock Resort and Casino. After the transfer, the balance in the Siskey Personal Account was approximately $14,000 on February 5, 2015. Thus, it appears that Siskey is taking money intended for investment and gambling with the money.

31.     On December 12, 2016, law enforcement interviewed TSI Holdings, LLC, investor M.S., who was told by Siskey that Siskey would invest M.S.'s money. On October 1, 2013, M.S. invested $600,000 into the TSI Account. On October 2, 2013, $500,000 was sent from the TSI Account to the Siskey Personal Account. On October 3, 2013, Siskey spent $389,500 from the Siskey Personal Account to Diamonds Direct for "Diane's ring." Before the transfer in from the TSI Account, the Siskey Personal Account had approximately $84,000. Thus, it appears that

12

Siskey is taking money intended for investment and spending the money on personal expenses.

M.S. also confirmed that Siskey spent over $1,000,000 for an addition to Siskey's residence.

32.     On December 12, 2016, TSI Holdings, LLC, investor A.F. was interviewed. A.F.

was told by Siskey he was investing her money and provided A.F. statements showing her

investment was performing as planned. On March 19, 2013, A.F. invested $75,000 into the TSI

Account which she believed would be invested. Later on March 19, 2013, $85,000 was sent from

the TSI Account to another TSI Holdings, LLC, investor, C.H., as a distribution. The ending

balance in the TSI Account on March 19, 2013, was $75,201.69. Thus, it appears that Siskey is

using investor money to make what are commonly referred to as "Ponzi" or "lulling" payments.

33.     On December 12, 2016, TSI Holdings, LLC, investor J.K. was interviewed. Siskey

promised J.K. a 6% return on his investment. On or about December 27, 2011, J.K. invested

$750,000 into the TSI Account, which he believed would be invested. On or about December 28,

2011, $400,000 was transferred from the TSI Account to the Siskey Personal Account. On or about

December 28, 2011, the Siskey Personal Account also received money in from other Siskey

controlled entities; $100,000 from Southpark Partners, LLC, and $100,000 from WSC Holdings,

LLC. On or about December 28, 2011, $500,000 was sent from the Siskey Personal Account to

The Cosmopolitan of Las Vegas and $89,000 was spent at Diamonds Direct. Thus, it appears that

Siskey is taking money intended for investment and gambling with the money and using the money

for personal expenses.

34.     J.K. also received a statement from TSI Holdings, LLC, dated September 30, 2016,

showing $388,324.33 in "Accrued Interest." As previously stated, the total TSI Holdings, LLC,

interest income for the entire entity reported from 2011-2015 was $63,775. ████████████

████████████████████████████████████████████████████████

13

Thus, it appears that the statements mailed and wired to TSI Holdings, LLC, investors are not based on actual performance or value, but are simply created to show investors a return and value commensurate with the promises made by Siskey. Siskey also manages J.K.'s life insurance policy, and Siskey borrowed $150,000 from J.K.'s life insurance policy to "invest."

35.    Investor M.A., who owned approximately .4% (.004) of TSI Holdings, LLC, with an $85,000 investment, received a quarterly statement with approximately three (3) months of "Current Interest" in 2015 of $1,062.50 (1/4 of 5% of $85,000). ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████ Thus, it appears that the statements mailed and wired to TSI Holdings, LLC, investors are not based on actual performance or value, but are simply created to show investors a value and return commensurate with the promises made by Siskey.

## ATTEMPT TO INTERVIEW RICHARD SISKEY

36.    On December 12, 2016, an attempt was made to interview Richard Siskey. Siskey could not provide details of what the assets of TSI Holdings, LLC, were that could be used to pay back the over 100 investors approximately $19,000,000. ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Shortly after being asked what the investors of TSI were told, Siskey terminated the interview.

14

## CONCLUSION

37.    It appears as if the investors' money has not been invested as promised and the investors' money has been primarily used to pay off other investors in TSI Holdings, LLC, and other Siskey controlled entities, as well as to fund Richard Siskey's personal account. Siskey has been sending the investors' money to casinos, not investing the money as promised, and not disclosing his personal use of investor funds. Probable cause exists that Richard Siskey is operating what is commonly referred to as a "Ponzi" scheme.

38.    Based upon the foregoing, your Affiant submits there is probable cause to believe that from in or about January 2011 through December 2016, in the Western District of North Carolina, and elsewhere, Richard Siskey has devised a scheme to defraud and/or obtained money by means of false or fraudulent pretenses, representations or promises, and transmitted or caused to be transmitted by mail sent or delivered by the Postal Service and/or by means of wire communications in interstate commerce, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and engaged in monetary transactions in violation of 18 U.S.C. § 1957. There is also probable cause to believe that the Properties constitute or are derived from proceeds of the fraud and property involved in the monetary transactions.

39.    Further, based on your Affiant's training and experience, your Affiant knows that funds in bank accounts are easily moveable, and restraining orders are not sufficient to secure

15

funds in bank accounts. Therefore, issuance of seizure warrants is appropriate to secure the funds

identified herein for forfeiture.

SPECIAL AGENT TIMOTHY DARIN STUTHEIT
FEDERAL BUREAU OF INVESTIGATION

SUBSCRIBED and SWORN to before me this _21_ day of December, 2016, at Charlotte, North
Carolina.

DAVID S. CAYER
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF NORTH CAROLINA

16

# EXHIBIT B

### IN THE UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

In re:                                    )
                                          )        Case No. 17-30132
TSI HOLDINGS, LLC                         )        Chapter 7
                                          )        (Involuntary Proceeding)
            Debtor.                       )

## ORDER REQUIRING APPOINTMENT OF INTERIM TRUSTEE

This matter came on for hearing on the 2nd day of February, 2017, upon Petitioning Creditors' Emergency Motion for an Order Requiring the United States Bankruptcy Administrator to Appoint an Interim Trustee under 11 U.S.C. § 303(g) and Rule 2001 of the Federal Rules of Bankruptcy Procedure (the "Motion").

The Court having considered the Motion and any responses thereto, finds that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; that notice of the Motion and Notice of Hearing on the Motion was appropriate under the particular circumstances; it is:

ORDERED that the Motion is GRANTED, the appointment being necessary to protect and preserve property of the Alleged Debtor's estate and to prevent concealment, waste, loss or conversion of the assets of the estate by the Alleged Debtor. Additionally, there is an immediate need for an investigation of known and potential assets; it is further

ORDERED that the United States Bankruptcy Administrator shall appoint Joseph W. Grier III ("Grier") of the law firm Grier Furr & Crisp, PA as interim trustee under 11 U.S.C. § 701 to preserve property of the estate and to prevent loss to the estate. The duties of the interim trustee shall include the following: (1) take possession of the property of the Alleged Debtor's estate and to operate the Alleged Debtor's business; (2) collect and analyze the Alleged Debtor's financial records to identify all property lost through fraudulent transfers and/or preferences, and to bring the property back into the estate for the benefit of creditors; and (3) taking of all other acts necessary to preserve and protect the property of the estate, including taking possession of property as might be necessary to prevent any further loss to the estate.

ORDERED that, pursuant to Rule 2001(b) of the Federal Rules of Bankruptcy Procedure, the appointment of the interim trustee by the United States Bankruptcy Administrator is contingent upon the furnishing of a bond by the Petitioning Creditors in the amount of $100.00, conditioned to indemnify the Alleged Debtor for costs, attorney 's fees, expenses, and damages allowable under 11 U .S.C. § 303(i).