IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| In re:                          | CASE NO. 17-30132                  |
|---------------------------------|------------------------------------|
| TSI Holdings, LLC[1] et al.,    | CHAPTER 7                          |
|                                 | Jointly Administered               |
| DEBTORS.                        |                                    |

**TRUSTEE'S FIRST OMNIBUS REPORT OF CLAIMS, OBJECTIONS TO CLAIMS, AND RECOMMENDATIONS REGARDING CLAIMS AS TO TSI HOLDINGS, LLC, WSC HOLDINGS, LLC, SOUTHPARK PARTNERS, LLC, AND SHARON ROAD PROPERTIES, LLC**

THE GROUNDS FOR THE TRUSTEE'S OBJECTIONS TO CLAIMS ARE EXPLAINED HEREIN AND IN THE SPREADSHEETS ATTACHED HERETO AS EXHIBITS A - E. YOU SHOULD LOCATE YOUR NAME (LISTED IN ALPHABETICAL ORDER) IN THE SPREADSHEETS AND REVIEW THE TRUSTEE'S PROPOSED TREATMENT OF YOUR CLAIM.

Joseph W. Grier, III, the duly appointed trustee ("Trustee") in the above-referenced bankruptcy case as well as in the chapter 7 cases for WSC Holdings, LLC ("WSC"), SouthPark Partners, LLC ("SPP") and Sharon Road Properties, LLC ("SRP") (collectively, including TSI Holdings, LLC ("TSI"), the "Debtors"), through counsel, and pursuant to 11 U.S.C. § 502 and FED. R. BANKR. P. 3007, hereby files this report of claims, objection to claims, and recommendations regarding claims filed in Debtors' cases (the "Claims Report"). The Trustee has reviewed proofs of claim and addendums (together the "Claim Forms") filed by investors of the Debtors, compared those forms with books and records of the Debtors, including bank account records, and accounting and tax records and books and records of related entities including those of Richard C. Siskey ("R. Siskey") (collectively the "Debtor Records"). As more fully described below, the Trustee has reconciled and calculated each investor's claimed deposits and withdrawals to arrive at amounts for each investor's recommended claim for

---

[1] These jointly administered cases are those of the following debtors: TSI Holdings, LLC, Case No. 17-30132, WSC Holdings, LLC Case No. 17-30338, SouthPark Partners, LLC Case No. 17-30339 and Sharon Road Properties, LLC Case No. 17-30363.

principal (excluding any claims for interest or lost profits).[2] In cases where the Claim Forms did not reconcile with the Debtor Records, the Trustee worked with individual claimants to resolve the differences. The Trustee respectfully requests that the Court approve the proposed treatment of investor claims for principal as outlined in this Claims Report, and in support, respectfully represents as follows:

## SCOPE OF THE CLAIMS REPORT

1. The Trustee's Claims Report addresses claims on file as of the deadline for filing proofs of claims established in these cases, August 23, 2017.

## BACKGROUND OF THE CASE PROCEEDINGS

2. On January 27, 2017, an involuntary bankruptcy petition (D.E. 1) pursuant to chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, was filed against TSI, initiating this case (this "Case"). On February 2, 2017, the Court held an emergency hearing on the petitioning creditors' emergency motion to appoint an interim trustee for the Debtor in this Case (D.E. 5) (the "Trustee Motion"). On February 8, 2017, the Court entered its Order granting the Trustee Motion (D.E. 17), appointing the Trustee. The Court subsequently entered its *Order For Relief* (D.E. 32) on February 22, 2017.

3. Similar involuntary petitions and motions were filed against WSC, SPP and SRP, and the Court appointed the Trustee and entered orders for relief in those cases.

4. The Court authorized the joint administration of these four cases by order entered on May 23, 2017 (D.E. 63).

---

[2] As discussed below, the Trustee proposes to submit to the Court for approval a proposed distribution for investor claims for interest and lost profits, should sufficient funds be available after payment of all administrative and priority claims, and investor claims for principal.

2

## BACKGROUND OF THE DEBTORS

5. Evidence presented to the Court in the Trustee Motion, including an affidavit of Timothy Darin Stutheit, a Special Agent with the Federal Bureau of Investigation, is that R. Siskey, prior to his death on December 28, 2017, operated the Debtors as a Ponzi scheme (D.E. 5).

6. A Ponzi scheme generally involves a fictitious investment whereby funds paid in by later investors are used to pay returns of earlier investors. Elements of a Ponzi scheme are: "… (1) deposits were made by investors, (2) debtor conducted little or no legitimate business operations as represented to investors, (3) debtor's purported business operation produced little or no profits or earnings, and (4) source of payments to investors was cash infused by new investors." *Ivey v. Swofford (In re Whitley)*, 463 B.R. 775, 782 (Bankr. M.D.N.C. 2012).

7. Additional traits of Ponzi schemes include investors being assigned arbitrary rates of return, investor statements only ever reflecting *positive* annual returns, and funds "invested" are never actually invested and thus not exposed to fluctuations of a market. *See In re Bernard L. Madoff Inv. Securities LLC*, 654 F.3d 229, 232 (2d Cir. 2011).

8. Based on the Debtor Records, and other evidence, the Trustee and his professionals are of the opinion that TSI, WSC and SPP were operated as Ponzi schemes. Further, six investors, who R. Siskey qualified as "Outside Investors," in SRP were also part of a Ponzi scheme (the "Outside Investors").

9. For example, in TSI, during the year 2016, there were:

   a. Investor contributions of approximately $1,440,000;

   b. Investor distributions of approximately $3,254,424;

   c. Net payments in from R. Siskey and Siskey Industries of approximately $1,711,500; and

3

      d. No investment income.

10. In WSC during the year 2016, there were:

      a. Investor contributions of approximately $4,737,615;

      b. Investor distributions of at least $2,128,491;

      c. Net payments out to R. Siskey and related entities of at least $3,160,975; and

      d. No investment income.

11. In SPP during the year 2016, there were:

      a. Investor contributions of approximately $45,000;

      b. Payments from MetLife of $172,500 (loan proceeds against life insurance policies on third parties);

      c. Investor distributions of approximately $871,602;

      d. Net payments in from R. Siskey of approximately $651,850; and

      e. No investment income.

12. The Trustee's marshalling and liquidation of cash and securities owned by TSI, WSC and SPP after the bankruptcy filings resulted in the following total recoveries:

      a. TSI      $39,450.65

      b. WSC      $2,588.84

      c. SPP      $98,339.90

WSC also has an unliquidated interest in Ballantyne Clubdominium, LLC, which owns undeveloped land of uncertain value.

13. Per R. Siskey's records, at the time of the bankruptcy filings of the Debtors, the total of the investors' investments in TSI, WSC, and SPP, plus the Outside Investors' investments in SRP, including alleged appreciation or interest, was approximately $51,506,242.00.

4

14. Statements sent to investors either as directed by R. Siskey and/or by a self-directed retirement account custodian (which in turn relied on reports from R. Siskey) reflecting values for TSI, WSC, SPP and SRP (regarding the Outside Investors) did not accurately reflect any actual value of any investment. The balances reflected thereon appear to have been totally fictitious and not based upon any actual investment or holding. Interest rates reflected thereon or otherwise promised appear to have been assigned arbitrarily and not tied to any actual investment. For example, investors in TSI were promised interest rates from 3.25% to 9.5%; investors in WSC were promised interest rates from 2% to 10%; investors in SPP were promised interest rates from 3.25% to 8.25% and the Outside Investors in SRP were promised interest rates from 2% to 8.25%.

15. Conversely, SRP owns a 32.55% interest in Bissell Porter Siskey, LLC, which in turn owns the commercial building located at 4521 Sharon Road, Charlotte, North Carolina. With the exception of the Outside Investors, the books and records of SRP reflect membership interests held by investors in SRP which total 100%, the financial records of SRP were maintained separate and apart from the other Debtors, the owners of SRP (other than the Outside Investors) received rental income generated by the commercial building, and I.R.S. K-1 tax forms were prepared and distributed to members annually. While funds commonly shuffled around TSI, WSC, and SPP through R. Siskey as part of the Ponzi scheme, SRP's funds appear to have been generally isolated from that shell game.[3] Therefore, SRP does not appear to be a part of the R. Siskey Ponzi scheme.

---

[3] Notwithstanding, R. Siskey did apparently borrow funds from SRP from time to time. However, not only did R. Siskey always pay such loans back prior to the applicable year's end (except for 2016), but also the loan proceeds were not generally used to make "Ponzi payments," as far as the Trustee's professionals are able to ascertain at this point.

5

## RECOMMENDATION OF INVESTOR CLAIMS FOR PRINCIPAL - TSI, WSC, SPP AND SRP OUTSIDE INVESTORS – USING THE NET INVESTMENT METHOD

16. The Trustee recommends to the Court allowance of investor claims for principal filed as to TSI, WSC, SPP, and by the SRP Outside Investors, based upon the "Net Investment Method." Simply stated, the Net Investment Method is a "Money in – Money out" calculation regardless of the characterization of the "Money out" or withdrawals (e.g., interest, gains, dividends, loan proceeds). *Id.* at 233.

17. "The Net Investment Method credits the amount of cash actually deposited by an investor into an account with the Debtors, and then subtracts any amounts actually withdrawn as a return of principal, profits or interest." *In re Pearlman*, 484 B.R. 241, 243 (Bankr. M.D. Fla. 2012).

18. This methodology disregards false profits and limits claimants to those who have deposited less than they have withdrawn.

19. Further, it relies on figures that have not been manipulated in that the claims have been compared to bank statements tracking actual dollars deposited and actual dollars withdrawn and ignores any promised profits. In the Bernie Madoff bankruptcy cases, the bankruptcy court found that "[t]he Net Investment Method is appropriate because it relies solely on unmanipulated withdrawals and deposits and refuses to permit Madoff to arbitrarily decide who wins and who loses." *In re Bernard L. Madoff Inv. Securities LLC*, 424 B.R. 122, 140 (Bankr. S.D.N.Y. 2010), aff'd by *In re Bernard L. Madoff Inv. Securities LLC*, 654 F.3d 229 (2d Cir. 2011) (approving the Net Investment Method for claims in those cases).

20. Lastly, the Net Investment Method is consistent with the Bankruptcy Code, which generally supports the public policy of correcting fraudulent transactions. If the Trustee were to propose a claim method which includes fictitious profits, he would be continuing the fraud and

proposing distributions be made based partially on the fraudulent scheme. The Net Investment Method – when calculating investor principal claims – avoids this proposition.

### REVIEW PERIOD AND THE PREMIER FUNDS

21. So far as the Trustee can ascertain, the inception of each Debtor is as follows: SRP in 1999; WSC in 2002; SPP in the mid-2000s; and TSI in 2010. During the claims review process the Trustee calculated the Net Investment for each claimant starting from the earliest date such claimant made a cash deposit in TSI, WSC, SPP or as an Outside Investor of SRP and accounted for each additional deposit and withdrawal thereafter.

22. To the best of the Trustee's ability, each deposit and withdrawal was compared to a bank statement or other evidence of deposit to assure that the transactions were in fact cash transactions and not fictitious profits or other journal entry transactions.

23. The exception to this procedure involves nine investor-claimants who began "investing" with R. Siskey in the mid-1990s (or earlier).

24. In the mid-1990s, R. Siskey solicited investors in two investments funds known varyingly[4] as Premier Funds One, LLC and Premier Funds II, LLC (collectively, the "Premier Funds"). Through review of the records of these entities, the Trustee understands that R. Siskey promised investors in the Premier Funds a fixed interest rate (ranging between 8% and 10%, depending on the investor) over a fixed time period (*i.e.*, 10 years). It appears that during the 10-year period, the investors would receive quarterly or monthly interest payments and at the end of the 10-year period some received return of their principal amount invested. Nine investors, however, did not receive their principal investment but agreed with R. Siskey to "invest" that

---

[4] Additional names used by R. Siskey for the Premier Funds include, without limitation, "The Premier Fund," "Premier Fund, LLC," "Premier Fund I, LLC," "Premier One," "Premier Fund One, LLC" "Premier Two," "Premier Fund II, LLC."

7

principal into one of Debtors. Those nine investors have filed claims in the SPP and SRP cases (the "Premier Fund Claimants").

25. Premier Funds' records reflect that though deposits were made by investors therein, the Premier Funds had no business operations, and therefore earned no profits. The source of periodic payments to investors was investments by new investors in Premier Funds or funds provided by R. Siskey from investors in other funds. When the Premier Funds life ended, virtually no cash remained in the respective Premier Funds bank accounts. The Trustee and his professionals believe that the Premier Funds were Ponzi schemes operated by R. Siskey.

26. The Trustee has reviewed records showing that the Premier Fund Claimants did deposit and/or transfer actual funds into the Premier Funds during the 1990s. Further, the Trustee has reviewed records reflecting funds paid out from the Premier Funds during the life of those investments to their investors.

27. So far as the Trustee can tell, when R. Siskey "rolled" the nine Premier Fund Claimants into either SPP or SRP (as Outside Investors), generally effective in 2008, no cash was deposited into the respective Debtor bank accounts.

28. Though there was little or no actual cash in any Premier Fund account when those funds were wound down, per the Trustee's analysis of the Premier Fund records, the total of the collective claims of the Premier Fund Claimants in the Premier Funds at the conclusion of those funds using the Net Investment Method analysis was $2,313,609.40 (in other words, the collective "money in" from the Premier Fund Claimants minus the collective money paid out to those Premier Fund Claimants totaled $2,313.609.40 during the life of the Premier Funds). However, when the Premier Funds Claimants were moved by R. Siskey to SPP and/or SRP (as Outside Investors), their collective initial investments in SPP and/or SRP were booked and reflected on those investors' account statements as being $3,288,323.00. It therefore appears

8

that not only did the Premier Funds Claimants not have actual funds deposited into any of the Debtors, but the beginning balance of each "investment" was inflated with false profits over and above their "Money in – Money out" balance in the Premier Funds.

29. The Trustee's recommendation with regard to the Premier Fund Claimants is to recognize their collective initial "money-in" to SPP and/or SRP, as being $2,313,609.40, despite the fact that there was no actual cash deposit made into SPP and/or SRP by these claimants. After applying the Net Investment Method to the deposits and withdrawals of the Premier Fund Claimants over the course of their investments in the Premier Funds and the Debtors, four of the Premier Fund Claimants withdrew more cash than they paid in; the remaining five Premier Fund Claimants have proposed claims herein collectively totaling $523,946.81 (the "Premier Fund Claims").

30. Notwithstanding their not having deposited any money directly into any Debtor entity, the Trustee, after discussions with the Administrator (the "Administrator") of R. Siskey's probate estate (the "Siskey Estate"), has elected to recognize the Premier Fund Claims. The Trustee and the Administrator are working together to insure that all investors in R. Siskey's Ponzi schemes are treated equally, whether they invested in one of the Debtors or in another R. Siskey Ponzi non-Debtor entity[5]. The Administrator and the Trustee believe that combining the claims against the Premier Funds and the Debtors is appropriate as each Premier Fund Claimant's "investment" was effectively one continuous account that begin in the 1990s and continued over the life of SPP and/or SRP (as an Outside Investor). Further, the Premier Fund Claimants believed in good faith that they held claims against Debtors due to the representations of R. Siskey, including through account statements reflecting SPP and/or SRP and thus, they filed claims in the Debtors' cases and may not have filed claims in the Siskey Estate.

---

[5] In addition to the Premier Funds, these entities include SPL Trust and the OST Trust.

## BASE CLAIMS AND INTEREST

31. In virtually all cases involving Ponzi schemes, where earlier investors are paid from the investments of more recent investors rather than from any real business activity, claimants recoup only a fraction of the amount of their claims as the funds invested have been depleted. In fact, in the case at hand, the assets of the Debtors marshalled by the Trustee represent a very small fraction of the total of claims.

32. Unusually, in this case, Diane Siskey, the widow of R. Siskey, has expressed a desire to utilize certain life insurance proceeds to satisfy claims of creditors in the Siskey Estate and the Debtors' estates, subject to reaching a mutually acceptable agreement regarding the disposition of those insurance proceeds (the "Third Party Funds"). As of the filing of this Claims Report though Third Party Funds have been escrowed, they are not yet available to the Trustee for distribution and the Trustee has not yet legally been given access to the funds. The Trustee and the Administrator are continuing to work with Diane Siskey and her attorneys to come to a mutually acceptable agreement that would result in the Third Party Funds being made available for the benefit of investors in Ponzi schemes promulgated by R. Siskey, including investors in the Debtors.

33. In addition, the Trustee has identified claims against net-winners[6] and other potential causes of action that the Trustee could assert for the benefit of the bankruptcy estates.

34. Further, the bankruptcy estates have claims against the Siskey Estate, which has independently generated substantial sums of cash from the liquidation of R. Siskey's assets. The Trustee and the Administrator have worked together during the claims process in the parallel proceedings. The Trustee has filed claims in the Siskey Estate on behalf of each Debtor for the

---

[6] A net-winner in a Ponzi scheme is an investor that receives or withdraws more money than that investor invested.

10

collective claims of all investors in the Debtors for the purpose of sharing in the Siskey Estate distributions, which should provide another source of assets for the claimants herein.

35.   Given the likelihood that the Trustee will obtain funds to disburse to holders of allowed claims and consistent with his duty, set out in § 704(a)(5) of the Bankruptcy Code to, "if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper," the Trustee has completed the claims process, and proposes this Claims Report in an effort to set the amount of principal owed on investor claims ("Base Claims").

36.   In addition to setting Base Claims for investors of TSI, WSC, SPP and the Outside Investors based upon the Net-Investment Method, the following are types of claims that the Trustee finds objectionable:

(a)   claims that duplicate other claims;
(b)   claims that were filed in the wrong case;
(c)   claims that have been satisfied or paid in full;
(d)   claims that do not assert a claim against a Debtor or where the claimant invested in a non-Debtor entity[7].

The Trustee's objections to claims listed in this Objection may be based on any of the foregoing grounds, as well as on any other basis permitted by law or equity.

37.   At this juncture the Trustee is proposing a claim for each investor pursuant to the Net Investment Method as a "Base Claim" ignoring any promised interest or lost profits. The Trustee's proposed treatment of the Base Claims asserted in the TSI, WSC, SPP cases, and by the SRP Outside Investors, is shown on the attached Exhibits A, B, C and D respectively (to comply with Bankruptcy Rule 3007(a)(6) the Trustee will file this Claims Report in each of the Bankruptcy Cases along with the Exhibit applicable to the case where filed however when serving this Claims Report, all Exhibits will be attached to one copy of the Claims Report).

---

[7] In some cases, an investor's funds were used to purchase an interest in a publicly traded entity, such as ContraFect Corp., in the name of the investor. It is the Trustee's position that such an investor received value for his investment and does not have a claim against a Debtor for the funds used to purchase the interest in the publicly traded entity.

38. In the event funds become available to distribute over and above payment in full of allowed administrative expenses and Base Claims, the Trustee reserves the right to propose to the Court a further distribution to compensate investors for interest and lost profits based upon some equalized interest rate. But the Trustee believes that investor claims for interest or lost profits should be subordinated to investor claims for principal. *See In re Taubman*, 160 B.R. 964, 980–82 (Bankr. S.D. Ohio 1993) (recognizing that principles of equity would allow an interest factor to be applied to allowed claims in a Ponzi scheme-based chapter 7 proceeding but only to the extent funds were actually available to pay such interest after payment of principal). Therefore, this Claims Report relates only to the Base Claims of the investors identified herein and is not in any way intended to be a limitation on the Trustee's right to seek an interest-based enhancement to allowed claims of investors. Should additional funds become available, the Trustee reserves the right to seek Court approval of an interest payment to investors holding allowed claims, in an amount, at a rate, and pursuant to a methodology to be approved by the Court after notice and hearing, reserving the rights of all interested parties to be heard on any such proposal made by the Trustee.

### RECOMMENDATION OF CLAIMS SHARON ROAD PROPERTIES, LLC

39. The Trustee's assessment of the Debtor Records is that SRP was not operated as a Ponzi scheme but as a legitimate business enterprise with books and records kept separate from those of other entities controlled by R. Siskey.

40. The proofs of claimed filed as to SRP represent equity interests in SRP, not creditor claims. The claims received are reflected in the spreadsheet attached hereto as Exhibit E which reports the percentage ownership in SRP of each claimant.

41. Upon liquidation of the assets of SRP, the Trustee will propose distribution based upon the equity interests reflected on Exhibit E.

## FINAL ISSUES

42.   The Trustee objects to any and all claims filed after August 23, 2017 as untimely pursuant to 11 U.S.C. § 502(b)(9) and requests that the same be disallowed.

43.   The Trustee's proposed treatment of claims is not an indication or statement regarding the validity of any claim not listed herein. The Trustee reserves the right to object to any such claims on any ground permitted by law or equity. Further, the Trustee expressly reserves the right to amend, modify, or supplement this Claims Report (and to file additional objections to any claims). Should the Trustee's objection to any of the claims addressed in this Claims Report be denied or overruled, the Trustee reserves the right to object to such claims on other grounds that the Trustee may subsequently determine to be appropriate, regardless of the occurrence of any deadline for filing objections to claims or for initiating avoidance actions.

44.   The Trustee's proposed treatment of claims does not guarantee distribution.

45.   Through the claims reconciliation process, the Trustee has become aware that some proposed allowed claimants may have net-winnings in one of the Debtors in which the claimant did not file a claim. The Trustee reserves the right to offset payment on claims with net-winnings and/or to bring actions against any party who received net winnings.

46.   Prior to any distribution the Trustee will consult with each payee to ascertain whether to distribute funds directly to the investor or to the investor's self-directed retirement account custodian.

WHEREFORE, the Trustee prays that the Court will enter an Order approving the Trustee's proposed treatment of claims as set forth in this Claims Report, specifically as set forth on Exhibits A, B, C, D and E, disallowing any claims filed after August 23, 2017, subordinating claims for interest and lost profits and reserving the right to award interest on each allowed

investor claim in an amount, at a rate, and pursuant to a methodology to be approved by the Court, and granting such other relief as is just and proper.

This is the 1st day of November, 2017.

/s/ Joseph W. Grier, III
Joseph W. Grier, III (State Bar No. 7764)
Anna S. Gorman (State Bar No. 20987)
Grier Furr & Crisp, PA
101 North Tryon Street, Suite 1240
Charlotte, North Carolina 28246
Telephone: 704.375.3720; Fax: 704.332.0215
agorman@grierlaw.com

*Attorneys for Joseph W. Grier, III, Trustee*