**IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA Charlotte Division**

| In re: | Chapter 7 cases |
|---|---|
| TSI HOLDINGS, LLC, | Case No. 17-30132 (Lead) |
| WSC HOLDINGS, LLC, | Case No. 17-30338 |
| SOUTHPARK PARTNERS, LLC, and | Case No. 17-30339 |
| SHARON ROAD PROPERTIES, LLC, | Case No. 17-30363 |
| Debtors. | (Jointly Administered) |

**TRUSTEE'S MEMORANDUM OF LAW IN SUPPORT OF CLAIMS REPORT**

Joseph W. Grier, III, the duly appointed trustee ("Trustee") for the above-referenced debtors (the "Debtors") in these jointly-administered bankruptcy cases, through counsel, hereby files this *Memorandum of Law* in support of the *Trustee's First Omnibus Report of Claims, Objections to Claims, and Recommendations Regarding Claims as to TSI Holdings, LLC, WSC Holdings, LLC, SouthPark Partners, LLC, and Sharon Road Properties, LLC* (D.E. 112) filed on November 1, 2017 (the "Claims Report"),[1] and respectfully represents as follows:

## I. INTRODUCTION

Similarly defrauded victims should receive equal treatment when a Ponzi scheme is unwound through the bankruptcy process. In addition to equal treatment, victims should receive equitable treatment, which means avoiding the arbitrary and otherwise unfair ramifications that result from lending credence to the machinations of a fraudster. The Trustee maintains that the

[1] Duplicates of the Claims Report's substantive text were filed in each of the above-captioned, jointly-administered cases for clerical purposes. The only difference in the various versions of the Claims Report is the "Exhibit A" attached thereto, which proposes treatment of claims submitted specifically against the debtor-entity in the corresponding bankruptcy case. For purposes of this brief, the various versions will be referred to collectively as the "Claims Report."

methodology proposed in the Claims Report reflects the most equal and equitable treatment of victims' claims in this Case and urges the Court to adopt the same.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. INITIATION OF THE BANKRUPTCY CASE

On January 27, 2017, an involuntary bankruptcy petition pursuant to chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), was filed against TSI Holdings, LLC ("TSI"), initiating the above-captioned lead case.[2] On February 2, 2017, the Court held an emergency hearing on the petitioning creditors' emergency motion to appoint an interim trustee for TSI.[3] On February 8, 2017, the Court entered an Order appointing the Trustee.[4] An *Order For Relief* was subsequently entered on February 22, 2017.[5] Similar involuntary petitions and motions were filed against WSC Holdings, LLC ("WSC"), SouthPark Partners, LLC ("SPP") and Sharon Road Properties, LLC ("SRP"), and the Court appointed the Trustee and entered orders for relief in those cases (collectively, with the TSI case, this "Case").[6]

### B. THE PONZI SCHEME

Evidence presented to the Court in the motion to appoint an interim trustee for TSI, including an affidavit of FBI Special Agent Timothy Darin Stutheit, indicated that Rick Siskey ("Siskey"), prior to his death on December 28, 2016, operated TSI as part of a Ponzi scheme (the "Ponzi Scheme"). Based on the Debtors' records, and other evidence, the Trustee and his professionals are of the opinion that TSI, WSC, and SPP were each operated as part of the Ponzi

---

2 D.E. 1.

3 D.E. 5.

4 D.E. 17.

5 D.E. 32.

6 The Court authorized the joint administration of the four cases on May 23, 2017. D.E. 63.

Scheme. Further, six investors who Siskey qualified as "Outside Investors" in SRP (the "Outside Investors") were also part of the Ponzi Scheme.

Statements sent to investors either as directed by Siskey and/or by a self-directed retirement account custodian (which in turn relied on reports from Siskey) reflecting values for TSI, WSC, SPP, and SRP (regarding the Outside Investors) did not accurately reflect the actual value of any investment. Rather, the balances provided to investors were totally fictitious and not based upon any actual investment or holding. Interest rates reflected in the statements or otherwise promised to investors appear to have been picked arbitrarily and not tied to any actual investment.[7] Indeed, the investments held by TSI, WSC, and SPP were nominal in comparison the money invested into those entities.

Conversely, as detailed in the *Affidavit of Edward P. Bowers Regarding Sharon Road Properties, LLC* which is attached hereto as "Exhibit A", SRP owns a 32.55% interest in Bissell Porter Siskey, LLC ("BPS"), which in turn owns a commercial building located at 4521 Sharon Road, Charlotte, North Carolina (the "Office Building"). BPS and its agents—not Siskey or anyone supervised by Siskey—managed all of the operations and finances of the Office Building, including the routine submission of accurate reports to SRP and the transfer to SRP of SRP's share of Office Building profits, after deducting SRP's legitimate share of expenditures and capital improvements. The books and records of SRP reflect membership interests held by investors in SRP which total 100%. The financial records of SRP were maintained separately from those of the other Debtors. SRP's members ("Members") received rental income from the SRP bank account traceable directly to the Office Building rents. Schedule K-1 tax forms were prepared and distributed to the Members annually pursuant to their ownership interests.

[7] For example, investors in TSI were promised interest rates from 3.25% to 9.5%; investors in WSC were promised interest rates from 2% to 10%; investors in SPP were promised interest rates from 3.25% to 8.25%; and the Outside Investors in SRP were promised interest rates from 2% to 8.25%.

## THE CLAIMS REPORT

In general, the Claims Report recommends that the Court allow claims in this Case based on the "Net Investment Method," which calculates claims by crediting the amount of cash deposited by an investor into a Ponzi scheme less any cash paid to the investor, regardless of whether the payments were categorized as a return of principal, profits, interest, or anything else at the time they occurred (the "Net Investment Method"). Notwithstanding the general application of the Net Investment Method, the Trustee's proposal in the Claims Report varies from a basic "money in, money out" calculation for two discreet groups of claimants.

First, based on the Trustee's belief that SRP operated legitimately and independently from the Ponzi Scheme, the Claims Report treats the proofs of claim filed as to SRP (except those filed by Outside Investors) as assertions of equity interests in SRP. As those equity interests are treated on a percentage basis and are not based on a dollar amount, the Claims Report does not apply the Net Investment Method to record owners of SRP equity interests. In contrast, the Claims Report proposes to allow claims filed by SRP Outside Investors based on the Net Investment Method.

Second, certain investors who contributed cash into deposit accounts owned by two investment funds known variously[8] as Premier Funds One, LLC and Premier Funds II, LLC (collectively, the "Premier Fund") were given credit for "rollover" amounts, even though no cash was actually contributed to deposit accounts owned by the Debtors with respect to those "rollover" amounts. As set forth in more detail in the Claims Report, the Trustee believes that the Premier Fund was part of the Ponzi Scheme, although it pre-existed the current Debtors as the primary medium of Siskey's fraud. The Trustee's recommendation employs a Net

8 Additional names used by Siskey for the Premier Funds include "The Premier Fund," "Premier Fund, LLC," "Premier Fund I, LLC," "Premier One," "Premier Fund One, LLC" "Premier Two," "Premier Fund II, LLC."

Investment Method analysis as to the Premier Fund investments, and credits the Premier Fund claimants with their outstanding net investment at the time when the Premier Fund was rolled into the Debtors, even though no cash contributions in those amounts were made by the claimants directly to the Debtors.

The Claims Report triggered the following responses:

> (1) Tobitha Deese ("Deese"), Evelyn Laynette Robinson ("Robinson"), James Burt ("Burt"), and Jeffrey N. Cochrane (as co-executor of the Estate of Ralph N. Cochrane) submitted responses to the Claims Report[9] challenging (a) the use of the Net Investment Method in this Case, (b) the resolution of claim amounts in this Case prior to the Trustee pursuing causes of action against third parties, and (c) the Trustee's attempt to extend the deadline to challenge claims on grounds other than those stated in the Claims Report;
>
> (2) Bob and April Frazer submitted a response to the Claims Report[10] positing that investors should receive some sort of interest factor on their allowed claims;
>
> (3) Andrew Peterson ("Peterson") and John K. Kelly ("Kelly") submitted responses to the Claims Report[11] challenging the Trustee's recommendation as to the SRP claimants;
>
> (4) Adam Goulet, Stone Street Partners, LLC, Dawn E. King, and Paul G. Porter submitted responses to the Claims Report[12] seeking indirect damages and other similar sorts of losses as part of an allowed claim;
>
> (5) Michael Salamone ("Salamone") submitted a response to the Claims Report[13] challenging the use of the Net Investment Method in this Case as applied to claims evidenced by promissory notes;
>
> (6) James D. Javaras and Nancy N. Javaras submitted responses to the Claims Report[14] objecting to a reduction in their claim amount based on the book value of unrelated entity stock purchased in their name by Siskey; and

---

[9] D.E. 118, 123, 125 & 128. The Deese, Robinson, and Cochrane responses also challenge the Trustee's recommendation as to the Premier Fund claimants. *See* D.E. 118, 123 & 128. Burt, a Premier Fund claimant, did not oppose the Claims Report's treatment of Premier Fund claimants, but did additionally challenge the categorization and treatment of Burt as an Outside Investor in SRP based on SRP's records. *See* D.E. 125. Yet another variation in these responses is that the Cochrane response challenges both the Trustee's calculations of money invested and withdrawn and the lack of an interest component for allowed claims. *See* D.E. 128.

[10] D.E. 119.

[11] D.E. 121 & 132.

[12] D.E. 122 & 126.

[13] D.E. 127.

(7) John W. Taylor, as the chapter 7 bankruptcy trustee for Brian J. Spiers, submitted a response to the Claims Report[15] requesting a hearing.

By agreement of the parties, the matter of the Claims Report's treatment of the Stone Street Partners, LLC, Dawn E. King, and Paul G. Porter claims (the "Stone Street Claims") has been continued indefinitely off-docket. Legal issues pertaining to the remaining Claims Report responses are discussed herein.

## III. ANALYSIS

### A. THE NET INVESTMENT METHOD SHOULD BE USED TO DETERMINE CLAIMS IN THIS CASE

The Court should adopt the Net Investment Method in this Case because this approach is favored by (i) principles of equity, (ii) public policy, (iii) nearly every Court who has considered the issue, and (iv) the Code.

#### 1. The Net Investment is the Most Equitable Method for Treating Ponzi Scheme Claims

There are several reasons why courts consistently approve the Net Investment Method as the most equitable framework for determining claims in Ponzi scheme liquidations.

First and foremost, the Net Investment Method avoids the unfair result of favoring those investors who were lucky enough to withdraw funds (or more funds than others) from the scheme prior to its collapse to the detriment of other investors who did not withdraw funds (or as much funds as others). A longstanding equitable principle followed by the Fourth Circuit is that a victim of a fraud scheme liquidated through bankruptcy "should account for all sums paid to him as profit before he can share with others in the application of the funds on hand to the debts due for sums actually paid in."[16] Even though the withdrawal of funds pre-collapse may—from the applicable investor's perspective—seem like a legitimate return on investment that should

---

14 D.E. 129 & 130.

15 Case No. 17-30363, D.E. 60.

16 *Abrams v. Eby (In re Young)*, 294 F. 1, 4 (4th Cir. 1923).

not reduce the investor's claim, it is generally deemed inequitable "to reward the parties who were fortunate enough to experience 'legitimate' profits in the midst of a pervasive fraud."[17] Basic notions of equity indicate that, "[w]here individuals have been similarly defrauded, all should recover their principal before any one of them recovers profits or interest."[18] Simply put, the Net Investment Method eliminates the unfair effects of allowing earlier investors to keep funds stolen from later investors as payment of fictitious interest or profits *plus* a claim for the full amount of principal in the liquidation proceeding.

Another reason why the Net Investment Method is more equitable than relying on the account statements disseminated by Siskey is that those account statements apply interest rates that were randomly selected by Siskey and not based on any investment risk, expectation of return, or other legitimate measure. As was recognized in the Bernard L. Madoff Ponzi scheme liquidation, the Net Investment Method was more equitable than other claims resolution methods because it "relies solely on unmanipulated withdrawals and deposits and refuses to permit Madoff to arbitrarily decide who wins and who loses."[19] Therefore, the Net Investment Method avoids "the absurd effect of treating fictitious and arbitrarily assigned paper profits as real."[20]

The Net Investment Method has also been deemed equitable because, even though it ignores the time value of money with respect to contributions, it also ignores the time value of money with respect to distributions.[21] In other words, those investors who received distributions

---

17 *Community First Bank v. First United Funding, LLC*, 822 N.W.2d 306, 311 (Minn. Ct. App. 2012) (finding that a lower court did not abuse its discretion in adopting a net-investment distribution method to allocate funds to the victims of a Ponzi scheme).

18 *In re Pearlman*, 484 B.R. 241, 244 (Bankr. M.D. Fla. 2012); *see also S.E.C. v. Capital Consultants, LLC*, 2002 WL 32502450, at *2 (D. Or. Dec. 5, 2002) (". . . all should recover their principal before any recovers profits or interest").

19 *In re Bernard L. Madoff Investment Securities LLC*, 654 F.3d 229, 238 (2d Cir. 2011).

20 *Id.* at 235.

21 *Capital Consultants*, at *2.

can complain that their claims amounts are being reduced by those distributions, but at least they have received the benefit of those funds in the interim period; other investors will have to wait until distributions are made by the Trustee to get their money back.

Similarly, certain claimants complain that the Net Investment Method is inequitable because it lacks an interest component, especially considering that there may be enough assets available for the Trustee to pay every investor's principal back in full. The Claims Report explicitly proposes to cross that bridge if and when the Trustee comes to it. If the Trustee should face the welcome problem (and extraordinarily rare situation) of having enough estate assets to satisfy all administrative expenses and claims in full, then nothing in the Claims Report would prohibit the Trustee from proposing an interest factor at that time.

**2. Public Policy Generally Favors the Use of the Net Investment Method**

In a Ponzi scheme, investors' account statements are "entirely fictitious" and do not reflect "actual securities positions that could be liquidated."[22] Accordingly, allowing or disallowing claims based "upon the false premise that customers' securities positions are what the account statements purport them to be" would work to "legitimize"—rather than "unwind"—the fraud.[23] Such an approach contravenes public policy. As explained by the U.S. Bankruptcy Court for the Middle District of Florida:

> [R]ecognizing returns from an illegal financial scheme is contrary to public policy inasmuch as it legitimizes the proscribed investment scheme. The claims administration process instead should focus on the cash actually invested and the withdrawals actually made, rather than on the fraudulent account statement prepared in connection with a criminal enterprise and used to deceive the masses.[24]

---

22 *Madoff*, 654 F.3d at 234.

23 *Madoff*, 654 F.3d at 234.

24 *Pearlman*, 484 B.R. at 244 (internal citations omitted).

Absent a compelling reason under the particular facts of this Case, the Court should not deviate from the Net Investment Method in favor of a process that tends to offend public policy.

### 3. Almost All Courts have Adopted the Net Investment Method

With respect to the method of determining claims held by Ponzi scheme victims,[25] courts have routinely followed the Net Investment Method,[26] and the Trustee is not aware of any compelling reason why this Court should deviate from the Net Investment Method in this Case. Specifically concerning the sort of method desired by many respondents to the Claims Report,[27] the Trustee has located no precedent in any Ponzi scheme liquidation case where that method was adopted instead of the Net Investment Method. Rather, methods that rely on investor statements appear to be limited to liquidations of entities that were not part of a Ponzi scheme.[28]

---

[25] When reviewing the case law, claims resolution methods should be distinguished from claims distribution methods because "net investment" or "net equity" or "net loss" each refers to both a claims resolution method and a claims distribution method, which are similar but separate concepts. In the claims resolution context, the Net Investment Method simply refers to the calculation of money in minus money out equals allowed claim. In the claims distribution context, "net investment" means paying allowed claims pro rata based solely on money in minus money out, without regard to other factors (most commonly, an offset for pre-collapse distributions). *See* Michael L. Martinez, *The Ebb of Rising-Tide Distributions in Ponzi Scheme Bankruptcies*, 35 Am. Bankr. Inst. J. 16 (2016).

[26] *See, e.g.*, *Madoff*, 654 F.3d at 238–39 (adopting the Net Investment Method instead of the "Last Statement Method" in a bankruptcy proceeding under the Code); *Jobin v. McKay (In re M & L Bus. Machine Co.)*, 84 F.3d 1330, 1341–42 (10th Cir. 1996) (recognizing that Ponzi scheme victims have restitution claims against bankruptcy estates that are reduced by pre-bankruptcy payments); *Pearlman*, 484 B.R. at 242–44 (adopting the Net Investment Method instead of "an account statement methodology" in a bankruptcy proceeding under the Code); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871–72 (Bankr. N.D. Ill. 2000) (recognizing that Ponzi scheme victims have restitution claims against bankruptcy estates for outstanding net investment); *S.E.C. v. Credit Bancorp, Ltd.*, 2000 WL 1752979, at *40–41 (S.D.N.Y. Nov. 29, 2000) (adopting the Net Investment Method); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 857 (Bankr. D. Utah 1987) (holding that the Code's definition of "debt" covers the Ponzi scheme debtors' obligation to return a victim's principal undertaking but not amounts in excess thereof); *C.F.T.C. v. Yellowstone Partners, Inc.*, 2014 WL 619478, at *1–2 (E.D.N.C. Feb. 18, 2014) (reciting the case history, which involved approval of claims procedures that resolved claims based on "net claims").

[27] The sort of method desired by many respondents has been referred to in the case law as the "Last Statement Method" or "Capital Account Method" or some similar nomenclature.

[28] *See, e.g.*, *Beacon Associates Mgm't Corp. v. Beacon Associates LLC I*, 725 F.Supp.2d 451, 463–64 (S.D.N.Y. 2010) (finding that "[a]lthough it may well be true . . . that in Ponzi scheme cases 'equity and practicality favor the Net Investment method,' " when the entity liquidated was not part of a Ponzi scheme, resolving claims based on account statement valuations could be appropriate); *Greenspon v. Hurwitz*, 2014 WL 10542993, at *4 (Va. Cir. Ct. Oct. 24, 2014) (although recognizing that "[t]he Net Investment Method is sometimes used by bankruptcy trustees in bankruptcy cases when dealing with persons directly involved in a Ponzi scheme," the court adopted the "Capital Account Method" when the entity is (i) not in bankruptcy and (ii) not part of a Ponzi scheme).

Furthermore, with respect to the method of distributing funds to Ponzi scheme victims, courts have almost uniformly followed either a "net investment" distribution method or a "rising tide" distribution method,[29] both of which cap distributions at an investors' outstanding net principal and reduce distributions to victims based on withdrawals / distributions received prior to the liquidation proceeding.

Thus, courts have overwhelmingly rejected arguments that give credence to the fraudster's impossible promises and ignore pre-bankruptcy withdrawals. The Court should follow guidance in seeking to redress Siskey's fraud.

### 4. **The Net Investment Method is Consistent with the Code**

The use of the Net Investment Method to resolve claims in Ponzi scheme liquidations does not offend any provision of the Code. As detailed above, many bankruptcy courts have invoked the Net Investment Method to determine claims against entities that were (i) instruments of a Ponzi scheme and (ii) being liquidated through the bankruptcy process.[30] In fact, the Net Investment Method is "more harmonious" with the Code than the method sought in several Claims Report responses (*i.e.*, a method that would honor the figures appearing on account

[29] *See, e.g., C.F.T.C. v. Capitalstreet Financial, LLC*, 2010 WL 2572349, at *1 (W.D.N.C. Jun. 18, 2010) (adopting the net investment distribution method); *C.F.T.C. v. Barki, LLC*, 2009 WL 3839389, at *2 (W.D.N.C. Nov. 12, 2009) (adopting the net investment distribution method); *S.E.C. v. Byers*, 637 F.Supp.2d 166, 176–77, 181 (S.D.N.Y. 2009) (adopting the net investment distribution method); *C.F.T.C. v. Franklin*, 652 F.Supp. 163, 170 (W.D. Va. 1986), *rev'd on other grounds* (adopting the net investment distribution method); *In re Waterford Funding LLC*, Case No. 09-22584 (Bankr. D. Utah Mar. 30, 2012), findings and conclusions and confirmation order (D.E. 1934 and 1935) (confirming chapter 11 plan that provided for rising tide distributions to Ponzi scheme victims); *C.F.T.C. v. Mason*, Case No. 3:13-CV-196 (W.D.N.C. Oct. 14, 2014), Order Approving Distribution Method and Distribution Procedure (D.E. 107) (adopting the rising tide distribution method); *C.F.T.C. v. Lake Shore Asset Mgmt. Ltd.*, 2010 WL 960362, at *9–10 (N.D. Ill. Mar. 15, 2010) (adopting the rising tide distribution method); *In re Receiver*, 2011 WL 2601849, at *2–4 (D. S.C. Jul 1, 2011) (adopting the rising tide distribution method); *In re Bayside Ventures LLC*, Case No. 07-15612 (Bankr. S.D. Fla. Oct. 30, 2008), confirmation order (D.E. 342) (confirming chapter 11 plan that provided for rising tide distributions to Ponzi scheme victims).

[30] *See supra* n. 27.

statements) because the Code generally seeks to avoid both (i) transfers made with fraudulent intent and (ii) unfairly preferring certain claims ahead of other like claims.[31]

The arguments made by certain respondents that the Net Investment Method contravenes the lookback periods attached to § 547 of the Code misunderstand the nature of the victims' claims in this Case. Victims of a Ponzi scheme have restitution claims sounding in equity—not contract[32]—in liquidations conducted under the Code[33]; those restitution claims—under common equitable principles—should be offset by pre-bankruptcy returns actually received, regardless of timing.[34] Accordingly, application of the Net Investment Method has nothing to do with undoing preferential payments on an enforceable contractual obligation. Rather, the Net Investment Method is merely a mechanism to calculate restitution claims. As equity follows no strict deadlines, the timing of the pre-bankruptcy distributions should not matter.

### 5. Exclusion of Indirect Damages Claims

The Net Investment Method excludes special, consequential, incidental, expectation, or other types of indirect damages, injuries, or losses for the same reasons that the Net Investment Method is the favored claims resolution method in Ponzi scheme cases.[35] Any dollar paid on one victim's special damages claim is a dollar that could have otherwise been spent paying back part

---

31 *Pearlman*, 484 B.R. at 244.

32 A contract is unenforceable as a matter of public policy to the extent it purports to give one Ponzi scheme victim a right to payment in excess of principal to the detriment of other victims. *See Sender v. Buchanan (In re Hedged-Investments Associates, Inc.)*, 84 F.3d 1286, 1290 (10th Cir. 1996) (applying Colorado law in a bankruptcy context). *See also infra* § B.

33 *See Wagner v. Pruett (In re Vaughan Co., Realtors)*, 477 B.R. 206, 221–23 (Bankr. D. N.M. 2012) (recognizing that Ponzi scheme victims' claims against the bankruptcy estate are restitution claims); *Lake States*, 253 B.R. at 871–72 (same); *Independent Clearing House Co.*, 77 B.R. at 857 (same).

34 *See Donnell v. Kowell*, 533 F.3d 762, 771–72 (9th Cir. 2008) (explaining that, as investors in a Ponzi scheme "have claims for restitution or recision against the debtor that operated the scheme up to the amount of the initial investment," pre-liquidation distributions "proportionally reduce the investors' rights to restitution").

35 *See Hedged-Investments*, 84 F.3d at 1290 (holding that a Ponzi scheme investor "did not have the enforceable option of . . . recovering expectation and consequential damages [b]ecause she had no claim . . . for damages in excess of her original investment").

of what was stolen from another victim. In addition, allowing victims to assert claims for indirect losses would multiply the complexity of the claims review process—and the administrative expenses incurred by the estate fiduciary unwinding the Ponzi scheme—by an exponential factor and for not much benefit, as nearly all victims would have similar types of losses. Therefore, the Court should reject those arguments made by certain respondents that their allowed claim amounts should include indirect damages.

### 6. The Trustee's Discretion Warrants Some Deference

As explained by the Second Circuit in the *Madoff* case, so long as the Net Investment Method "is not clearly inferior to other methods under consideration" in a particular case, the bankruptcy court "should accord a degree of deference" to the trustee's exercise of discretion in selecting the Net Investment Method.[36] Upon review of the Debtors' records, all of the claims submitted by victims of the Ponzi Scheme, and other information made available to the Trustee, the Trustee proposed the Net Investment Method in the Claims Report as the claims resolution framework that would achieve the most equitable results in this Case; the Trustee deserves some deference in that exercise of discretion.

## B. PRE-PETITION FORMALITIES ARE IRRELEVANT

Several claimants have objected to the Net Investment Method as applied to their claims because their claims purportedly: (i) reflect debt obligations, not equity interests; and/or (ii) are evidenced by a valid contract, promissory note, or other document.[37]

---

36 *Madoff*, n.7.

37 For example, Salamone objected to the Claims Report, arguing that: (i) Salamone's claim "is supported by valid and enforceable Promissory Notes"; (ii) the Net Investment Method "effectively convert[s] the Promissory Notes to equity investments; (iii) Salamone's claim "is based on contract and not investments"; and (iv) even if the Net Investment Method applies generally, it is improper to deduct pre-petition withdrawals received by Salamone on promissory notes other than the ones outstanding on the petition date. D.E. 127, at 2. Similarly, Deese and Robinson each argues that she "loaned money" to WSC "in return for an interest rate of approximately seven percent (7%) per year." D.E. 118, at 1; D.E. 123, at 1.

Most fundamentally, courts have observed that " '[t]he case law about Ponzi schemes does not support a distinction between investments and loans,' describing it as a 'distinction without a difference.' "[38] Especially where the funds acquired by calling the transaction a "debt" transaction were ultimately commingled with the funds acquired by calling the transaction an "equity" transaction (as is the case with this Ponzi Scheme), it is equitable to treat all victims of a Ponzi scheme *pari passu*, even if some of those victims have claims supported by what appeared to be valid promissory notes.[39]

Again, a promissory note, contract, or other document executed in connection with a Ponzi scheme that purports to guarantee one victim profits in excess of the victim's principal to the detriment of other victims is void as a matter of public policy.[40] In assessing certificates of deposit sold in connection with a Ponzi Scheme, the Fifth Circuit Court of Appeals explained:

> [The certificates of deposit issued by the fraudster] are void and unenforceable. This is because to allow an investor to enforce his contract to recover promised returns in excess of his undertaking would be to further the debtors' fraudulent scheme as the expense of other investors. . . . To be sure, courts often permit innocent plaintiffs to enforce contracts that are against public policy, but here, such enforcement would further none of the policies generally favoring enforcement by an innocent party to an illegal bargain. Any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme.[41]

---

38 *Zayed v. Buysse*, 2012 WL 12893882, at *18 (D. Minn. Sep. 27, 2012) (*citing Finn v. Peoples Bank of Wis.*, Case No. 11-CV-322-WMC, 2012 U.S. Dist. LEXIS 130863, at *41 (W.D. Wis. Aug. 22, 2012)).

39 *See S.E.C. v. Torchia*, 2017 WL 4456905, at *2, 5 (N.D. Ga. Aug. 7, 2017).

40 *See Buchanan*, 84 F.3d at 1290 (applying Colorado law); *Warfield v. Carnie*, 2007 WL 1112591, at *12 (N.D. Tex. Apr. 13, 2007) (holding—in a case where victims of a Ponzi scheme argued that "by loaning money . . . under a contractual agreement" they were entitled to retain their pre-liquidation profits or interest—that "an illegal contract is void, it creates no legal entitlement to profits or interest . . . [t]herefore, investors in illegal Ponzi schemes have only provided reasonably equivalent value up to the portion of their actual investment in the scheme"); *see also Wiand v. Wells Fargo Bank, N.A.*, 2014 WL 12620820, at *1 (M.D. Fla. Aug. 20, 2014) (applying Florida law to hold that "purported investment agreements are not enforceable" if they were created to further a Ponzi scheme). To the extent North Carolina law and public policy govern the determination of whether the documents executed by Siskey are void or not, there is no North Carolina case law that disturbs the foregoing analysis.

41 *Janvey v. Brown*, 767 F.3d 430, 441 (5th Cir. 2014) (internal quotations, alterations, and citations omitted) (applying Texas law).

This analysis was confirmed in another Ponzi scheme liquidation overseen in the Eastern District of North Carolina, in which it was found that:

> The Defendants' scheme involved fraudulently soliciting some customers in a manner that lead them to be identified as creditor claimants while others were fraudulently solicited in a manner that lead them to be identified as equity investor claimants. . . . [A]ll of the customers were victims of the Defendants' fraudulent scam, **the differentiation between equity investor and creditor claimant was based on fraudulent paperwork**, there was effectively no differentiation between customers who provided money to the Defendants, and **it is unjust to treat the defrauded customers differently**. . . . In reality, the Claimants were neither creditor claimants nor equity investor claimants; rather, they were all simply customers of one large fraud.[42]

For example, in the *Vaughan Co.* chapter 11 Ponzi scheme case, many of the victims received promissory notes from the debtor.[43] That fact did not prevent the bankruptcy court from treating those noteholders as having restitution claims:

> [A] party is entitled to restitution to recover benefits conferred when a contractual obligation to the party is unenforceable as against public policy provided restitution would not defeat or frustrate the policy rendering the contract unenforceable, and the party asserting a claim for restitution has not acted inequitably. Retention of withdrawals or distributions up to the amount of the investment would not defeat or frustrate the public policy rendering a promissory note issued in furtherance of a Ponzi scheme void as against public policy.[44]

Similarly defrauded victims should receive equal treatment in this Case even though Siskey: (i) promised certain victims higher interest rates than other victims; (ii) called some relationships investments and others loans; (iii) signed contractual commitments in favor of some victims but not others; and (iv) promised any given victim whatever assurances or formalities Siskey needed in order to prolong the Ponzi Scheme. All victims should receive an equal opportunity to recoup their losses in this Case, regardless of whom Siskey favored previously.

### C. Applying Differing Claims Resolution Methods Offends the Code

42 *Yellowstone Partners*, 2014 WL 619478, at *4–5 (emphasis added).

43 *Vaughan Co.*, 477 B.R. at 220–21.

44 *Vaughan Co.*, 477 B.R. at 223 (internal citations omitted).

As set forth more fully in the *Trustee's Reply to Tobitha Deese's Response to Trustee's Motion to Reconsider Bench Order* (D.E. 147) filed on January 3, 2018, which is expressly incorporated herein by reference, applying differing claims resolution methods to similarly-situated investors in this Case contravenes the prime policy upon which the Code was built. In the event that the Court rejects the Net Investment Method, whatever method the Court deems more appropriate should be applied unvaryingly to all victims of the Ponzi Scheme.

### D. Treatment of the Premier Fund Claimants

The Trustee's proposal to give credit to certain Premier Fund investors for rollover amounts conforms to the Net Investment Method and principles of equity. Faced with a similar situation, the U.S. District Court for the Southern District of New York, in applying a net investment distribution method, determined that equity was served by crediting investors with an amount of net principal rolled over from a prior investment vehicle that was essentially part of the same fraud scheme.[45] As acknowledged by the Ninth Circuit Court of Appeals in a chapter 11 Ponzi scheme case:

> Bankruptcy courts are courts of equity. As such, they possess the power to delve behind the form of transactions and relationships to determine the substance.[46]

Based on these guiding concepts, the Trustee maintains that the Claims Report's treatment of the Premier Fund claimants complies with the Code, best serves the principles of equity, and should otherwise be approved by the Court.

### E. Treatment of SRP

The Claims Report, on the one hand, recognizes SRP as a legitimate enterprise and proposes to allow claims based on each claimant's equity interest percentage in SRP. On the

---

[45] *See Byers*, 637 F.Supp.2d at 182–83.

[46] *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991).

other hand, the Claims Report treats the SRP Outside Investors as part of the TSI/WSC/SPP Ponzi Scheme. SRP investors Peterson and Kelly responded to the Claims Report, arguing in favor of applying the Net Investment Method to SRP instead of using equity interest percentage.[47] SRP Outside Investor Burt filed a response that argues that the SRP Outside Investors should be treated as owners of SRP and that the Court should not respect Siskey's arbitrary assignment of some victims as Outside Investors and other victims as true owners.[48]

As to the Peterson / Kelly response, because SRP was not operated as part of the Ponzi Scheme or otherwise fraudulently, there is no principled reason to apply the Net Investment Method in apportioning ownership stakes in SRP.[49] The *Affidavit of Edward P. Bowers Regarding Sharon Road Properties, LLC,* which is attached hereto as "Exhibit A", sets forth the basis for the Trustee's position that SRP was operated independently of the Ponzi Scheme. Peterson and Kelly thought that they were purchasing a certain percentage of Siskey's equity interest in SRP from Siskey[50] in 2016 and, in fact, each of them received that certain percentage interest.[51] To the extent that Siskey fraudulently exaggerated the value of the interests being sold to Peterson or Kelly by Siskey personally,[52] the resulting claim is one against Siskey (as the

---

47 *See* D.E. 121, at 1; D.E. 132, at 1.

48 *See* D.E. 125, at 1–2.

49 Applying the Net Investment Method to apportion interests in SRP works to Peterson's and Kelly's benefit because they paid more per share in 2016 (approximately $73,500 per 1%) than other SRP investors did in, say, 2002 (approximately $36,000 per 1%) or 2010 (approximately $45,000 per 1%).

50 Peterson and Kelly challenge whether SRP corporate formalities were followed in their receipt of SRP interests, presumably as some indication that SRP was not operated legitimately. However, the formalities that they complain were not followed do not apply to these facts because they govern the issuance of new shares in SRP, not the purchase and sale of existing shares. Moreover, minor failures to follow corporate formalities, standing alone, are a weak foundation upon which to contend that a company was operated fraudulently.

51 The value of the Office Building, a rent-producing property, is based on historical rents, which information would have been available to Peterson and Kelly at the time of purchase.

52 The Peterson response refers to an "Overpayment to investors whom joined Sharon Road Properties in 2016." Admittedly, although SRP generally paid investors their correct percentage of net rental income transferred by BPS, Peterson did, in fact, receive more than his fair share of rent proceeds in 2016. The payment discrepancy does not warrant application of the Net Investment Method to correct whatever fraud there might have been.

seller in the transaction) and does nothing to impugn the legitimacy of the corresponding entity (SRP). In any event, the Net Investment Method is not an appropriate framework for resolving claims against a legitimate commercial enterprise.

As to the Burt response, Burt makes a valid point that Siskey's arbitrary characterizations of investments should not dictate the treatment of Ponzi Scheme victims. The Trustee agrees, but only to the extent of the Ponzi Scheme. SRP was not part of the Ponzi Scheme, and, notably, Burt is not arguing that SRP should be consolidated with TSI, WSC, and SPP in this Case. To the contrary, Burt advocates that SRP be separately treated; Burt just also wishes to be a part of that special treatment. Because SRP was isolated from the Ponzi Scheme, the formalities *do* matter in terms of figuring out which investments were part of the Ponzi Scheme and which were part of SRP. All of the "inside" SRP investors received periodic payments directly from SRP's bank account; Burt and the other Outside Investors did not. All of the "inside" SRP investors received annual Schedule K-1s each year for tax reporting; Burt and the other Outside Investors did not. No money flowed to Burt from SRP and vice versa. Especially in terms of the movement of funds, SRP was isolated from the Outside Investors and the Ponzi Scheme. Therefore, the concepts described in this memorandum for unwinding Ponzi schemes—including ignoring the formalities arbitrarily followed by the fraudster—do not apply to SRP.

## IV. CONCLUSION

Admittedly, the Net Investment Method will not ameliorate all of the painful ramifications of this Ponzi Scheme. In this Case, as was the case in *Madoff*, "[i]t is unquestioned that the great majority of investors relied on their customer statements for purposes of financial planning and tax reporting, to their terrible detriment."[53] However, that equitable consideration,

[53] *Madoff*, 654 F.3d at 232.

standing alone, does not outweigh the various positive attributes of the Net Investment Method outlined above. "An equitable plan is not necessarily a plan that everyone will like."[54] Rather, a proposed claims resolution plan need only be "fair and reasonable" to be approved by a court of equity.[55] As explained above, the Trustee believes the Net Investment Method reflects *the most* fair and reasonable manner to assess claims in this Case. At the very least, the Net Investment Method satisfies the minimum threshold of basic fairness and reasonableness, and the Court should afford some deference to the Trustee's discretion. For these and other reasons, the Court should approve the Net Investment Method and apply that framework to all claims filed in this Case other than the claims of SRP investors; *provided, however*, that any determinations relating to the Stone Street Claims shall be preserved for a future date.

This is the 16th day of January, 2018.

*/s/ Michael L. Martinez*

Joseph W. Grier, III (N.C. Bar No 7764)
Anna S. Gorman (N.C. Bar No 20987)
Michael L. Martinez (N.C. Bar No. 39885)
Grier Furr & Crisp, PA
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone: 704/375.3720; Fax: 704/332.0215
Email: mmartinez@grierlaw.com

*Attorneys for Joseph W. Grier, III, Trustee*

54 *Byers*, 637 F.Supp.2d at 168 (quoting *Credit Bancorp*, 2000 WL 1752979, at *29).

55 *See Byers*, 637 F.Supp.2d at 168.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| In re: | Chapter 7 cases |
| TSI HOLDINGS, LLC, | Case No. 17-30132 (Lead) |
| WSC HOLDINGS, LLC, | Case No. 17-30338 |
| SOUTHPARK PARTNERS, LLC, and | Case No. 17-30339 |
| SHARON ROAD PROPERTIES, LLC, | Case No. 17-30363 |
| Debtors. | (Jointly Administered) |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the ***Trustee's Memorandum of Law in Support of Claims Report*** was served on all parties requesting notice through the Court's electronic noticing system including the Bankruptcy Administrator, by electronic mail to each party in interest where the Trustee has a valid email address, including but not limited to the parties listed below, and by posting on the website being maintained by the Trustee regarding these Cases at https://tsiholdings.wordpress.com.

R. Keith Johnson via email: kjgrumpy@bellsouth.net
Attorney for Tobitha Deese

Adam Goulet via email: adam.goulet@gmail.com

Andrew Peterson via email: andyp3212003@yahoo.com

Robert and April Frazer via email: Robertbfrazer@yahoo.com; Aprilmfrazer@yahoo.com

John W. Taylor via email: johntaylor@johntaylorlaw.com
Attorney for Trustee
Of Brian Spiers

James W. Surane via email: jim@suranelawpllc.com
Attorney for Evelyn Laynette Robinson

James H. Henderson via email: Henderson@title11.com
Attorney for James Burt

James C. Smith via email: jsmith@nexsenpruet.com
Attorney for Stone Street Partners, LLC, Paul G. Porter and Dawn E. King

| | |
|---|---|
| Jeffrey C. Grady<br>Katten Muchin Rosenman LLP<br>Attorney for Michael Salamone | via email: jeff.grady@kattenlaw.com |
| Ralph Cochrane | via email: Jeff.Cochrane@asahq.com; gacochrane@comcast.net |
| James D. Javaras | via email: jamesjavaras@icloud.com |
| Nancy N. Javaras | via email: jamesjavaras@icloud.com |
| John K. Kelly | via email: kris.gobfs.com |

This is the 16th day of January, 2018.

Anna S. Gorman
Grier Furr & Crisp, PA
101 North Tryon Street, Suite
Charlotte, NC 28246