IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| **TSI HOLDINGS, LLC**, *et al*. ) | Case No. 17-30132 |
| ) | (Jointly Administered) |
| Debtors.[1] ) | |

**BRIEF IN OPPOSITION TO THE TRUSTEE'S MOTIONS TO CONVERT AND APPROVE INTERIM DISTRIBUTIONS**

NOW COMES Stone Street Partners LLC ("SSP"), and hereby responds to the *Trustee's Motion for Order (I) Terminating Joint Administration of Sharon Road Properties, LLC Case, (II) Converting Remaining Cases to Chapter 11, and (III) Providing Miscellaneous Related Relief* (the "Conversion Motion"), [Doc. 253], and the *Trustee's Motion for Approval of Interim Distribution to Creditors of the Ponzi Entities* (the "Interim Distribution Motion," and together with the Conversion Motion, the "Motions"), [Doc. 252], filed by Joseph W. Grier, III the Chapter 7 trustee (the "Trustee"). In support hereof, SSP respectfully shows the Court as follows:

### *I. INTRODUCTION*

1. SSP wants to see a reasonable and comprehensive resolution of these bankruptcy cases, which provides for substantial distributions to all of the victims of Rick Siskey's fraudulent and criminal schemes. SSP cannot support the current proposal put forth by Diane Siskey and the Trustee, however, which attempts to abuse the bankruptcy process by converting three of these bankruptcy cases to Chapter 11 for the express purpose of giving Diane Siskey an improper third-party litigation injunction, while allowing her to maximize her assets. This is

---

[1] The following debtors' cases are being jointly administered by the Court: *In re: TSI Holdings, LLC*, Case No. 17-30132; *In re: WSC Holdings, LLC*, Case No. 17-30338; *In re: SouthPark Partners, LLC*, Case No. 17-30339; *In re: Sharon Road Properties, LLC*, Case No. 17-30363.

simply not an appropriate use of Chapter 11 because there is no business to reorganize and no going concern value to preserve. Consequently, the Court should deny both Motions.

2.  With respect to the Conversion Motion, the Court should deny the relief requested by the Trustee because: (a) the Supreme Court's decision in *Marrama v. Citizens Bank* dictates that a case should not be converted from Chapter 7 to another chapter where it would have to be reconverted or dismissed as a bad faith filing, (b) the Fourth Circuit's decision in *Carolin Corp. v. Miller* dictates that this case would have to be converted or dismissed from Chapter 11 because there are no businesses to reorganize or going concern value to preserve, (c) these cases would have to be converted or dismissed if they were in Chapter 11 pursuant to 1112(b)(4) because there is a substantial and continuing diminution of the estate coupled with no likelihood of rehabilitation, and (d) the relief requested is at odds with the fundamental policy underlying Chapter 11, which is "to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business."

3.  With respect to the Interim Distribution Motion, the Court should similarly deny the requested relief because: (a) it is conditioned on the Court granting the Conversion Motion, (b) it specifically violates the Supreme Court's *Czyzewski v. Jevic Holding Corp.* decision by requesting to make distributions that do not follow the priority rules established by Congress, (c) it violates the Fourth Circuit's decision in *Official Committee of Equity Sec. Holders v. Mabey,* which prohibits pre-confirmation distributions to unsecured creditors, and (d) the Trustee is trying to administer life insurance proceeds where he has not made any showing that he is entitled to any of the life insurance proceeds that he seeks to distribute.

4.  For all of these reasons, and those additional reasons discussed below, the Court should deny the Motions.

## II. BACKGROUND

5. On January 27, 2017, an involuntary Chapter 7 bankruptcy petition was filed against debtor TSI Holdings, LLC ("TSI"), pursuant to 11 U.S.C. § 303.

6. Similar involuntary petitions were subsequently filed against debtors WSC Holdings, LLC ("WSC"), SouthPark Partners, LLC ("SPP") and Sharon Road Properties, LLC ("SRP," and collectively with TSI, WSC, and SPP, the "Debtors").

7. TSI, WSC and SPP are sometimes referred to herein as the "Ponzi Debtors" to coincide with the Trustee's definition of same in the Motions.

8. As the Trustee has stated in prior sworn filings with the Court, the Debtors were all controlled and operated by Rick Siskey prior to his death in December 2016. *See*, *Affidavit of Joseph W. Grier III* dated April 4, 2018 (the "Grier Affidavit"). [Doc. 219-1, ¶ 4].

9. Rick Siskey's decedent's estate is being administered in Mecklenburg County, North Carolina at case number 17-E-243 (the "Siskey Estate"). F. Lane Williamson is the administrator of the Siskey Estate.

10. The Trustee has represented to the Court "that TSI, WSC and SPP were each operated as part of a Ponzi scheme orchestrated by [Rick] Siskey." *Grier Affidavit*, ¶ 5. The Trustee has also represented to the Court that Rick Siskey has run Ponzi schemes through prior entities known as, among others, the "Premier Funds." *Id.* at ¶ 9.

11. SSP is informed and believes that Diane Siskey was actively involved in the operation of the Premier Funds and the Ponzi scheme as a whole.

12. Debtors TSI, WSC and SPP are sham entities that never operated a legitimate business, and they have not operated at all in at least 18 months since Rick Siskey's death.

13. Each entity has been dissolved by the North Carolina Secretary of State's office. None of them have any type of business to reorganize or going concern value to preserve.

14. In fact, the Trustee refers to these three debtors as "empty corporate shells that have been abandoned by Rick Siskey." *Conversion Motion*, p. 12, ¶ 41.

15. He similarly refers to these debtors as "totally defunct entities with no active or available officers, directors, employees, or other agents of representatives…" *Id.* at p. 21, ¶ 72.

### III. CONVERSION MOTION

16. On June 1, 2017, the Trustee filed the Conversion Motion. In pertinent part, the Conversion Motion seeks to convert the Chapter 7 bankruptcy cases of the "empty corporate shells" of TSI, WSC and SPP to Chapter 11 to pursue confirmation of a bankruptcy plan.

17. The proposed plan is summarized in a Settlement Term Sheet dated June 1, 2018, which is attached as Exhibit 1 to the Conversion Motion (the "Plan Term Sheet"). A copy of the proposed plan is attached as Exhibit A to the Plan Term Sheet (the "Plan").

18. The Plan Term Sheet and Conversion Motion summarize a byzantine and vague series of transactions whereby two (2) trusts (the "Estate Liquidating Trust" and the "Residual Payment Trust") will be created to liquidate the Ponzi Debtors' estates and to make distributions to classes of creditors.

19. But, in substance, the proposed plan is just a sham orchestrated by Diane Siskey (referred to as the "Primary Plan Sponsor") to: (a) minimize her own liability by securing a sweeping third-party injunction prohibiting victims of the Ponzi scheme from suing her, and (b) maximize substantial assets that she and her family will retain totaling well in excess of $10 Million.

20. In pertinent part, the Plan contemplates that Diane Siskey will "pay" $20,000,000 to fund the Estate Liquidating Trust with the trust to be fully funded on the Plan's effective date.[2] *Conversion Motion*, p. 14, ¶ 45.

21. On the Plan's effective date, however, Diane Siskey will receive broad releases from the Trustee and creditors, and a sweeping injunction from the Court discharging her from any liability. *Plan Term Sheet*, ¶ 4, pp. 5-8.

22. Specifically, the Plan contemplates that the Court will enter an injunction against all creditors of the Ponzi Debtors prohibiting them from suing Diane Siskey, her family and others from any claim:

> …that arises from or in any way relates to the pre- or post-petition activities of the Plan Debtors or Richard Siskey, including without limitation, any claim or assertion that Richard Siskey operated a "Ponzi scheme" or other improper or illegal investment fraud, and any claim or assertion that [Diane Siskey and her family] knew, should have known about, was negligent in not knowing about, or otherwise aided and abetted any Ponzi scheme or other illegal investment fraud operated by Rick Siskey…

*Plan Term Sheet*, ¶ 4, pp. 7-9.

23. The proposed plan also seeks to pay the claims of the "Non-Debtor Investors" from the Residual Payment Trust where they will "receive exactly the same financial treatment as investor victims." *Conversion Motion*, p. 14, ¶ 45.

24. The Conversion Motion acknowledges that these claims were previously disallowed by the Court, yet seeks to administer and pay them anyway to avoid what the Trustee calls an "arbitrary and inequitable result." *Id.*

---

[2] The term sheet contemplates that Diane Siskey will pay $15,000,000 if the Conversion Motion is granted, and the final $5,000,000 is paid in when the plan is confirmed. *Plan Term Sheet*, ¶ 4 p. 5. The Court should take note that Diane Siskey is coercing creditors to induce them to approve an improper injunction of all claims against her and her family by trickling funds into the bankruptcy estate. SSP is accustomed to this type of coercion and manipulation by Diane Siskey, and the proposed Plan is filled with similar provisions.

25. The Residual Payment Trust is funded by: (a) certain funds purportedly committed by Diane Siskey, <u>less</u> a multi-million[3] dollar "holdback" that Diane Siskey will use to pay her personal expenses and liabilities, and (b) 50% of the "Probate Estate Available Cash" from the Siskey Estate. *Plan Term Sheet*, ¶ 4, pp. 9-11.[4]

26. In order to participate in distributions from the Residual Payment Trust, however, a claimant must be an "Eligible Creditor." *Id*. at p. 9. "Eligible Creditor" is defined as a creditor that has "voted in favor of the [p]lan" and dismisses any pending "Adverse Action" against Diane Siskey, among others. *Id*. at pp. 10-11. In other words, creditors only receive a *pro rata* distribution if they vote in favor of the plan.

27. But, even if a creditor doesn't vote in favor of the plan, all creditors are still enjoined from pursuing Diane Siskey, her family, and the Siskey Estate as discussed above. *Plan Term Sheet*, ¶ 4, pp. 7-9.

28. Pursuant to Article XI, the Plan contemplates that it requires "at least 90%" approval by the "Investor Class, the Tort Claimant Class, and…Eligible Non-Debtor Investors" to support confirmation of the plan. *Plan*, p. 37, Art. XI, B. (iv). However, <u>Diane Siskey</u> "alone

---

[3] The definition of "Holdback Amount" on page 6 of the Plan states that the "holdback" will be at least $2,000,000 <u>plus</u> an additional sum based on a formula for determining how much Diane Siskey gets to keep based on creditors that do not support the plan.

[4] In essence, the plan substantively consolidates the Ponzi Debtors with some of the assets and liabilities of the Siskey Estate and Diane Siskey. SSP believes that the <u>full</u> substantive consolidation of the assets and liabilities of Diane Siskey, the Siskey Estate and the Debtors is the only legitimate way to administer the assets and liabilities of this Ponzi scheme. This is consistent with the alter ego theory of liability espoused by SSP, the Trustee's admissions at p. 4 ¶ 9 of the Conversion Motion that the affairs of these individuals and entities were excessively commingled, and reality. Substantive consolidation of the assets and liabilities of corporate debtors and the related individuals is also the norm in Ponzi scheme bankruptcy cases. *See, e.g., White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.),* 195 B.R. 680, 690-91 (Bankr. S.D. Ohio 1996) (ordering substantive consolidation where "the financial wherewithal and financial affairs of the entities" and a person who was the sole shareholder of three of the entities "are so entangled that they constitute a single enterprise"); *In re Baker & Getty Fin. Serv. Inc.,* 78 B.R. 139, 142 (Bankr. N.D. Ohio 1987) (substantive consolidation ordered when corporate funds were commingled and used for the principal's personal purposes, and corporate entities were alter egos of principal who engaged in Ponzi scheme to defraud investors).

may modify such condition to lower (but not raise)" this purported voting threshold thereby usurping the Court's control over confirmation of the Plan.[5] *Id.*

### IV. INTERIM DISTRIBUTION MOTION

29. On June 1, 2018, the Trustee also filed the Interim Distribution Motion. In the Interim Distribution Motion, the Trustee proposes to distribute $14,500,000 to certain identified investors with claims in the TSI, WSC and SPP cases.

30. The Interim Distribution Motion also contemplates a $500,000 holdback for administrative expenses.

31. The relief sought in the Interim Distribution Motion is entirely conditioned on the Court granting the Conversion Motion. *Plan Term Sheet*, ¶ 6, pp. 12-13 (illustrating that payments are made after the Court grants the Interim Distribution Motion and verbally approves the Conversion Motion).

32. The motion also provides that "the Interim Distribution is premised upon and has been structured in a way to make it an integrated piece of the proposed plan…the Trustee intends to effectuate once these cases are converted." *Interim Distribution Motion*, p. 4, ¶ 13.

33. Furthermore, the Conversion Motion makes it clear that this proposed interim distribution is a pre-confirmation distribution under the Plan by stating that the Interim Distribution Motion seeks "to make a distribution…to creditors that are classified under the Plan as if such amounts were distributed under the Plan." *Plan Term Sheet*, ¶ 6, p. 12.

---

[5] SSP believes that this provision is intended for Diane Siskey to seek approval of the Plan from the "Investor Class" where she will then change her mind about requiring 90% approval from the Tort Claims Class in order to secure a third-party injunction against SSP and other parties that have filed actions against her. The Court should not give Diane Siskey any control over these bankruptcy cases, nor should it allow her to make up the rules of the game and then try to change them right before the finish line.

34. The Interim Distribution Motion then states that (if approved) the Trustee plans to make the distribution "prior to the entry of a written order on conversion from the Court." *Id*. p. 2, ¶ 3.[6]

## V. ARGUMENT AND OBJECTIONS

35. As discussed below, the Court should deny the Motions for numerous reasons. SSP addresses these reasons below in turn.

### A. *The Court should deny the Conversion Motion.*

36. On pages 12 & 13 of the Conversion Motion, the Trustee proclaims that he "hereby elects to convert" the TSI, WSC and SPP cases by suggesting he has a "unilateral" right to do so under 11 U.S.C. §706(a). This unsupported proposition is frivolous because Section 706(a) is unambiguous and only applies to the "debtor," not the Chapter 7 trustee.

37. In fact, if the Court converts the cases under Section 706(a) as suggested, then the Trustee is terminated by operation of law under Section 348 of the Bankruptcy Code. *See*, 11 U.S.C. § 348(e)(stating "[c]onversion of a case under section 706…terminates the service of any trustee that is serving in the case before such conversion.").

38. Moreover, the Trustee's request to convert this case is completely undermined by the United States Supreme Court's decision in *Marrama v. Citizens Bank*, which held that even a Chapter 7 debtor does not have an absolute right to convert to another chapter of the Bankruptcy Code under Section 706(a) where the case would have to be immediately reconverted or dismissed from that chapter as a bad-faith filing. *Marrama v. Citizens Bank*, 549 U.S. 365, 373-374 (2007).

---

[6] This appears to be some type of attempt to consummate the Trustee's "settlement" prior to the entry of the order on conversion to render any appeal of the extreme relief requested by the Trustee as equitably moot.

MWH: 10406.001; 00019021.4            8

39. Indeed, the Supreme Court found that a debtor would not eligible to be a debtor in the converted case under Section 706(d) in that circumstance. *Id*. at 374. Rather, the Supreme Court said the bankruptcy court should deny such a request as an "abuse of process." *Id*. at 375.

40. Here, much like in *Marrama*, the Court should deny the Conversion Motion to prevent an abuse of process. Indeed, as discussed below, if this case were in Chapter 11 now it would have to dismissed or converted as a bad faith filing. This result is supported by the *Marrama* case, the Fourth Circuit's *Carolin Corp*. decision, the plain language of Section 1112 of the Bankruptcy Code, and the factors cases discuss in deciding Section 706 motions.

   1. ***These cases cannot proceed in Chapter 11 because they would be considered "bad faith" filings if they were currently in Chapter 11.***

41. The Fourth Circuit has held that a Chapter 11 petition should be dismissed or converted where the petition was filed in bad faith. *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989). A Chapter 11 case is filed in bad faith where it objectively and subjectively futile. *Id*. at 701.

42. The objective futility prong is designed to demonstrate that the Chapter 11 case embodies "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *Id*. Therefore, a Chapter 11 case is objectively futile where "there is no going concern to preserve . . . and . . . no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'" *Id*. at 701-02.

43. The subjective inquiry focuses on whether the debtor intends "to use the provisions of Chapter 11 . . . to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." *Id*. at 702. Indeed, it is an "abuse of the reorganization process…[if there is no] intent or ability to reorganize his affairs." *Id*. "It is of

course obvious that 'if there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre*. . . .'" *Id.* at 698.

44. In the present case, the Ponzi Debtors' cases would have to be converted or dismissed as bad faith filings if they were currently in Chapter 11 because they are subjectively and objectively futile. Without belaboring the point, there is simply no attempt to reorganize troubled debtors, save a struggling business, or preserve going concern value. Indeed, the Ponzi Debtors are sham entities that operated a fraudulent scheme, they have no operations, no employees and nothing to reorganize.

45. Furthermore, the proposed plan is patently unconfirmable on its face under 11 U.S.C. § 1129(a)(3) "because it is not intended for the benefit of the Debtor…The Debtor's Plan is for the sole and exclusive benefit of its insiders." *In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 461 (Bankr. N.D. Fla. 2011). *See also* 11 U.S.C. § 1129(a)(3)(requiring that a plan be proposed in good faith).

46. Indeed, the Trustee is requesting the conversion of these cases for the express purpose of allowing Diane Siskey (a non-debtor, and likely co-conspirator) to secure a release of her liabilities and a sweeping injunction from this Court, while maximizing her own assets. This is not a proper bankruptcy purpose.

47. This point is further reinforced by the fact that the Ponzi Debtors are neither seeking nor entitled to a discharge under Section 1141(c)(3), because they are corporate entities, will not continue in business, and are liquidating all of their assets.

48. Furthermore, the proposed plan's request for a broad release and injunction is patently futile here, because it is not essential to or even being proposed for the purpose of furthering a "workable reorganization." *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880

F.2d 694, 702 (4th Cir. 1988)(stating that plan injunctions must be "essential in this case to a workable reorganization…").

49. Indeed, the Fourth Circuit will only approve such a third party release and injunction if it is "…essential to reorganization." *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014)(emphasis added).

50. Even if a party contributes substantial assets to a reorganization, that party "must have provided a cognizable and valid contribution to the debtor as part of the debtor's reorganization." *Id*. at 348 (emphasis added).

51. Put simply, the third-party releases and injunctions requested here should never be approved because they are neither essential to, nor even sought for, the purpose of a reorganization of the Ponzi Debtors. Rather, they are requested for the perverse goal of allowing Diane Siskey to minimize her liability related to her role in the Ponzi scheme, while maximizing her assets.

52. This request is futile, requested in bad faith, and seeks the Court's stamp of approval on an abuse of the reorganization process. The Court should thus deny the Conversion Motion.

**2. The Court should deny the Conversion Motion under Section 706(b) because it would have to convert or dismiss the case under 11 U.S.C.§ 1112(b) if it were in Chapter 11.**

53. Similarly, under Section 706(b) "[i]f cause exists to reconvert from Chapter 11 under § 1112(b), conversion from Chapter 7 under section 706(b) would be a futile and wasted act." *In re Gordon*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012).

54. Pursuant to 11 U.S.C. § 1112(b), the Court "shall" convert or dismiss a Chapter 11 case "for cause." Cause exists under Section 1112(b)(4) where there is "a substantial or

continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."

55. Here, both prongs of the inquiry would require the Ponzi Debtors' cases to be converted if they were in Chapter 11. With respect to the first prong (a substantial or continuing loss), that prong is satisfied "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, [from] any negative cash flow-including that resulting only from administrative expenses." *Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004)

56. In the present case, a substantial or continuing loss to the estate will occur if the case is converted because the estates will incur additional and unnecessary expenses associated with litigating a contested confirmation process, and the additional expenses that accrue in Chapter 11 cases such as the payment of quarterly fees, holding an additional 341 meeting[7], additional reporting requirements and the likely formation of a creditors' committee.[8]

57. These are unnecessary expenses in a liquidating case of "empty corporate shells" as the Trustee has referred to the Ponzi Debtors.

58. The second prong of the test is also satisfied because there is no reasonable likelihood of rehabilitation because the Ponzi Debtors' are "empty corporate shells" with no operations or employees as discussed at length above.

59. For all these reasons, the Conversion Motion should be denied.

---

[7] In the Conversion Motion, the Trustee asked the Court not to schedule a Section 341 meeting if the Court converts the case, but Bankruptcy Rule 2003(a) provides that the Bankruptcy Administrator "shall" call a meeting of creditors.

[8] In the Conversion Motion, the Trustee also asks the Court to forego the appointment of a creditors' committee "for cause." However, Section 1102(a)(3) of the Bankruptcy Code governs the appointment of creditors' committees in Chapter 11 and only allows the Court to enter an order directing that a creditors' committee not be appointed in a small business case. The Ponzi Debtors do not qualify as small business debtors, however, because they are not engaged in business and their liabilities exceed the debt limits described in Section 101(51D) of the Bankruptcy Code.

> **3. The factors some courts evaluate to determine whether to convert a case from Chapter 7 to Chapter 11 pursuant to Section 706 do not support conversion.**

60. Courts engaging in a Section 706 analysis have also identified the following pertinent factors that apply here: "…whether the debtor's pre-petition conduct has been improper…whether the debtor has no ongoing business or employees; and whether there is a lack of possibility for reorganization." *In re: George Love Farming, LC*, 366 B.R. 170, 178 (Bankr. D. Ut. 2007).

61. Courts also consider "whether the debtor has a business to reorganize as well as the debtor's assets, business operations, and whether a separate business infrastructure exists." *In re Miller*, 496 B.R. 469, 477 (Bankr. E.D. Tn. 2013). Furthermore, "if the purpose is only to liquidate, which is more compatible with a Chapter 7 than a Chapter 11 case, conversion may not be appropriate." *In re: Gordon*, 465 B.R. at 692.

62. Much like with the other tests, conversion is inappropriate here because the Ponzi Debtors' pre-petition conduct was fraudulent and criminal, there is no business to restructure, there are no employees and no request to rehabilitate the Ponzi Debtors.

63. Nor is it appropriate to convert the case to simply liquidate the Ponzi Debtors' estates, which are already being liquidated in Chapter 7.

> **B. The Court should deny the Interim Distribution Motion.**

> **1. The Interim Distribution Motion should be denied because it is conditioned to the Conversion Motion being granted.**

64. The Court should deny the Interim Distribution Motion because it is conditioned on the Court granting the Conversion Motion. Indeed, it provides that "the Interim Distribution is premised upon and has been structured in a way to make it an integrated piece of the proposed

plan…the Trustee intends to effectuate once these cases are converted." *Interim Distribution Motion*, p. 4, ¶ 13; *Plan Term Sheet*, ¶ 6, p. 12.

65. For the reasons stated above, the Conversion Motion should be denied, therefore, the Interim Distribution Motion should also be denied.

### 2. The Interim Distribution Motion violates the Supreme Court's Jevic decision.

66. As discussed in detail in the Trustee's prior attempt to settle with Diane Siskey, the United States Supreme Court has held that the Bankruptcy Court should not approve a settlement "that provides for distributions that do not follow ordinary priority rules without the affected creditors' consent." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

67. For the reasons discussed previously, selectively making payments to unsecured creditors violates the priority scheme set forth in 11 U.S.C. § 726. The Court should, therefore, deny the Interim Distribution Motion.

### 3. The Interim Distribution Motion violates the Fourth Circuit's Mabey decision.

68. In *Official Committee of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987), the United States Court of Appeals for the Fourth Circuit specifically addressed the scope of the Bankruptcy Court's power under section 105(a) to authorize pre-confirmation payments to unsecured creditors.

69. In *Mabey*, the Debtor and other parties in interest filed a motion seeking the establishment of an emergency treatment fund to provide medical assistance to Dalkon Shield infertility claimants prior to confirmation of a plan of reorganization. *Mabey*, 832 F.2d at 301.

70. The District Court granted the motion and directed the Debtor to establish a $15,000,000 "emergency treatment fund…for the purpose of assisting in providing tubal reconstructive surgery or in-vitro fertilization to eligible Dalkon Shield claimants." *Id.* at 300.

71. At the time it approved the motion, a plan was filed but it had not been confirmed. *Id*. at 301.

72. On appeal, the Fourth Circuit reversed the District Court's order stating "…the creation of the Emergency Treatment Fund at this stage of the Chapter 11 bankruptcy proceedings violates the clear language and intent of the Bankruptcy Code, and such action may not be justified as an exercise of the court's equitable powers under 105(a)." *Id*. at 302.

73. The Fourth Circuit reasoned as follows:

> The Bankruptcy Code does not permit a distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved. 11 U.S.C. § 1121 provides for the filing of a plan of reorganization. Sections 1122-1129 set forth the required contents of a plan, the classification of claims, the requirements of disclosure of the contents of the plan, the method for accepting the plan, any modification thereof, the hearing required on confirmation of the plan and the requirements for confirmation. ***The clear language of these statutes, as well as the Bankruptcy Rules applicable thereto, does not authorize the payment in part or in full, or the advance of monies to or for the benefit of unsecured claimants prior to the approval of the plan of reorganization***. The creation of the Emergency Treatment Program has no authority to support it in the Bankruptcy Code and ***violates the clear policy of Chapter 11 reorganizations by allowing piecemeal, pre-confirmation payments to certain unsecured creditors***. Such action also violates Bankruptcy Rule 3021 which allows distribution to creditors only after the allowance of claims and the confirmation of a plan.

*Id*. (emphasis added).

74. Here, much like in *Mabey*, the Interim Distribution Motion must be denied because it requests that the Court authorize the pre-confirmation payments to certain unsecured under the proposed plan. This request should be rejected, though, because the Bankruptcy Code "does not authorize the payment in part or in full, or the advance of monies to or for the benefit of unsecured claimants prior to the approval of the plan of reorganization." *Id*.

75. Indeed, such piecemeal pre-confirmation payments violate the text of the Bankruptcy Code and the clear policy underlying Chapter 11.

76. Accordingly, the Interim Distribution Motion should be denied.[9]

### 4. Under the circumstances, the equities do not support making any interim distributions.

77. Given the current status of these cases, the equities do not support making any interim distributions. SSP believes that result is appropriate for multiple reasons.

78. First, the Trustee's filings and actions in this case have been inconsistent and potentially jeopardize substantial economic rights of many parties in interest, including SSP. For example, when the Trustee opposed SSP's request for relief from stay to streamline the liquidation of its claims against multiple joint tortfeasors, he argued to the Court that it would be "absurd" to allow SSP to have an allowed claim in these cases while disallowing the claims of the Non-Debtor Investors. *See*, *Memorandum of Law in Opposition to Motion for Relief from Stay* ("Relief from Stay Memo"), Doc. 219-2, pp. 10-13.

79. Now, however, the Trustee has put forward a proposed bankruptcy plan that effectively overrules this Court's prior order and allows the claims of the Non-Debtor Investors for the purpose of distributions under the proposed plan. Nonetheless, the Trustee has not withdrawn his objection to SSP's claims. The Trustee's actions are impossible to reconcile, and the Court should not allow him to transfer millions of dollars around under these circumstances.

80. Second, the Trustee has made no showing whatsoever demonstrating his entitlement to any of the life insurance proceeds he seeks to distribute. In fact, he has puzzlingly argued in prior filings with the Court that such proceeds are held in constructive trust for investors, not the Debtors' estates. If that is true, the life insurance proceeds are not property of the estate pursuant to Section 541(d) of the Bankruptcy Code, and the Trustee has wasted approximately $1 million chasing assets that he concedes are not property of the estate. Given

---

[9] Authorizing pre-confirmation distributions under a proposed bankruptcy plan as requested also appears to be analogous to a *sub rosa* plan.

that the Trustee's professional fees have been paid from settlements with Ben Lowder and Denise Rhodes, he would also likely be required to disgorge any fees he was paid to date.

81. Third, the Trustee's positions with the Court in relation to SSP are inequitable. In his filings, the Trustee has taken the position that SSP has adequate remedies at law to pursue remedies against Diane Siskey and the Siskey Estate in state court. *See*, *Relief from Stay Memo*, Doc. 219-2, p. 10. Notwithstanding the foregoing, he is also actively attempting to assist those same parties in divesting themselves of substantial assets that could be used to pay SSP's claims. By doing so, he is assisting those parties in hindering, delaying or defrauding their own creditors.

82. Given the foregoing, SSP asks the Court to deny making any distributions until a coherent strategy is put forward for administering these cases by the Trustee or someone else.[10]

### VI. CONCLUSION

83. Based on the foregoing, SSP respectfully requests that the Court deny the Motions.

WHEREFORE, Stone Street respectfully requests that the Court (i) deny the Motions, and (ii) grant such other and further relief as is just and proper.

Dated: Charlotte, North Carolina
June 20, 2018

**MOON WRIGHT & HOUSTON, PLLC**

*/s/ Andrew T. Houston*
Andrew T. Houston (Bar No. 36208)
121 West Trade Street, Suite 1950
Charlotte, North Carolina 28202
Telephone: (704) 944-6560
Facsimile: (704) 944-0380
*Counsel for Stone Street Partners LLC*

---

[10] SSP reiterates that it remains willing to sit down with the Trustee, Diane Siskey, the administrator of the Siskey Estate and the other creditors of this estate to try to come to a workable solution. To date, SSP and all other creditors in these cases have been completely shut out of this process, and they are necessary parties in any global resolution of these cases.