IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| TSI Holdings, LLC, | ) | CASE NO. 17-30132 (Lead) |
| WSC Holdings, LLC, | ) | CASE NO. 17-30338 |
| South Park Partners, LLC and | ) | CASE NO. 17-30339 |
| Sharon Road Properties, LLC, | ) | CASE NO. 17-30363 |
| | ) | |
| | ) | Chapter 7 |
| DEBTORS. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |

**STATEMENT OF NON-PARTY DIANE M. SISKEY
IN SUPPORT OF MOTION TO CONVERT**

Non-Party Diane M. Siskey hereby files this Statement in Support of the Trustee's *Motion for Order (I) Terminating Joint Administration of Sharon Road Properties, LLC Case, (II) Converting Remaining Cases to Chapter 11, and (III) Providing Miscellaneous Related Relief* [D.E. 253] (the "**Motion**").[1] The Motion seeks to convert the TSI, SouthPark Partners, and WSC cases to chapter 11. While the purposes of conversion is to propose a chapter 11 plan (a draft of which is attached to the Motion) (the "**Plan**"), the hearing on the Motion should focus on the merits of the Motion itself and not be turned into a mini-confirmation hearing on the Plan. After conversion, the Trustee will file a disclosure statement and a solicitation procedures motion to govern the timing and process of litigation over and voting on the Plan. At that time, and after

---

[1] Mrs. Siskey also supports the Trustee's *Motion for Approval of Interim Distribution*. Briefly, there is nothing about that motion that is improper. It contemplates distributions that will follow the priority scheme of the Bankruptcy Code (and, indeed, would be incorporated into the distributions under the Plan) and can be accomplished as part of the conclusion of the chapter 7 administration of these cases before their conversion to chapter 11. If the Court elects not to grant that motion, Mrs. Siskey and the Trustee stand fully ready to propose and support the chapter 11 plan and defer distributions until after the effective date of the Plan.

1

creditors and other parties have a Court approved disclosure statement, they may vote on the Plan and (if they choose) object and litigate to attempt to defeat confirmation.

Nonetheless, the two Objections[2] filed to the Motion: (a) misapprehend the nature of the litigation that is proposed to be settled under the Plan; and (b) misconstrue the mechanisms that the Plan uses to settle that litigation.  Mrs. Siskey therefore files this Statement to address and clarify some of these issues.

The Plan resolves numerous issues that, outside of such a structure, would (a) delay the resolution of these cases for years, (b) reduce the assets ultimately available to creditors for distribution, (c) exponentially increase the administrative costs of these cases, and (d) create the likelihood of an inequitable outcome among investors based upon whether such investors happened to have their money passed through the accounts of the Plan Debtors.

A major objective of the Plan is to comprehensively resolve contested litigation claims between Mrs. Siskey and the Trustee, and to do so in a way that will resolve other potential litigation claims that Mrs. Siskey may face.  By accomplishing this latter objective, it maximizes the amount that Mrs. Siskey can contribute to settlement.  The nature of the disputes between Mrs. Siskey and the Trustee have been miscast or mischaracterized in the Objections and otherwise. For instance, these disputes are not over whether the Trustee can "administer" the life insurance proceeds (*see* Stone Street Objection ¶ 3).  Nor are they over whether the life insurance proceeds are currently property of the bankruptcy estate (*id.*) or whether there are grounds to "substantively consolidate" the Plan Debtors assets with the assets of Mrs. Siskey (*id.* ¶ 25 fn.4).

---

[2]     Stone Street Partners LLC has filed an Objection [D.E. 266] (the "**Stone Street Objection**") and eight individual investors have also filed an Objection [D.E. 268] (the "**Investor Objection**").

Rather, the claims that are being settled through the Plan have two basic components. *First*, can the Trustee establish that Mrs. Siskey has direct liability because she knew of and participated in the Ponzi scheme? Mrs. Siskey steadfastly denies any prior knowledge of or participation in the Ponzi scheme, has provided full documents to the Trustee (as well as government regulators), and answered any questions on this front posed to her by the Trustee (or government regulators). Indeed, no responsible fiduciary or governmental regulator has, to date, ever suggested that there is any evidence that Mrs. Siskey knew of or participated in the Ponzi scheme. *Second*, even if she does *not* have direct liability, can the Trustee impose a constructive trust against some or all of the life insurance proceeds for the benefit of creditors of the Plan Debtors? Absent settlement, that claim will be resolved through a civil action that not only pits the Trustee against Mrs. Siskey, but also the Trustee against Ponzi victims that were not creditors of the Plan Debtors. The issues in that litigation will include, but likely not be limited to:

- *Whether the North Carolina Constitution entirely bars the imposition of a constructive trust?* There is little guiding precedent on this point in North Carolina – one case from a trial court that was resolved prior to the appeals court issuing a decision. This issue, if litigated, would likely need to be resolved by the North Carolina Supreme Court.

- *Whether, even if the North Carolina Constitution does not entirely bar imposition of a constructive trust, North Carolina statutes would limit the Trustee's recovery in such an action to the premiums paid plus interest?* Certain North Carolina statutes contain provisions that, on their face, limit the recovery a creditor of a decedent may obtain from life insurance proceeds – even when the payments for premiums were made with an attempt to defraud the decedent's creditors – to the premiums paid plus interest. Such a provision, if enforced, would substantially limit the scope of any potential recovery by the Trustee in litigation.

- *Even if the North Carolina Constitution and North Carolina statutes do not bar or limit recovery for the Trustee, over what proportion of the life insurance proceeds can he impose a constructive trust?* Even if the North Carolina Constitution and North Carolina statutes do not bar or limit recovery, the Trustee may only be able to recover *all* of the life insurance proceeds if he is able to show that *all* of the premiums were paid from money of creditors of the Plan Debtors. If, in contrast, the evidence shows that Mr. and Mrs. Siskey's substantial non-Ponzi related assets or the assets of Ponzi victims that were not creditors of the Plan Debtors were used

3

to pay some or all of the premiums, the Trustee will likely be limited to a ratable share of the life insurance proceeds. Under any scenario other than a complete victory by the Trustee over Mrs. Siskey, *as well as other Ponzi victims that are not creditors of the Plan Debtors*, the settlement in the Plan produces an economic outcome for creditors that is substantially better than any reasonable result in litigation.

The Plan settles these litigation issues on terms highly favorable to the Trustee. It does this by allowing Mrs. Siskey to maximize the amount she is able to contribute towards settlement by limiting the risk that she will need to defend multiple claims for contribution, indemnity, or reimbursement from third parties. First, it contemplates that the Trustee will waive claims he can bring against third parties (which could result in contribution claims from those third parties against Mrs. Siskey) other than the Reserved Claims.³ Second, the Plan grants the "Plan Sponsor Releasees" a Third Party Injunction that bars subsequent suit against those parties from any creditor that could have filed a claim in these cases. The Third Party Injunction is limited, runs only in favor of the Plan Sponsors Releasees (Mrs. Siskey, her relatives, and the Probate Estate), and bars no independent claim of any third party or creditor against any potential defendant other than the Plan Sponsors Releasees. Its limited scope is tailored within the terms permitted for such injunctions in the Fourth Circuit as articulated in *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 347 (4th Cir. 2014).

Finally, the Plan provides a mechanism for creditors to **voluntarily opt-in** to release any other claims they may have related to their investment in the Plan Debtors against third parties in exchange for a substantial additional payment (through a Creditor Release and participation in the Residual Payment Trust).⁴ This voluntary release is entirely optional for creditors and the Plan is

---

³ The Trustee will disclose the Reserved Claims in the Plan Supplement as part of the Plan process.

⁴ The only issue raised in the Investor Objection is a stated concern that the "requirement of a creditor release of claims in exchange for distributions." *See* Investor Objection at 7. The Plan

4

clear on this.[5]  This optional release is also separate from, and not a part of, the Trustee's claims and the assets made available from this settlement are not at any time assets of the Plan Debtors' bankruptcy estates.[6]  The Creditor Release is intended as an option, incentive, and inducement for creditors to voluntarily cease their litigation efforts against third parties (any of which could result in additional contribution claims from those defendants against Mrs. Siskey if the defendants are not subject to the Third Party Injunction) in exchange for a substantial payment.[7]  Some of those claims have already been filed – *see, e.g.*, Case No. 17-CVS-15265 pending in North Carolina Business Court (a civil action filed by Stone Street against Mrs. Siskey, the Richard Siskey Probate Estate, and MetLife) – while others are being solicited – *see, e.g.,* https://www.hemmingsandstevens.com/siskey-ponzi-scheme.htm.  The Plan lets Eligible Creditors choose:  they can either continue to litigate their claims against third parties (subject to the Third Party Injunction) or they can settle them and receive a substantial and assured payment.

The Plan also provides a mechanism to address a fundamental potential inequity that may arise in the current posture of these cases:  certain investor/victims may receive unequal treatment

---

does not contain any such requirement, as discussed herein.  Mrs. Siskey and the Trustee intend to reach out to counsel to discuss these points, attempt to allay any such concerns, and resolve this Objection consensually.  To the extent the Plan is in any way ambiguous on these points, Mrs. Siskey and the Trustee will be open to any proposed edits to the draft of the Plan.

[5]     *See* Plan Article I (definitions of "Creditor Release" and "Participating Creditor") III.B.1; III.B.2; VI.C.4; and X.F.

[6]     *See* Plan Article VII.B.

[7]     Stone Street asserts that "creditors only receive a *pro rata* distribution if they vote in favor of the plan."  *See* Stone Street Objection ¶ 26.  This is incorrect.  Stone Street asserts this position in connection with its discussion of the Residual Payment Trust.  The Residual Payment Trust has nothing to do with distributions from the Plan Debtors – it is a separate and wholly voluntary opportunity for Eligible Creditors to release their claims against third parties – not the Plan Debtors – in exchange for additional consideration.  If the Plan is confirmed, *all* creditors – regardless of whether they vote in favor of or against the Plan and regardless of whether or not they give a Creditor Release – will receive a *pro rata* distribution on their Allowed claims against the Plan Debtors.  That is accomplished through Distributions from the Estate Liquidating Trust.

because their money was never placed into the accounts of any of the Plan Debtors and the entities into which they invested were never subject to involuntary bankruptcy petitions. This has already been the subject of litigation in these cases (*see, e.g.*, D.E. 153) and no fair and objective observer can reasonably say that investor recoveries *should* be driven by whether investors, by chance, happened to have their money run through entities that the petitioning creditors later placed into involuntary bankruptcy. The Plan addresses this by permitting these investors (Eligible Non-Debtor Investors in the parlance of the Plan) to **voluntarily opt-in** to the Residual Payment Trust (*i.e.*, the trust being set up to address third party claims with assets that are not and never become property of the bankruptcy estates) in exchange for the same treatment that creditors of the Plan Debtors will receive if they give a Creditor Release. Thus, the Plan will use non-estate funds to bridge this fundamental potential inequity.

This mechanism of resolving the claims of Eligible Non-Debtor Investors also has a derivative benefit for the bankruptcy estates. The claims of these investors may dilute the recovery the bankruptcy estates receive from the Probate Estate (as they are sharing from a common pot) or prime the claims of the bankruptcy estates (to the extent they are claims against Siskey Industries, in which the Probate Estate only has an equity interest). The Plan resolves this by channeling all of these claims (for Eligible Non-Debtor Investors that voluntarily opt-in) into the Residual Payment Trust.

Finally, a condition precedent to Mrs. Siskey's obligations under the Plan is that the Participation Percentage be at least 90% (which, at her option, she can lower, but not raise). The Participation Percentage is a measure of Eligible Creditors and Eligible Non-Debtor Investors that voluntarily opt in to the Residual Payment Trust. The Stone Street Objection accuses Mrs. Siskey

of trying to "control"[8] the bankruptcy cases through this mechanism. This is simply not correct. The Participation Percentage does not alter or modify any requirement of section 1129 of the Bankruptcy Code; it is a contractual condition that is in addition to the statutory requirements imposed by the Bankruptcy Code. It is included as part of the settlement and Plan because, if participation is low (but still high enough to meet class acceptance – for example, 70% support), it will fundamentally alter the assessment of risk of future contribution claims against Mrs. Siskey. A fundamental premise of the Plan Sponsors' payments under the Plan is that most or all remaining or potential litigation arising out of this situation will end. If that is not the case – if the percentage of support is going to be materially lower (an outcome that will be unknown until Plan voting) – the litigation risk remaining to the Plan Sponsors post-confirmation will be materially greater. Therefore, they need to reserve the right to reassess their financial ability to make the contemplated contributions in such an environment. It is not a mechanism to try to "control" these cases; it is a mechanism to ensure that the Plan Sponsors receive the benefit of the bargain that the parties are trying to accomplish through the Plan.

There are essentially two legal objections to the Motion, both of which should fail. First, Stone Street asserts that the Plan itself is somehow proposed in bad faith (or with a lack of good faith) and that bad faith (or lack of good faith) warrants denial of the Motion (and also renders the Plan futile). Stone Street cites *Marrama v. Citizens Bank*, 549 U.S. 365 (2007), a case refusing to permit the conversion of an individual chapter 7 case to chapter 13 because the debtor "made a number of statements about his principle asset … that were misleading or inaccurate" (*id*. at 368) to support their "bad faith filing" argument. Stone Street cites *Carolin Corp. v. Miller*, 866 F.2d 693 (4th Cir. 1988), a single asset real estate case (which predates most of the lender protections

---

[8]     *See* Stone Street Objection ¶ 28, fn.5.

currently available in SARE cases) where the borrower had no tenant, no source of rental income, and filed the bankruptcy case 50 minutes before a foreclosure proceeding (*id*. at 695-96) to support their "lack of good faith" argument.

Stone Street takes repeated swipes at the Trustee, Mrs. Siskey, and the underpinnings of the Plan in an attempt to substantiate its bad faith/lack of good faith argument.[9] *See, e.g.,* Stone Street Objection ¶¶ 18 ([T]he proposed plan is just a sham orchestrated by Diane Siskey…"); 46 ("[T]he Trustee is requesting conversion of these cases for the express purpose of allowing Diane Siskey (a non-debtor, and likely co-conspirator) to secure a release of her liabilities and a sweeping injunction from this Court, while maximizing her own assets."); 51 ("[The third party releases and injunctions] are requested for the perverse goal of allowing Diane Siskey to minimize her liability related to her role in the Ponzi scheme, while maximizing her assets."). These slurs by Stone Street are supported by no evidence and are disputed in full by Mrs. Siskey (and the Trustee as well). Furthermore, the justifications for the material portions of the Plan that Stone Street attacks are set forth in summary above. Put simply, this is not a single asset real estate case or a consumer bankruptcy case where the debtor has hidden assets. These bankruptcy cases are part of (but not all of) an exceedingly complicated Ponzi scheme where creditors face substantial risks and

---

[9] The Stone Street Objection also makes allegations about the Plan and the Interim Distribution Motion that are, frankly, just odd and Mrs. Siskey does not understand their basis or logic. For instance, Stone Street alleges that Mrs. Siskey is trying to "coerce" creditors by "trickling funds into the bankruptcy estate" through the Interim Distribution Motion. *See* Stone Street Objection ¶ 20, fn.2. This is an assertion that is contrary both to logic and the facts of these cases. If anything, by making the interim distribution, creditors stand to receive relatively *less* by confirmation of the Plan (because they will have already received the Interim Distribution) and therefore may have a greater incentive to vote against it (there is no mechanism for Mrs. Siskey to try to claw these payments back if the Plan is not approved). Similarly, these assertions are contrary to the facts of the case. Indeed, little more than a month ago, counsel to Stone Street sent Mrs. Siskey a letter "demanding" that she release $10 million as an interim distribution (and agreeing to take nothing from such a distribution). *See* D.E. 261 at 8-9. Now Stone Street apparently opposes the same relief that little more than a month ago the "demanded."

uncertainties associated with the quantum of their recovery, the timing of any recovery, and whether all victims will be treated in a fair and equitable manner. These risks are mitigated through a plan settlement of the kind that is specifically contemplated by section 1123(b)(3)(A) of the Bankruptcy Code. There is nothing about that settlement that is proposed in bad faith or with a lack of good faith. The Trustee should therefore be permitted to convert the Plan Debtors' cases to chapter 11 and creditors should be provided with an opportunity to vote in favor of or against the Plan and better control their own economic fate and outcome from these cases.

Stone Street's second objection to conversion focuses on an alleged requirement that there be a "reorganization purpose" in order to convert to chapter 11 and propose a plan. *See, e.g.,* Stone Street Objection ¶¶ 2, 49-51, 60-62. However, there is no "reorganization purpose" test for conversion to chapter 11 and Stone Street does not attempt to cite to one in the Bankruptcy Code. To the contrary, chapter 11 is clear that a plan may be used to settle claims (section 1123(b)(3)(A)) or effectuate the sale of substantially all assets of the debtor (section 1123(b)(4)). And, indeed, section 1141(d)(3)(A) expressly contemplates that a plan may be used "for the liquidation of all or substantially all of the property of the estate."[10] Chapter 11 plans have been used to liquidate thousands of entities in this district and others across the United States. There is nothing improper or unusual about using chapter 11 to resolve these cases in the manner described herein and there is nothing about the Trustee's effort to do so that should preclude the Motion from being granted.

WHEREFORE, Diane Siskey respectfully requests that the Court overrule the Objections and grant the Motion.

Respectfully submitted this 22nd day of June 2018.

---

[10] In such a case – a "liquidating chapter 11" – the debtor may not receive a discharge of indebtedness. Nothing in the Plan grants any such discharge to the Plan Debtors.

9

**ALSTON & BIRD LLP**

/s/ *William S. Sugden*
Thomas G. Walker
N.C. State Bar. No.: 17635
Caitlin A. Counts
N.C. State Bar. No.: 50639
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
Tel.: (704) 444-1000
Fax: (704) 444-1111
thomas.walker@alston.com
caitlin.counts@alston.com

Matthew P. McGuire
N.C. State Bar No. 20048
555 Fayetteville St., Suite 600
Raleigh, NC 27601
Tel: (919) 862-2200
Fax: (919) 862-2260
matt.mcguire@alston.com

William S. Sugden (*pro hac vice)*
Georgia Bar. No.: 690790
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777
will.sugden@alston.com

*Attorneys for Non-party Diane M. Siskey*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2018, I electronically filed the foregoing **STATEMENT OF NON-PARTY DIANE M. SISKEY IN SUPPORT OF MOTION TO CONVERT** with the Clerk of Court using the CM/ECF system which will send notification of such filing and effectuate service to all counsel of record in this matter.

                              **ALSTON & BIRD LLP**

                              /s/ *William S. Sugden*
                              William S. Sugden (*pro hac vice*)
                              Georgia Bar. No.: 690790
                              One Atlantic Center
                              1201 West Peachtree Street
                              Atlanta, GA 30309
                              Tel: (404) 881-7000
                              Fax: (404) 881-7777
                              will.sugden@alston.com