## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| In re: | **CASE NO. 17-30132** |
| **TSI Holdings, LLC[1] et al.,** | **CHAPTER 7**<br>Jointly Administered |
| **DEBTORS.** | |

## MOTION FOR (I) AUTHORITY TO ENTER INTO SETTLEMENT AND (II) BAR ORDER

Joseph W. Grier, III, the duly-appointed trustee (the "Trustee") in the above-captioned, jointly-administered bankruptcy cases (collectively, this "Case"), through counsel, hereby presents this *Motion for (I) Authority to Enter into Settlement and (II) Bar Order* (this "Motion") and, in support hereof, respectfully represents as follows:

### ESSENTIAL ECONOMIC TERMS OF THE SETTLEMENT[2]

- Diane Siskey and Jenna Negrelli pay the total sum of approximately $41,376,196.46.[3]

- MetLife pays $1,000,000.00.

- All creditors in this Case have previously received a 27.58% interim distribution.

- Upon settlement approval, all creditors in this Case will receive an immediate interim distribution of an additional approximately 40.64%.

- Any creditors willing to release their individuals claims against Diane Siskey and her children will receive an additional approximately 18.07% payment from Diane Siskey.

---

[1]	These jointly administered cases are those of the following debtors:  TSI Holdings, LLC ("TSI"), Case No. 17-30132 (the "TSI Case"); WSC Holdings, LLC ("WSC"), Case No. 17-30338 (the "WSC Case"); and SouthPark Partners, LLC ("SPP"), Case No. 17-30339 (the "SPP Case").

[2]	These figures are subject to the assumptions, estimations, and additional details shown on "Schedule 1" attached to this Motion.  **The information contained herein has not been subject to a certified audit or other independent review.  Any values of assets and liabilities contained herein (including Schedule 1) have been estimated by the Trustee based on the best information currently available to the Trustee.  Although substantial efforts have been made to be complete and accurate, the Trustee is unable to warrant or represent the full and complete accuracy of the information contained herein (including Schedule 1)**.

[3]	The total amount will depend on the value of an escrow account at Regions Bank, which fluctuates from month to month.

- Any creditors willing to release their individuals claims against MetLife will receive an additional approximately 3.63% payment from MetLife and Diane Siskey.

- In exchange for the Stone Street claimants receiving an upfront payment of $1,000,000.00, the Stone Street claimants consent to investors receiving a 100% distribution on base claims before any additional distributions to Stone Street from bankruptcy estate property, and Stone Street will thereafter share in any additional distributions after the full repayment (without interest) of base claims up to a maximum total payment of $4,000,000.00 (inclusive of the immediate $1,000,000 upfront payment).

## **INTRODUCTION**

1.      This Case arises in the aftermath of a Ponzi scheme (the "Ponzi Scheme") orchestrated by the late Richard C. Siskey ("Rick Siskey").  The Trustee has reached an agreement in principle (the "Settlement") with:  Rick Siskey's widow, Diane M. Siskey ("Diane Siskey"); Jenna Marie Negrelli ("Negrelli"); F. Lane Williamson (the "Administrator"), the Administrator CTA of the Estate of Richard C. Siskey (the "Siskey Estate"); Siskey Industries, LLC ("Siskey Industries"); Stone Street Partners, LLC f/k/a Siskey Capital, LLC ("Stone Street"); Dawn E. King ("King"); Paul G. Porter ("Porter"); and Metropolitan Life Insurance Company, MSI Financial Services, Inc. (f/k/a MetLife Securities, Inc. n/k/a MML Investors Services, LLC), Massachusetts Mutual Life Insurance Company, and Brighthouse Life Insurance Company (collectively, "MetLife").  If ultimately approved and implemented, the Settlement: (a) secures an immediate distribution to all investors and similarly-situated creditors (collectively, "investors") in an amount sufficient to satisfy approximately **68%** of claims, (b) offers the opportunity to investors to immediately receive an additional approximately **22%** recovery on their claims in exchange for providing certain voluntary releases, (c) provides a mechanism by which investors may receive as much as 100+% of their base claims pending the administration of the Siskey Estate; and (d) provides for the full and final resolution of complex litigation claims by, among, and between the Trustee, Diane Siskey, Negrelli, the Siskey Estate, Siskey Industries, Stone Street, King, Porter, and MetLife.

2.      In addition to the foregoing payments (funded primarily by Diane Siskey, Negrelli, and MetLife), there are substantial assets in the Siskey Estate.  The Administrator will need to determine when, under state law, he can distribute funds and other assets in the Siskey Estate; however, the Trustee hopes that, ultimately, the Settlement will enable victims of the Ponzi Scheme to receive at least another approximately $4,700,000 by way of the Siskey Estate, resulting in a 100% recovery on base claims plus some interest factor.  In other words, if approved, **the Settlement could pay victims up to 90% of their claims following settlement approval, plus the possibility for an eventual recovery of more than 100%,** subject to certain variables primarily concerning the Siskey Estate.

3.      Because of its global nature, various aspects of the Settlement do not directly impact the bankruptcy estates in this Case.  This Motion seeks Court approval only of those certain portions of the Settlement that affect the bankruptcy estates and authority for the Trustee to enter into the settlement agreement.

## PROCEDURAL BACKGROUND AND JURISDICTION

4.      On January 27, 2017 (the "Petition Date"), an involuntary bankruptcy petition pursuant to chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), was filed against TSI, initiating the above-captioned lead case.  On February 2, 2017, the Court held an emergency hearing on the petitioning creditors' emergency motion to appoint an interim trustee for TSI.  On February 8, 2017, the Court entered an Order appointing the Trustee.  An *Order For Relief* was subsequently entered on February 22, 2017.  Similar involuntary petitions, emergency motions, orders for relief, and orders appointing the Trustee

were filed and entered against WSC and SPP (collectively, with TSI and WSC, the "Ponzi Debtors").[4]

5.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).  Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a).  The predicates for the relief requested in this Motion are § 105 of the Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule" and, collectively, the "Bankruptcy Rules").

## FACTUAL BACKGROUND

### THE PONZI SCHEME

6.    Based on the Ponzi Debtors' records, and other evidence, the Trustee and his professionals are of the opinion that TSI, WSC, and SPP were each operated as part of the Ponzi Scheme.  However, the Trustee also believes that the Ponzi Scheme was not limited to investments of money made directly to the Ponzi Debtors.

7.    For example, Rick Siskey purported to sell equity interests in SRP to six investors, whom Rick Siskey qualified as "Outside Investors" in SRP (the "SRP Outside Investors"); however, the SRP Outside Investors were not properly admitted as members to SRP and the funds invested by the SRP Outside Investors were instead diverted by Rick Siskey into the Ponzi Scheme.

8.    In addition, Rick Siskey credited certain investors (the "Premier Fund Investors") who contributed cash into deposit accounts owned by two investment funds known variously[5] as

---

[4]    A similar involuntary petition, emergency motion, order for relief, and order appointing the Trustee were filed and entered against Sharon Road Properties, LLC ("SRP"), another entity controlled by Rick Siskey, initiating case number 17-30363 (the "SRP Case").  Although the SRP Case was initially jointly administered with this Case, the Trustee eventually formed the belief that SRP is a legitimate business enterprise that existed independently from the Ponzi Scheme.  The Court agreed and entered an Order finding and concluding that "SRP is not part of a Ponzi scheme."  *See* D.E. 177, at 3–4.  On July 27, 2018, the Court entered an Order terminating the joint administration of the SRP Case with this Case.  *See* D.E. 312, at 4–5.

Premier Funds One, LLC and Premier Funds II, LLC (collectively, the "Premier Fund") with "rollover" investments in SPP and/or SRP (as an "Outside Investor").[6]  Although the Premier Fund Investors did not contribute cash directly into deposit accounts owned by the Ponzi Debtors, the Trustee believes that the Premier Fund Investors were victims of the Ponzi Scheme.

9.     Rick Siskey deposited Ponzi Scheme investments into—and moved money back and forth between—bank accounts in the name of:  the Ponzi Debtors; the Premier Fund; Rick Siskey; Rick Siskey and Diane Siskey; and Siskey Industries.  The Trustee believes that funds invested in the Ponzi Debtors were typically used by Rick Siskey to pay for his lavish lifestyle, to make distributions to other investors in the Ponzi Scheme, and to pay premiums on life insurance policies owned by Rick Siskey insuring his life and the lives of others.[7]

### LEGITIMATE INVESTMENT VENTURES

10.     Not all of Rick Siskey's investment ventures were part of the Ponzi Scheme or otherwise operated fraudulently.  For example, as previously determined by this Court,[8] SRP is a legitimate business enterprise that existed independently from the Ponzi Scheme.  In addition, throughout the time period that the Ponzi Scheme existed in some form or fashion, Rick Siskey opened and closed various investment deals that appear isolated from the Ponzi Scheme and otherwise legitimate based on the information currently available to the Trustee.  Of particular note, Rick Siskey's involvement in a securities offering pertaining to Carolina Beer & Beverage

---

[5]     Additional names used by Siskey for the Premier Funds include "The Premier Fund," "Premier Fund, LLC," "Premier Fund I, LLC," "Premier One," "Premier Fund One, LLC" "Premier Two," "Premier Fund II, LLC."

[6]     Upon information and belief, Rick Siskey had solicited investments into the Premier Fund since at least the early 2000s.

[7]     Diane Siskey, Negrelli, and possibly other parties to the Settlement contest the Trustee's position that Rick Siskey used stolen funds to pay premiums on life insurance policies.  The existence and scope of any such activities is a matter of dispute between the settling parties (and is part of what is being settled through the Settlement).

[8]     *See supra* n. 3.

Holdings, LLC ("CB&B") returned at least $19,059,438.39 to him.[9]  Similarly, the Trustee's

investigation did not disclose any evidence that Stone Street, or its investment portfolio, was

operated as part of the Ponzi Scheme.

### THE CLAIMS REPORT

11.     On November 1, 2017, the Trustee filed the *Trustee's First Omnibus Report of

*Claims, Objections to Claims, and Recommendations Regarding Claims as to TSI Holdings,*

*LLC, WSC Holdings, LLC, SouthPark Partners, LLC, and Sharon Road Properties, LLC*

(D.E. 112) (the "Claims Report").[10]  In general, the Claims Report recommended that the Court

allow claims against the Ponzi Debtors based on the "Net Investment Method," (*i.e.*, crediting

the amount of cash deposited by an investor less any cash paid to the investor, regardless of

whether the payments were categorized as a return of principal, profits, interest, or anything else

at the time they occurred) (the "Net Investment Method").

12.     Given the number of claimants affected and number of nuanced legal issues

implicated, the Claims Report resulted in five (5) hearings[11] and nine (9) orders (collectively, the

"Claims Order").[12]  In general, the Claims Report adopted the Net Investment Method for

treating claims against the Ponzi Debtors.  However, the Claims Report disallowed any claim

against the Ponzi Debtors' bankruptcy estates for Ponzi Scheme investments that were not made

---

[9]      All or a portion of Rick Siskey's earnings and/or investment return from the CB&B venture have come
from an entity called "Home Run Holdings, LLC."

[10]     Duplicates of the Claims Report's substantive text were filed in the WSC Case, the SPP Case, and the SRP
Case.  The only difference in the various versions of the Claims Report is the "Exhibit A" attached thereto, which
proposes treatment of claims submitted specifically against the debtor-entity in the corresponding bankruptcy case.
For purposes of this Motion, the various versions will be referred to collectively as the "Claims Report."

[11]     The Claims Report hearings were held on December 11, 2017, January 8, 2018, January 24, 2018,
February 5, 2018, and March 12, 2018.

[12]     *See* D.E. 134, D.E. 69 (in the WSC case), D.E. 67 (in the SPP case), D.E. 61 (in the SRP case), D.E. 138,
D.E. 152, D.E. 176, D.E. 177, and D.E. 194.

directly into the Ponzi Debtors, including, without limitation, claims by the SRP Outside Investors and the Premier Fund Investors.

13.    Stone Street, King, and Porter (collectively, the "Stone Street Claimants") submitted claims in the aggregate amount of $26,383,847.00 against each of the Ponzi Debtors (and also SRP).    The Trustee filed an objection to the Stone Street Claimants' claims, recommending that the Court disallow those claims in their entirety. Thereafter, the Stone Claimants and the Trustee agreed to continue resolution of the allowance of the Stone Street Claimants' claims indefinitely off-docket.

### ASSETS OF THE PONZI DEBTORS' BANKRUPTCY ESTATES

14.    Upon Rick Siskey's death, Diane Siskey, Negrelli (the daughter of Rick Siskey and Diane Siskey), and two of Rick Siskey's former employees[13] received an aggregate of approximately $49,525,000.00 in life insurance proceeds from four separate life insurance policies (the "Life Ins. Proceeds").  The primary asset of the Ponzi Debtors' bankruptcy estates is a litigation claim for the imposition of a constructive trust on some or all of the Life Ins. Proceeds, based on the theory that, if investor money deposited with the Ponzi Debtors was misappropriated to pay the life insurance premiums, the beneficiaries of the Life Ins. Proceeds hold bare legal title to the Life Ins. Proceeds and have a duty to return the Life Ins. Proceeds to the Ponzi Debtors.[14]

---

[13]    Rick Siskey's former employees, Denise Rhodes and Ben Lowder, who received a portion of the Life Ins. Proceeds ($250,008.58 each), returned $220,000.00 each to the Trustee pursuant to settlements approved by the Court earlier in this Case.

[14]    As described above, Rick Siskey commingled investments among the Ponzi Debtors' deposit accounts, Rick Siskey's personal deposit accounts, and deposit accounts owned by Siskey Industries (among others).  Thus, there is no clean or clear trail of payments from the Ponzi Debtors directly to MetLife for life insurance premiums; rather, most of the money flowed from the Ponzi Debtors to Rick Siskey or Siskey Industries and then to MetLife. Accordingly, the Administrator—on behalf of the Siskey Estate, Siskey Industries, or both—and/or individual investors who have claims against the Siskey Estate but not the Ponzi Debtors, arguably have similar arguments for the imposition of a constructive trust against the Life Ins. Proceeds.

15.     In addition, the Trustee theoretically could assert tort claims against Diane Siskey, Stone Street, King, Porter, MetLife, and others (including professionals, advisers, and referral sources) for their alleged roles in furthering the Ponzi Scheme.  Indeed, individual creditors in this Case have been filing their own actions against some of these parties in state court while this Case has been pending (discussed in further detail below).

16.     Similarly, the Trustee could sue certain investors who received more in distributions from the Ponzi Scheme than investments made into the Ponzi Scheme ("Net Winners").  Without opining on the collectability of such judgments, the Trustee anticipates that he could obtain judgments against Net Winners in the aggregate amount of approximately $1,200,000.00.

17.     Other than the foregoing litigation claims, the Ponzi Debtors' only other assets as of each of their respective petition dates were:  various securities that have since all been liquidated in the aggregate amount of $138,438.23; a general claim against the Siskey Estate; and WSC's 25% membership interest in Ballantyne Clubdominium, LLC, which, based on various factors (such as the allegations made by Ballantyne Clubdominium, LLC's management), the Trustee estimates could produce between approximately $100,000.00 and $300,000.00 for WSC's bankruptcy estate.

### ADMINISTRATION OF THE SISKEY ESTATE

### Liabilities of the Siskey Estate

18.     The Ponzi Debtors' bankruptcy estates have an allowed general claim in the Siskey Estate's state court estate administration proceeding.  The Trustee's claim is derivative of the claims asserted in this Case based on the Net Investment Method.[15]  Some Ponzi Scheme

---

[15]     For purposes of this Motion, claims based on the Net Investment Method held by victims of the Ponzi Scheme will be referred to as "Base Claim(s)."

investors who ultimately did not have allowed claims in this Case, including investors whose money was deposited with Siskey Industries, submitted, or were otherwise allowed, claims against the Siskey Estate separate from the Trustee's claim (the "Probate Investors").  However, some of the SRP Outside Investors and the Premier Fund Investors relied on the Trustee's claim as a surrogate for their claims against the Siskey Estate and did not independently submit, and were not otherwise allowed, claims against the Siskey Estate (the "Orphaned Investors").  As it currently stands, the Orphaned Investors have neither allowed claims in this Case nor allowed claims against the Siskey Estate.

19.    Allowed Probate Investor Base Claims against the Siskey Estate total **$4,204,459.00**,[16] in the aggregate.

20.    The Orphaned Investors' Base Claims total **$835,946.81**, in the aggregate.

21.    Other than Base Claims and those claims specifically identified below, the only other claims made against the Siskey Estate (including claims against Siskey Industries) are: (a) a claim for unpaid rent by Bissell Porter Siskey, LLC in the maximum amount of $237,623; and (b) miscellaneous outstanding bills and invoices totaling less than $10,000.[17]

22.    More importantly, the Siskey Estate is potentially subject to certain governmental liabilities that, if allowed, would be entitled to an absolute priority in payment over the general claims allowed against the Siskey Estate.[18]  For example, the Securities and Exchange

---

[16]    Technically, the allowed claims against the Siskey Estate held by Probate Investors exceeds $4,204,459 by approximately $883,000, which figure reflects the allowed amount of claims held by Michael Salamone in this Case. To avoid double-counting the claims of Michael Salamone allowed both in this Case and against the Siskey Estate, the total Probate Investor claims was adjusted downward accordingly, for purposes of this Motion.

[17]    The Administrator also entered into a tolling agreement with MetLife relating to purported contribution and/or indemnification claim(s) that MetLife may have against the Siskey Estate.

[18]    Pursuant to North Carolina law, in an estate administration proceeding, "[a]ll dues, taxes, and other claims with preference under the laws of the United States" are entitled to priority ahead of general claims.  *See* N.C. GEN. STAT. § 28A-19-6(a).  SEC and IRS claims are entitled to priority in estate administration proceedings pursuant to federal law.  *See* 31 U.S.C. § 3713(a)(1)(B).

Commission ("SEC") submitted a claim for monetary remedies that may be imposed for potential violations of federal securities laws. Also, the Internal Revenue Service ("IRS") might pursue the Siskey Estate to the extent Rick Siskey failed to pay income taxes on certain "Ponzi income," which obligation, if allowed, would also be entitled to priority over other unsecured claimants, including the allowed claims of the Ponzi Debtors.

23.     Furthermore, the Stone Street Claimants submitted claims against the Siskey Estate, presumably totaling $26,383,847.00. The Administrator disputed the Stone Street Claimants' claims, and now the Administrator and the Stone Street Claimants are engaged in state court litigation designed to resolve the Stone Street Claimants' claims for purposes of the estate administration.

<u>**Assets of the Siskey Estate**</u>

24.     Based on the best information currently available to the Trustee, the Siskey Estate has the following assets:

(a)   cash existing in a bank account owned by Rick Siskey at the time of his death, cash distributed to the Siskey Estate based on stock connected to the CB&B deal, and cash generated from the sale of personal property owned by Rick Siskey at the time of his death, including a wine collection, a car collection, a guitar collection, and jewelry and household furnishings (of which, after deducting expenses incurred in the administration of the Siskey Estate to date, **approximately <u>$5,550,000</u>** remains);

(b)   a lien against the real property owned by Ballantyne Clubdominium, LLC (**<u>$170,000</u> estimated value**);

(c)   cash value in life insurance policies insuring the lives of third parties (**<u>$100,000</u> estimated value**);

(d)   a **<u>$2,500,000</u>** holdback from a distribution to the Siskey Estate based on stock connected to the CB&B deal, which is subject to further reduction beyond the control of the Administrator (the "CB&B Holdback");

(e)   a 21.38% interest in SRP (valued at approximately **<u>$536,540.00</u>**); and

(f)  shares in Guarantee Insurance Company and unsecured notes payable, including related litigation claims (minimal estimated value).

25.    In addition to the foregoing assets, the Siskey Estate also owns 98% of Siskey Industries.  Siskey Industries has substantial assets, including the following stock interests (the "Siskey Industries Stock"):  an approximately 25% equity interest in Stone Street; 51,526 shares in Level Brands Inc.; 4,000 shares in Social Reality Inc.; 47,896 shares in Isodiol International; and 269,334 shares in Level Beauty Group.

## PRIOR INTERIM DISTRIBUTION

26.    The aggregate amount of allowed Base Claims in this Case totals **$36,252,107.75**.

27.    On July 13, 2018, the Court entered an Order authorizing the Trustee to make an interim distribution on allowed Base Claims in this Case in the aggregate amount of $10,000,000.00, out of $11,000,000.00 in Life Ins. Proceeds contributed by Diane Siskey to the bankruptcy estates in this Case.  *See* D.E. 295.  The interim distribution enabled the Trustee to pay approximately 27.58% of all allowed Base Claims in this Case.

28.    The remaining $1,000,000.00 contributed by Diane Siskey was reserved by the Trustee to help cover administrative expenses.  After satisfying all outstanding administrative expenses approved by the Court, the Trustee has $806,820.38 in cash remaining.  If this Motion is approved, the Trustee estimates that the Ponzi Debtors' bankruptcy estates will incur, from and after June 1, 2018, another $2,000,000.00 in administrative expenses.[19]

---

[19]    The allowance and payment of any and all expenses of administering the Ponzi Debtors' bankruptcy estates are subject to approval of the Court, after providing parties in interest notice and an opportunity for hearing.

## STATE COURT LITIGATION AGAINST METLIFE

29.    Since the Petition Date, several victims of the Ponzi Scheme have filed state court lawsuits against MetLife (and others) for the return on investment promised by Rick Siskey and other alleged injuries arising out of the Ponzi Scheme (the "Investor Lawsuits").[20]

30.    On September 5, 2018, some of the plaintiffs in the Investor Lawsuits filed an objection to the Trustee's motion seeking certain relief from the Court in connection with a mediation contemplated by the Trustee, the Administrator, Diane Siskey, the Stone Street Claimants, and MetLife.  The objection expressed concern that the mediation motion requested an order from the Court that would allow the Trustee to settle the plaintiffs' individual claims.

31.    During a hearing on the mediation motion on September 10, 2018, the Court requested that any motion to approve a settlement arising out of the mediation ". . . be as specific as possible and identify the causes of action" that the Trustee proposes to release in the mediated settlement.

## PROPOSED SETTLEMENT

32.    After several days of mediation and subsequent detailed, arm's-length settlement discussions over the course of several weeks, a tentative Settlement was reached by the Trustee, the Administrator, Diane Siskey, Negrelli, the Stone Street Claimants, and MetLife.  If approved by the Court, the Settlement would resolve a litany of complex disputes by and among the aforementioned parties arising out of the Ponzi Scheme.

---

[20]    The Trustee is currently aware of the Investor Lawsuits initiated by the following plaintiffs:  Evelyn Laynette Robinson (17-CVS-5843 (Mecklenburg)); James Aldridge (18-CVS-1050 (Union)); Andrew Peterson (18-CVS-528 (Lincoln)); John "Kris" Kelly, Paul Leite, Randy J. Reittinger, Dana Lemons, and Herbert Lee Lemons (18-CVS-4978 (Guilford)); Katherine Aldridge (18-CVS-1124 (Union)); James Williams and William Van Williams (18-CVS-307 (Yadkin)); Adam Goulet (18-CVS-12201 (Mecklenburg)); and Donald B. Olin (18-CVS-19512 (Mecklenburg)).  On September 26, 2018, many (perhaps most) of the plaintiffs filed amended complaints in the Investor Lawsuits.

33.     The terms of the Settlement are more particularly described in the settlement agreement attached hereto as Exhibit A and incorporated herein by reference (the "Settlement Agreement").  The basic provisions of the Settlement are summarized in the chart below.

| CONSIDERATION FLOWING BETWEEN SETTLING PARTIES | | | | | |
|---|---|---|---|---|---|
| → → → | Trustee | Administrator | Diane Siskey/Negrelli | Stone Street Parties | MetLife |
| Trustee | | ● Release of claims to all Life Ins. Proceeds ●Subordination of bankruptcy estates' claim(s) as necessary to provide equal treatment of all victims | ●Release of all claims by the bankruptcy estates ●Consent to equal treatment of all victims | ●Upfront payment of $1,000,000.00 ●Split Siskey Settlement Fund 50/50 after Base Claims paid in full, max of $3,000,000 ●Release of all claims by the bankruptcy estates | ●Release of all claims by the bankruptcy estates |
| Administrator | ● Release of claims to all Life Ins. Proceeds ●Consent to equal treatment of all victims ●Pays 100% of Siskey Estate—net of gov't and non-investor claims—to Settlement Fund | | ●Release of all claims by the Siskey Estate ●Consent to equal treatment of all victims ●Pays 100% of Siskey Estate—net of gov't and non-investor claims—to Settlement Fund | ●Immediate transfer of Siskey Industries Stock ●Release of all claims by the Siskey Estate | ●Release of all claims by the Siskey Estate |
| Diane Siskey & Negrelli | ● $33,165,916.29 paid to Siskey Settlement Fund[21] ●Consent to equal treatment of all victims | ● $33,165,916.29 paid to Siskey Settlement Fund ●Consent to equal treatment of all victims | | ●Release all claims | ●Release all claims |
| Stone Street Parties | ●Subordination of Stone Street claim ●Withdraw/release of King & Porter claims ●Withdraw/release of all claims vs. SRP | ●Withdraw/release of all claims | ●Release of all claims | | ●Release all claims |
| MetLife | ●Pays $250,000.00 to Siskey Settlement Fund | ●Pays $250,000.00 to Siskey Settlement Fund ●Release of all claims | ●Release of all claims | ●Release all claims | |

---

[21]     The $33,165,916.29 includes the $11,000,000.00 interim distribution already paid to the Trustee and a litigation holdback/reserve of $2,050,000.00.

34.     The epicenter of the multitude of claims and disputes between the settling parties

is the question of who has superior legal and/or equitable title to the Life Ins. Proceeds—the

Trustee, the Administrator, Diane Siskey (or Negrelli), or some other party(ies).  As part of the

effort to resolve those competing claims to the Life Ins. Proceeds, the Settlement provides for

equal, pro rata treatment of all investor victims of the Ponzi Scheme, regardless of whether the

victim is the holder of an allowed claim in this Case, a Probate Investor, or an Orphaned

Investor.

35.     Pursuant to the Settlement, Diane Siskey and Negrelli will contribute

$33,165,916.29 and MetLife will contribute $250,000.00 to a settlement fund (the "Siskey

Settlement Fund")[22] to be disbursed and applied as follows:

(a)     first, Diane Siskey has already contributed $11,000,000.00 to the Ponzi
Debtors' bankruptcy estates;

(b)     second, the Trustee proposes to reserve for incurred and future
administrative expenses from and after June 1, 2018, which the Trustee
estimates to be $2,000,000.00,[23] such that the Trustee needs set aside
another $1,193,370.71 to supplement the current administrative reserve;

(c)     third, Stone Street will receive an immediate payment of $600,000.00,
King will receive an immediate payment of $200,000.00, and Porter will
receive an immediate payment of $200,000.00;

(d)     fourth, while holders of allowed Base Claims in this Case have received a
27.58% recovery per the interim distribution, the Probate Investors and
Orphaned Investors have received no recovery to date and, therefore, will
receive a catch-up payment to the 27.58% level, $1,159,783.32 and
$230,592.61, respectively;

---

[22]     Pursuant to the Settlement, the Siskey Settlement Fund will be distributed, managed, and otherwise
administered by American Legal Claims Services LLC, as the designated disbursing agent.

[23]     For the sake of clarity, the Trustee estimates that total administrative expenses in this Case after June 1,
2018 will total $2,000,000.00.  The Trustee currently has $510,538.86 in the deposit accounts for the Ponzi Debtors'
bankruptcy estates, but has also satisfied $296,090.43 in post-June 1 administrative expenses.  Therefore, the
Trustee needs an additional $1,193,370.71 from the Siskey Settlement Fund to fund what the Trustee believes to be
a sufficient administrative expense reserve in this Case.

(e)  fifth, $16,782,169.65 will be paid, pro rata, to holders of allowed Base Claims in this Case, the Probate Investors, and Orphaned Investors, resulting in the satisfaction of an additional 40.64% of all Base Claims; and

(f)  sixth, Diane Siskey will "holdback" or reserve from the distribution (the "Holdback") the minimum, base amount of $2,050,000.00, which Diane Siskey will be able to spend to defend against and/or settle (i) governmental investigations or litigation and (ii) private litigation against her arising out of or in any way related to the Ponzi Scheme, with any unspent Holdback funds eventually reverting to Siskey Settlement Fund.

36.    In addition, Diane Siskey will contribute up to an additional $7,460,280.17 into an individual investor settlement facility (the "Siskey Settlement Facility"), which funds will be paid to victims of the Ponzi Scheme who voluntarily agree to release all of their individual claims (if any) against Diane Siskey (and her children) (the "Optional Siskey Release") in exchange for an increased recovery from the Settlement.

37.    Any Ponzi Scheme victim holding Base Claims wishing to participate in the Siskey Settlement Facility must execute the Optional Siskey Release and, in exchange, will receive his or her pro rata share of $7,460,280.17, which is tantamount to an additional 18.07% recovery.  In other words, any investor who participates in the Siskey Settlement Facility will recover at least 86% on their Base Claims from the Settlement.

38.    Similarly, Diane Siskey will contribute up to an additional $750,000.00 and MetLife will contribute up to an additional $750,000.00 into a separate individual investor settlement facility (the "MetLife Settlement Facility"), which funds will be paid to victims of the Ponzi Scheme who voluntarily agree to release all of their individual claims (if any) against MetLife (the "Optional MetLife Release") in exchange for an increased recovery from the Settlement.

39.     Any Ponzi Scheme victim holding Base Claims wishing to participate in the MetLife Settlement Facility must execute the Optional MetLife Release and, in exchange, will receive his or her pro rata share of $1,500,000.00, which is tantamount to an additional 3.6% recovery.

40.     The Siskey Settlement Facility and the MetLife Settlement Facility are entirely optional; investors may choose to participate in (i) both facilities, (ii) one facility but not the other, or (iii) neither facility.

41.     **Any investor who participates in both the Siskey Settlement Facility *and* the MetLife Settlement Facility will recover approximately 90% on their Base Claims from the Settlement**.

42.     Any investor who does not participate in the Siskey Settlement Facility or the MetLife Settlement Facility will recover 68% on their Base Claims immediately following approval of the Settlement.

43.     For any investor electing not to execute the Optional Siskey Release, an amount equal to his or her pro rata share of $7,460,280.17 will be added to the Holdback.  Likewise, for any investor electing not to execute the Optional MetLife Release, an amount equal to his or her pro rata share of $750,000.00 will be added to the Holdback, and MetLife's Settlement payment will be reduced by an amount equal to his or her pro rata share of $750,000.00.

44.     If the Settlement is approved, in exchange for the various consideration provided to the bankruptcy estates by the Administrator, Diane Siskey, Negrelli, the Stone Street Claimants, and MetLife, the Trustee would release any and all claims owned or controlled by the Ponzi Debtors' bankruptcy estates against Diane Siskey (and her two children), the Stone Street Claimants, and MetLife.

## RELIEF REQUESTED

45.    Through this Motion, the Trustee seeks entry of an Order:  (a) approving the portions of the Settlement directly affecting the Ponzi Debtors' bankruptcy estates as being fair, equitable, reasonable, and in the best interests of the Ponzi Debtors' bankruptcy estates; (b) authorizing the Trustee to take any and all actions necessary to carry out the terms of the Settlement without further confirmation by the Court, including the Trustee's execution of the Settlement Agreement; and (c) enjoining any person sued by the Trustee for tort liability arising out of or in connection with the Ponzi Scheme from pursuing any contribution or indemnity claims against Diane Siskey (or her children) but mandating that any enjoined defendant receive a credit against any monetary judgment entered in favor of the Trustee in the amount of $27,317,725.49[24] plus whatever funds are ultimately leftover for the Ponzi Debtors' bankruptcy estates from the Holdback.

46.    In the opinion of the Trustee, an exclusive list of the Settlement terms that would materially affect the Ponzi Debtors' bankruptcy estates is as follows:

(a)    in exchange for the Administrator providing a comparable release, the settlement payments made by Diane Siskey, Negrelli, and MetLife, and other consideration, the Trustee would release the Ponzi Debtors' bankruptcy estates' legal and/or equitable claim to the Life Ins. Proceeds;

(b)    the Trustee would voluntarily subordinate the claims held against the Siskey Estate by the Ponzi Debtors' bankruptcy estates to the extent

---

[24]    This figure is intended to reflect the amount of money contributed by Diane Siskey and Negrelli that flows directly to the Ponzi Debtors' bankruptcy estates, and is calculated by the Trustee as follows:  (a) of the $41,376,196.46 payable by Diane Siskey and Negrelli through the Settlement, (i) $2,050,000.00 is being reserved in a Holdback, and (ii) an aggregate of $8,210,280.17 is going to the Siskey Settlement Facility or MetLife Settlement Facility, leaving a subtotal of $31,115,916.29 in funds from Diane Siskey and Negrelli to be distributed through the Siskey Settlement Fund; (b) of the total amount of Base Claims across all of the victim constituencies (*i.e.*, Probate Investors, Orphaned Investors, and "bankruptcy" investors), which totals $41,292,513.56 in the aggregate, the aggregate amount of allowed Base Claims in this Case ($36,252,107.75) represents approximately 87.79% of all Base Claims (and, therefore, 87.79% of all Siskey Settlement Fund contributions should be allocated as benefitting the Ponzi Debtors' bankruptcy estates); and (c) $27,317,725.49 (approximately 87.79% of $31,115,916.29) represents the portion of Diane Siskey and Negrelli Settlement funds that will directly benefit the Ponzi Debtors' bankruptcy estates pursuant to the Settlement.

necessary to equalize recoveries among claimants in this Case and the Probate Investors and Orphaned Investors;

(c) in exchange for a payment from Diane Siskey and Negrelli to the bankruptcy estate and other consideration, the Trustee would release Diane Siskey and her children from any and all causes of action of any nature whatsoever owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Ponzi Debtors' bankruptcy estates, including, without limitation:  (A) causes of action under chapter 5 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of common acts or omissions by Diane Siskey (or her children) that injured the Ponzi Debtors and, therefore, derivatively injured all of the Ponzi Debtors' creditors, generally;

(d) in exchange for a payment from MetLife to the bankruptcy estate and other consideration, the Trustee would release MetLife from any and all causes of action of any nature whatsoever owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Ponzi Debtors' bankruptcy estates, including, without limitation:  (A) causes of action under chapter 5 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of common acts or omissions by MetLife that injured the Ponzi Debtors and, therefore, derivatively injured all of the Ponzi Debtors' creditors, generally;

(e) in exchange for the subordination and disallowance of the Stone Street Claimants' claims (as detailed in the Agreement), an immediate payment to the Stone Street Claimants by the Trustee of $1,000,000.00, plus Stone Street shall receive 50% of recoveries by the Ponzi Debtors' bankruptcy estates—up to an additional $3,000,000.00—once 100% of Base Claims have been satisfied;

(f) the Trustee would also release the Stone Street Claimants from any and all causes of action of any nature whatsoever owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Ponzi Debtors' bankruptcy estates, including, without limitation:  (A) causes of

action under chapter 5 of the United States Bankruptcy Code, 11 U.S.C.
§§ 101 *et seq.*; (B) causes of action seeking the imposition of a
constructive trust; and (C) causes of action for actual fraud, constructive
fraud, negligent misrepresentation, breach of duty, unjust enrichment,
restitution, negligence, unfair and deceptive trade practices, civil
conspiracy, private causes of action based on state or federal insurance or
securities laws violations, vicarious liability, respondeat superior, aiding
and abetting, and/or punitive damages arising out of common acts or
omissions by the Stone Street Claimants that injured the Ponzi Debtors
and, therefore, derivatively injured all of the Ponzi Debtors' creditors,
generally;

(g) the SEC withdrawing the SEC's claim in this Case; and

(h) the Trustee's transfer of $24,164.76[25] to the Administrator.

## BASIS FOR RELIEF REQUESTED

47.     Pursuant to § 105 of the Code, the Court "may issue any order, process, or
judgment that is necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C.
§ 105(a).

48.     Pursuant to Bankruptcy Rule 9019, the Court may—upon a motion by a trustee,
notice to creditors and the Bankruptcy Administrator, and a hearing—approve a compromise or
settlement. FED. R. BANKR. P. 9019(a).

49.     In bankruptcy proceedings, "compromises are favored in order to minimize
litigation and expedite the administration of the bankruptcy estate." *In re Energy Future
Holding Corp.*, 527 B.R. 157, 163 (Bankr. D. Del. 2015). In order to approve a settlement, a
bankruptcy court must find that the settlement is fair, equitable, and does not fall "below the
lowest point in the range of reasonableness." *Id.*; *Hinson v. Bank of America, N.A. (In re
Broughton)*, 2017 WL 6373977, at *4 (E.D.N.C. Dec. 13, 2017).

---

[25]     On July 25, 2017, the Court entered an Order in this Case [D.E. 85] directing the United States to remit
$24,164.76 to the Trustee, reflecting funds seized from a deposit account owned by Rick Siskey. The Trustee is
currently holding those funds in an escrow account separate and apart from any bankruptcy estate funds. These
escrowed funds, at least legally, are more accurately characterized as property of the Siskey Estate.

50.     A bankruptcy court has subject matter jurisdiction to approve a settlement so long as there is some nexus between the bankruptcy proceedings and the claims disposed by the settlement. *See In re Land Resource, LLC*, 505 B.R. 571, 582–84 (M.D. Fla. 2014). Similarly, a bankruptcy court has the constitutional authority to approve settlements affecting bankruptcy estates, partially because a settlement is not tantamount to a final adjudication on the merits of any of the claims disposed by the settlement. *Id.*, at 578–82.

51.     Similarly, a bankruptcy court has subject matter jurisdiction to enter "bar orders" integral to a proposed settlement that enjoin prosecution of third-party contribution and/or indemnification claims derivative of bankruptcy estate claims to be resolved by the proposed settlement. *See In re Munford, Inc.*, 97 F.3d 449, 453–54 (11th Cir. 1996).

## ARGUMENT

52.     The Settlement is premised on Diane Siskey, Negrelli, and MetLife making substantial cash payments in exchange for receiving a release from claims owned or controlled by the Ponzi Debtors' bankruptcy estates. Unlike the previous settlement agreed to by the Trustee and Diane Siskey,[26] **the Settlement involves no non-consensual third-party releases, waivers, or injunctions impacting any investor victims' claims against Diane Siskey or any other party**.[27]

53.     There are several reasons why the Trustee believes the Settlement benefits all creditors in this Case and otherwise serves the best interests of the bankruptcy estates. First and

---

[26]     The previous settlement was embodied by the "Settlement Term Sheet" attached to the Trustee's *Motion for Order (I) Terminating Joint Administration of Sharon Road Properties, LLC Case, (II) Converting Remaining Cases to Chapter 11, and (III) Providing Miscellaneous Related Relief* (D.E. 253).

[27]     Admittedly, the Settlement seeks entry of a bar order, but the injunction(s) sought would only prevent contribution/indemnification claims between joint tortfeasors responsible for the Ponzi Scheme; such a bar order would have no impact on investor/victim litigation. More specifically, the bar order would merely prevent contributions/indemnification suits against Diane Siskey and her children by defendants that the Trustee sues in tort for some responsibility related to furthering the Ponzi Scheme.

foremost, the Settlement will provide a substantial distribution on Base Claims. Holders of allowed Base Claims in this Case that choose to participate in the Siskey Settlement Facility and the MetLife Settlement Facility would receive an approximately 90% recovery from the Settlement. Holders of allowed Base Claims in this Case that elect not to execute the Optional Siskey Release and Optional MetLife Release would still receive an approximately 68% recovery from the Settlement. Thereafter, depending on a number of variables,[28] by the end of this Case, there could be additional distributions totaling as much as another approximately 10%–20% of Base Claims to all investor victims, regardless of whether the victim elects to participate in the individual investor settlement facilities.

54.    Moreover, the Settlement quickly and comprehensively resolves complicated and vehemently disputed issues that would be extremely costly and time consuming to litigate and secures an immediate distribution to investor-victims and other creditors. If litigation with Diane Siskey and the Administrator is necessary, there is no guaranty that the Trustee will succeed in obtaining a monetary judgment against Diane Siskey or in imposing a constructive trust on the Life Ins. Proceeds in favor of the Ponzi Debtors' bankruptcy estates. Not only is North Carolina law and federal common law unsettled on the extent to which the Life Ins. Proceeds could be burdened with a constructive trust, but also there are competing tracing methodologies—all of which are complex—that necessitate a review of financial records dating back 20+ years that may no longer be available. The tracing analysis is further complicated by the fact that substantial amounts of Rick Siskey's income—particularly the $19,059,438.39 earned on the

---

[28]    The most significant of these variables include: (1) whether the IRS dilutes Siskey Estate assets otherwise available for distribution on Base Claims; (2) how much of the Holdback will ultimately be released back to pay Base Claims; (3) how much of the CB&B Holdback will ultimately be released back to the Administrator and thereafter made available to pay Base Claims; (4) the administrative expenses to be incurred by the Siskey Estate and the Ponzi Debtors' bankruptcy estates; and (5) whether, and the extent to which, the Trustee is able to collect on judgments obtained via future litigation arising out of the Ponzi Scheme.

CB&B deal—came from sources independent of the Ponzi Scheme. Diane Siskey also had her own income independent of the Ponzi Scheme. Thus, the outcome of the Trustee's litigation against Diane Siskey, the Administrator, and others is uncertain. Should the Trustee's litigation to acquire the Life Ins. Proceeds fail, only a very small fraction of Base Claims would be paid. In light of this risk, the Settlement unquestionably provides a fair, equitable, and reasonable outcome for victims of Rick Siskey's fraud and the bankruptcy estates more generally.

55.      In addition to litigation uncertainty, the litigation against Diane Siskey, the Administrator, and others would be extraordinarily expensive. From the Trustee's perspective alone, fully litigating the estates' claims against Diane Siskey, the Administrator, and others—and all related appeals—would cost the bankruptcy estates substantial amounts in attorneys' fees and litigation costs. Likewise, Diane Siskey's costs of litigating will limit her ability to pay any judgment the Trustee might obtain against her. The Trustee is informed that, if forced to litigate, Diane Siskey is prepared to vigorously defend any claims asserted against her or her children.

56.      In addition to the uncertainty and cost of litigation, perhaps the most troubling aspect such a strategy is the delay that would result. This Case has been pending for twenty-two (22) months. Litigation with Diane Siskey, the Administrator, and others would take years to reduce to a final, non-appealable judgment, thereby pushing back any additional distributions to investor-victims and other creditors by at least several years. Even assuming for the sake of argument that the Trustee ultimately would prevail, there are many benefits to the bankruptcy estates, creditors, and the Court of distributing the vast majority of the Life Ins. Proceeds today through the Settlement as opposed to attempting to recover all of the Life Ins. Proceeds years from now through protracted litigation.

57.    The Settlement also resolves the impediment to paying Base Claims created by the Stone Street Claimants' claims, which, if allowed as asserted, would comprise approximately 42% of the claims in this Case.  In exchange for a release and an upfront payment totaling $1,000,000.00, the Stone Street Claimants have agreed to subordinate their claims to the extent necessary to pay all Base Claims in full and thereafter share in any recovery 50/50 with the Base Claims up to a maximum payment to Stone Street of $4,000,000.00 (inclusive of the $1,000,000.00 upfront payment).[29]    Much like the resolution with Diane Siskey (and the Administrator) regarding access to the Life Ins. Proceeds, the compromise with the Stone Street Claimants avoids substantial litigation-related costs, delay, and uncertainty.

58.    The Trustee has also agreed to release the bankruptcy estates' claims against MetLife in exchange for a payment from MetLife in the amount of $1,000,000.00.  Under North Carolina law, when "all creditors of an insolvent or bankrupt corporation share an injury based on a common act, only a receiver or trustee has standing to assert the creditors' collective claim . . . on behalf of the corporation." *Associated Hardwoods, Inc. v. Lail*, 2018 WL 3747439, at *6, 18-CVS-329 (Caldwell County) (N.C. Bus. Ct. Aug. 6, 2018) (quoting *Angell v. Kelly*, 336 F.Supp.2d 540, 544–45 (M.D.N.C. 2004) (internal quotations omitted)).[30]    For example, in the bankruptcy proceedings arising in the aftermath of the Madoff Ponzi scheme, the U.S. Bankruptcy Court for the Southern District of New York, the U.S. District Court for the Southern District of New York, and the U.S. Court of Appeals for the Second Circuit all agreed that claims against Madoff's "co-conspirator(s)" were property of the bankruptcy estate and individual

---

[29]    The Stone Street Claimants have also agreed to immediately withdraw their claims in the SRP Case.

[30]    "Indeed, a review of North Carolina cases and federal cases applying North Carolina law reveals that an individual creditor typically only has standing to sue directors of a debtor corporation where some misconduct was directed specifically at plaintiff or the directors were alleged to have misappropriated funds that were earmarked for plaintiff." *Associated Hardwoods*, 2018 WL 3747439, at *6.

creditors would be enjoined from pursuing duplicate or derivate claims after the Madoff trustee had settled the same or similar claims in the name of the debtor's bankruptcy estate. *See In re Madoff*, 848 F.Supp.2d 469, 472–73, 479–81 (S.D.N.Y. 2012) (*aff'd* 740 F.3d 81 (2d Cir. 2014)). Rick Siskey (and potentially others) owed the Ponzi Debtors an obligation to spend funds invested into those entities for legitimate investment purposes; every dollar diverted from the Ponzi Debtors for the illegitimate purpose of furthering the Ponzi Scheme caused injury to the Ponzi Debtors and, derivatively, ***all*** creditors and equity interest holders of the Ponzi Debtors. It therefore follows that, under North Carolina law, the Ponzi Debtors own, and have exclusive standing to assert, any claims against MetLife based on alleged acts or omissions that generally facilitated the Ponzi Scheme.

59.    As indicated above, the Settlement is contingent upon entry of a "*Munford* style" bar order. *See Munford*, 97 F.3d at 454–56. Such a bar order would have absolutely zero effect on the Investor Lawsuits or on any other claims held by victims of the Ponzi Scheme against Diane Siskey or others. The bar order sought would: (a) enjoin any contribution or indemnity claims against Diane Siskey (or her children) by third-party defendants sued by the Trustee for tort liability arising out of or in connection with the Ponzi Scheme; and, in exchange for such injunction, (b) mandate that any enjoined third-party defendant(s) receive a "dollar-for-dollar" credit against any monetary judgment entered in favor of the Trustee to the extent of Diane Siskey's settlement payment contributed to the Ponzi Debtors' bankruptcy estates (*i.e.*, $27,317,725.49 plus whatever funds are ultimately leftover for the Ponzi Debtors' bankruptcy estates from the Holdback).

60.    Ultimately, the Settlement resolves the most vexing problems plaguing this Case and expedites a swift resolution of an otherwise complicated drove of litigation involving the

Ponzi Debtors' bankruptcy estates.  The Trustee, in the exercise of his discretion and business

judgment, believes the Settlement to be fair, equitable, reasonable, and otherwise in the best

interests of the Ponzi Debtors' bankruptcy estates.

**WHEREFORE**, the Trustee respectfully prays that the Court will enter an Order:

1) GRANTING this Motion;

2) approving the portions of the Settlement directly affecting the Ponzi Debtors' bankruptcy estates as being fair, equitable, reasonable, and in the best interests of the Ponzi Debtors' bankruptcy estates;

3) authorizing the Trustee to take any and all actions necessary to carry out the terms of the Settlement without further confirmation by the Court, including executing the Settlement Agreement;

4) enjoining any person sued by the Trustee for tort liability arising out of or in connection with the Ponzi Scheme from pursuing any contribution or indemnity claims against Diane Siskey (or her children) but mandating that any enjoined defendant receive a credit against any monetary judgment entered in favor of the Trustee in the amount of $27,317,725.49 plus whatever funds are ultimately leftover for the Ponzi Debtors' bankruptcy estates from the Holdback; and

5) granting such other and further relief as may be just and proper.

This is the 3d day of December, 2018.

_/s/ Michael L. Martinez_
Joseph W. Grier, III (N.C. Bar No 7764)
Anna S. Gorman (N.C. Bar No 20987)
Michael L. Martinez (N.C. Bar No. 39885)
Grier Furr & Crisp, PA
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone:  704/375.3720; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

*Attorneys for Joseph W. Grier, III, Trustee*

# SCHEDULE 1

## Distribution Estimations

| Assets | | Liabilities | | |
|---|---|---|---|---|
| **Settlement Funds (Available on "Day 1")** | | **Claims** | | |
| Diane Siskey - Siskey Settlement Fund Contribution (1) | $33,165,916.29 | Total Bankruptcy Claims | | $36,252,107.75 |
| Diane Siskey - Siskey Settlement Facility Contribution (2) | $7,460,280.17 | Total Probate Investor Claims | | $4,204,459.00 |
| Diane Siskey - MetLife Settlement Facility Contribution (3) | $750,000.00 | Total Outside Investor Claims | | $835,946.81 |
| **Total Diane Siskey Settlement Payment** | **$41,376,196.46** | **Reserves** | | |
| MetLife - Siskey Settlement Fund Contribution (1) | $250,000.00 | Reserve for Bankruptcy Estate Administrative Expenses | $2,000,000.00 | |
| MetLife - MetLife Settlement Facility Contribution (3) | $750,000.00 | Less admin expenses post June 1, 2018 | $296,090.43 | |
| **Total MetLife Settlement Payment** | **$1,000,000.00** | Less bankruptcy bank balance | $510,538.86 | |
| **Probate Estate Assets in Hand (Potentially Available on "Day 2")** | | Additional reserve needed | | $1,193,370.71 |
| Cash in Probate Estate Account (1) | $5,543,040.92 | Diane Siskey Holdback | | $2,050,000.00 |
| 21.38% interest in SRP (estimate) (1) | $536,540.00 | Estimated Unpaid Probate Estate Administrative Expenses | | $500,000.00 |
| Bank Account Proceeds in Escrow (1) | $24,164.76 | **Settlement Payments Owed by Bankruptcy Estate** | | |
| **Total Probate Estate Assets** | **$6,103,745.68** | Upfront Settlement Payment to Stone Street / Porter / King | | $1,000,000.00 |
| **Speculative/Estimated Probate Assets (Potentially Available on "Day 3")** | | | | |
| Ballantyne Clubdominium Lien (1) | $170,000.00 | | | |
| C&B Holdback (Speculative) (1) | $2,500,000.00 | | | |
| **Total speculative/estimated Probate assets** | **$2,670,000.00** | | | |
| **Speculative Bankruptcy Estate Assets (Potentially Available on "Day 3")** | | | | |
| WSC 25% Ballantyne Clubdominium, LLC (Speculative) (1) | $180,000.00 | | | |
| Net Winner Actions (Speculative) (1) | $250,000.00 | | | |
| Unused Portion of Diane Siskey Holdback (Speculative) (1) | $2,050,000.00 | | | |
| **Total Speculative Bankruptcy Estate Assets** | **$2,480,000.00** | | | |
| **TOTAL---ALL ASSETS (some speculative)** | **$53,629,942.14** | **TOTAL---ALL LIABILITIES** | | **$45,035,884.27** |

| Waterfall | | | | | | |
|---|---|---|---|---|---|---|
| | | | | $33,415,916.29 | | |
| **Siskey Settlement Fund "Day 1" Waterfall (1)** | | | | | | |
| Prior Interim Distribution to Bankruptcy Investors | $10,000,000.00 | Balance of "Day 1" Waterfall Available | $23,415,916.29 | from Siskey Settlement Fund on Day 1 | 27.58% | 27.58% |
| Prior Interim Distribution to Bankruptcy Admin | $1,000,000.00 | Balance of "Day 1" Waterfall Available | $22,415,916.29 | | | |
| Diane Siskey Holdback | $2,050,000.00 | Balance of "Day 1" Waterfall Available | $20,365,916.29 | | | |
| Additional Funds for Bankruptcy Estate Admin Reserve | $1,193,370.71 | Balance of "Day 1" Waterfall Available | $19,172,545.58 | | | |
| Upfront Settlement Payment to Stone Street / Porter / King | $1,000,000.00 | Balance of "Day 1" Waterfall Available | $18,172,545.58 | | | |
| Catch-up Payment to Probate Investors (27.58%) | $1,159,783.32 | Balance of "Day 1" Waterfall Available | $17,012,762.26 | | | |
| Catch-up Payment to Outside Investors (27.58%) | $230,592.61 | Balance of "Day 1" Waterfall Available | $16,782,169.65 | | | |
| Day 1 Siskey Settlement Fund Distribution to All Investors | $16,782,169.65 | Balance of "Day 1" Waterfall Available | $0.00 | from Siskey Settlement Fund on Day 1 | 40.64% | 68.23% |
| **Optional Siskey Settlement Facility (2)** | | | | | | |
| Siskey Settlement Facility Distribution IF 100% Participation | $7,460,280.17 | Optional "Day 1" Distribution | | % from Siskey Settlement Facility | 18.07% | 86.29% |
| **Optional MetLife Settlement Facility (3)** | | | | | | |
| MetLife Settlement Facility Distribution IF 100% Participation | $1,500,000.00 | Optional "Day 1" Distribution | | $ from MetLife Settlement Facility | 3.63% | 89.93% |
| **Estimated Siskey Settlement Fund "Day 2" Waterfall Based on Assets in Hand (1)** | | | | $6,103,745.68 | | |
| Additional Funds for Probate Estate Admin Reserve | $500,000.00 | Balance of "Day 2" Waterfall Available | $5,603,745.68 | | | |
| Payment Necessary to Pay Base Claims in Full | $4,159,687.81 | Balance of "Day 2" Waterfall Available | $1,444,057.87 | % Up to Stone Street "Kick-In" | 10.07% | 100.00% |
| Estimated Stone Street Backend Payment | $722,028.93 | Balance of "Day 2" Waterfall Available | $722,028.93 | | | |
| Estimated Payment to Investors | $722,028.93 | Balance of "Day 2" Waterfall Available | $0.00 | | | |
| **Possible Siskey Settlement Fund "Day 3" Waterfall Based on Speculative Assets (1)** | | | | $5,150,000.00 | | |
| Balance to Stone Street on Backend Payment | $2,277,971.07 | Balance of "Day 3" Waterfall Available | $2,872,028.94 | | | |
| Estimated Payment to Investors | $2,872,028.94 | Balance of "Day 3" Waterfall Available | $0.00 | | | |

The information contained herein has not been subject to a certified audit or other independent review. Any values of assets and liabilities contained herein have been estimated by the Trustee based on the best information currently available to the Trustee. Although substantial efforts have been made to be complete and accurate, the Trustee is unable to warrant or represent the full and complete accuracy of the information contained herein.

# SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (this "Agreement") is made and entered into by and among JOSEPH W. GRIER, III, as Trustee for TSI Holdings, LLC, WSC Holdings, LLC, SouthPark Partners, LLC, and Sharon Road Properties, LLC (the "Trustee"); F. LANE WILLIAMSON, as Administrator CTA of the Estate of Richard C. Siskey (the "Administrator"); SISKEY INDUSTRIES, LLC ("Siskey Industries"), DIANE M. SISKEY ("Mrs. Siskey"); JENNA MARIE NEGRELLI ("Negrelli"); STONE STREET PARTNERS, LLC ("Stone Street"), DAWN E. KING ("King"); PAUL G. PORTER ("Porter"); and METROPOLITAN LIFE INSURANCE COMPANY, MSI FINANCIAL SERVICES, INC. (f/k/a MetLife Securities, Inc. n/k/a MML Investors Services, LLC), MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, and BRIGHTHOUSE LIFE INSURANCE COMPANY (collectively, "MetLife").  The Trustee, the Administrator, Siskey Industries, Mrs. Siskey, Negrelli, Stone Street, King, Porter, and MetLife are each referred to as a "Party" and collectively referred to as the "Parties."

## RECITALS

WHEREAS, in early 2017, involuntary bankruptcy petitions were filed as to TSI Holdings, LLC ("TSI"), WSC Holdings, LLC ("WSC"), SouthPark Partners, LLC ("SPP," and, collectively with TSI and WSC, the "Ponzi Debtors"), and Sharon Road Properties, LLC ("SRP") before the U.S. Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court");

WHEREAS, the Bankruptcy Court entered orders for relief in the bankruptcy cases for each of TSI, WSC, SPP, and SRP, and the Trustee was appointed in each of those cases;

WHEREAS, the Trustee is of the opinion that, prior to the death of Richard C. Siskey ("Rick Siskey") on December 28, 2016, Rick Siskey controlled the operations and financial affairs of TSI, WSC, SPP, and SRP and operated the Ponzi Debtors (excluding SRP)—and Siskey Industries—as part of a Ponzi scheme (the "Ponzi Scheme");

WHEREAS, Rick Siskey was also a founding member of Stone Street, which employed King as chief financial officer and Porter as managing director and counsel;

WHEREAS, on March 17, 2017, an estate administration proceeding was initiated before the Mecklenburg County Clerk of Superior Court under file number 17-E-243 for the Estate of Richard C. Siskey (the "Siskey Estate"), for which the Administrator was issued letters of administration;

WHEREAS, upon Rick Siskey's death, Mrs. Siskey (Rick Siskey's wife), Negrelli (Rick Siskey's daughter), and two other individuals received an aggregate of approximately $49,525,000.00 in life insurance proceeds from four separate life insurance policies (the "Life Ins. Proceeds");

# EXHIBIT A

WHEREAS, after Rick Siskey's death, Mrs. Siskey agreed to liquidate her primary residence and certain of her personal property and to allow the Trustee to hold the resulting proceeds in escrow, which total $1,898,221.29 (the "House Proceeds");

WHEREAS, Mrs. Siskey previously agreed to release $11,000,000.00 of the Life Ins. Proceeds to the Trustee, which enabled the Trustee to make a $10,000,000.00 interim distribution (the "Interim Distribution") in the Ponzi Debtors' bankruptcy case (the "Bankruptcy Case"), which resulted in a 27.58% recovery on claims arising out of the Ponzi Scheme calculated pursuant to the Net Investment Method ("Base Claims") of holders of allowed claims in the Bankruptcy Case ("Bankruptcy Investors");

WHEREAS, various claims, cross-claims, counter-claims, and other disputes have arisen among the Parties in the aftermath of the Ponzi Scheme, including, without limitation, (a) competing claims to the Life Ins. Proceeds by the Trustee, the Administrator, Mrs. Siskey, and Negrelli, and (b) damages and/or contribution claims relating to alleged responsibility for failing to prevent or terminate the Ponzi Scheme; and

WHEREAS, the Parties, through their respective counsel, have negotiated a compromise of these various disputes upon the terms and conditions more particularly set forth in this Agreement (the "Settlement").

**NOW, THEREFORE**, in consideration of the foregoing recitals and mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, the Parties hereby agree as follows:

1. <u>Court Approval</u>.  The terms and provisions of this Agreement, including the Parties' obligations hereunder, shall be subject to the condition precedent of the Bankruptcy Court entering a final, non-appealable order authorizing the Trustee to enter into this Agreement.  The Parties agree to use good faith efforts to seek, pursuant to Bankruptcy Rule 9019, approval of the Settlement, including by supporting entry of an Order by the Bankruptcy Court approving the motion attached hereto as Exhibit 1 (the "Settlement Motion").

2. <u>Definitions</u>.  Capitalized terms not otherwise defined in this Agreement shall have the meanings prescribed in the Settlement Motion.

3. <u>Settlement Terms</u>.  The fundamental terms of the Settlement are set forth below.

a. <u>Consideration from Mrs. Siskey and Negrelli</u>.

i. <u>Total Settlement Payment</u>.  Mrs. Siskey and Negrelli shall pay the sum of $41,376,196.46 toward the satisfaction of claims arising out of or in any way relating to the Ponzi Scheme upon the terms and conditions more thoroughly set forth herein (the "Siskey Settlement Payment"); *provided, however*, that Mrs. Siskey and Negrelli shall be given a credit against the Siskey Settlement Payment in the amount of $11,000,000.00 for funds previously contributed to the bankruptcy estates for TSI, WSC, and SPP (collectively, the "Bankruptcy Estates").  The Siskey Settlement Payment shall be increased in an amount equal to any and all additional interest or other income earned on the Regions Bank custodial account established by Mrs. Siskey to hold certain of the Life Ins. Proceeds after October 31, 2018 until the date all

**EXHIBIT A**

Parties have signed this Agreement and all conditions precedent to the effectiveness of this Agreement specifically enumerated herein have been satisfied (the "Implementation Date").

       ii.   <u>Division of the Siskey Settlement Payment</u>.  Of the Siskey Settlement Payment, (A) $20,115,916.29 shall be contributed to a settlement fund to be administered and distributed consistent with the provisions of Section 4.a of this Agreement (the "Siskey Settlement Fund"), (B) $7,460,280.17 (the "Siskey Settlement Facility Contribution") shall be contributed to an investor settlement facility to be administered and distributed consistent with the provisions of Section 4.b of this Agreement (the "Siskey Settlement Facility"), and (C) $750,000.00 (the "Siskey MetLife Settlement Facility Contribution") shall be contributed to an investor settlement facility to be administered and distributed consistent with the provisions of Section 4.c of this Agreement (the "MetLife Settlement Facility"); *provided, however*, that the Siskey Settlement Facility Contribution shall be reduced by an amount equal to the aggregate pro rata share of $7,460,280.17 for all Qualified Investors (defined below) who do not execute the Optional Siskey Release (defined below) and that the Siskey MetLife Settlement Facility Contribution shall be reduced by an amount equal to the aggregate pro rata share of $750,000.00 for all Qualified Investors (defined below) who do not execute the Optional MetLife Release (defined below).

       iii.   <u>Litigation Holdback</u>.  Notwithstanding anything herein to the contrary, Mrs. Siskey and Negrelli shall be entitled to reserve or "holdback" from the Siskey Settlement Payment the amount described in Section 3.a.iii.A (the "Holdback").

       A.   <u>Amount of the Holdback</u>.  The Holdback shall equal $2,050,000.00 *plus* an amount equal to the aggregate pro rata share of $7,460,280.17 for all Qualified Investors (defined below) who do not execute the Optional Siskey Release (defined below) *plus* an amount equal to the aggregate pro rata share of $750,000.00 for all Qualified Investors (defined below) who do not execute the Optional MetLife Release (defined below).

       B.   <u>Location of the Holdback</u>.  The Holdback shall be held and administered in escrow by Alston & Bird LLP or, in the event Alston & Bird LLP is unable or unwilling to hold and administer the Holdback, by a third party mutually agreeable to the Trustee, the Administrator, and Mrs. Siskey in their reasonable discretion.

       C.   <u>Uses of the Holdback</u>.  Mrs. Siskey may expend the Holdback for the exclusive purpose of funding the reasonable costs of the defense and/or settlement of:  (I) any governmental investigation or litigation concerning Mrs. Siskey or Mrs. Siskey's children, Negrelli and Richard Christopher Siskey, Jr. ("Mrs. Siskey's Children") relating to the Ponzi Scheme; and/or (II) any litigation against Mrs. Siskey or Mrs. Siskey's Children based on claims arising out of or in any way relating to the Ponzi Scheme, whether direct claims, third-party claims, or otherwise.

       D.   <u>Release of Holdback</u>.  At the conclusion (via settlement, final judgment, or expiration of the applicable statute(s) of limitations) of each of the foregoing categories of litigation for which the Holdback may be used, Mrs. Siskey shall release escrowed funds to the Siskey Settlement Fund in the following amounts:

# EXHIBIT A

I.   for any governmental investigation or litigation, the lesser of (1) 37% of the outstanding amount of Mrs. Siskey's Holdback or (2) $750,000.00;

II.   for any other litigation against Mrs. Siskey or Mrs. Siskey's Children, the lesser of (1) 63% of the outstanding amount of Mrs. Siskey's Holdback or (2) $1,300,000.00.

Notwithstanding any of the foregoing to the contrary, after all categories of litigation for which the Holdback may be used are concluded (via settlement, final judgment, or expiration of the applicable statute(s) of limitations), Mrs. Siskey shall release all remaining escrowed funds to the Siskey Settlement Fund, including, without limitation, funds escrowed as a result of reductions in the Siskey Settlement Facility Contribution and in the Siskey MetLife Settlement Facility Contribution. Mrs. Siskey agrees that, for purposes of this Agreement, the applicable statute of limitations for governmental investigation and/or litigation shall be December 31, 2022; and the applicable statute of limitations for other claims against Mrs. Siskey or Mrs. Siskey's Children arising out of or in any way relating to the Ponzi Scheme shall be June 1, 2021.

E.   Accounting for Use of the Holdback.   Mrs. Siskey shall provide, on or before the 15th day of the following month, a written monthly update to the Trustee and the Administrator accounting for Mrs. Siskey's use of the Holdback. The monthly updates shall provide: (a) a narrative explanation of the status of all litigation and the litigation activity that occurred during the applicable monthly period; (b) a specific dollar amount in litigation fees and costs that were incurred during the applicable monthly period for each category of uses described above; (c) a specific dollar amount in disbursements that were actually made during the applicable monthly period for each category of uses described above; and (d) the total amount of Holdback remaining for each category of uses described above. In addition to the foregoing monthly reporting requirement, Mrs. Siskey shall provide the Trustee and the Administrator with 14 days' advance written notice prior to: (I) making any disbursements in a particular month that cumulatively exceed $75,000.00; or (II) entering into any settlements fully or partially disposing of any litigation.

F.   Holdback Dispute Resolution.   In the event a dispute arises between the Trustee and/or the Administrator and Mrs. Siskey regarding whether an incurred cost is reasonable, the parties shall first attempt to resolve the dispute informally and then through mediation. If the parties fail to resolve the dispute at mediation, then such dispute shall be settled pursuant to binding arbitration by a single arbitrator in Charlotte, North Carolina, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

b.   Consideration from MetLife.

i.   Total Settlement Payment.   MetLife shall pay the sum of $1,000,000.00 toward the satisfaction of claims arising out of the Ponzi Scheme upon the terms and conditions more thoroughly set forth herein ("MetLife's Settlement Payment").

ii.   Division of MetLife's Settlement Payment.   Of MetLife's Settlement Payment, (A) $250,000.00 shall be contributed to the Siskey Settlement Fund, and

# EXHIBIT A

(B) $750,000.00 ("MetLife's Settlement Facility Contribution") shall be contributed to the MetLife Settlement Facility; *provided, however*, that MetLife's Settlement Facility Contribution shall be reduced by an amount equal to the aggregate pro rata share of $750,000.00 for all Qualified Investors (defined below) who do not execute the Optional MetLife Release (defined below).

> c. <u>Consideration from the Stone Street Claimants</u>.

> i. <u>Resolution of Claims against the Bankruptcy Estates</u>. Stone Street, King, and Porter shall execute a consent order in the form attached hereto as Exhibit 2, which shall provide for the following:

>> A. allowance of the claim(s) made by Stone Street in the Bankruptcy Case in the amount claimed;

>> B. subordination of the Stone Street claim(s) in the Bankruptcy Case to the extent necessary to pay all Base Claims of Bankruptcy Investors, Probate Investors, and Orphaned Investors in full, *provided, however*, that (I) Stone Street, Porter, and King shall receive an immediate aggregate payment of $1,000,000.00 from the Siskey Settlement Fund, (II) once Qualified Investors (defined below) who executed the Optional Siskey Release (defined below) and Optional MetLife Release (defined below) have received distributions equal to 100% of their Base Claims, factoring in any and all payments received from (1) the Interim Distribution, (2) the Siskey Settlement Fund, (3) the Siskey Settlement Facility, (4) the MetLife Settlement Facility, and (5) the Siskey Estate (the "Stone Street Distribution Threshold") then further Siskey Settlement Fund distributions shall be split between Stone Street and the Bankruptcy Investors, Probate Investors, and Orphaned Investors, with fifty percent (50%) of such distributions going to Stone Street (capped at $3,000,000.00 (the "Stone Street Payment Cap")) and fifty percent (50%) going toward the claims of Bankruptcy Investors, Probate Investors, and Orphaned Investors; *provided, further*, that, for the sake of clarity, in no event shall the Stone Street Claimants receive more than $4,000,000.00 from the Siskey Settlement Fund.

>> C. disallowance of any and all claims asserted by King or Porter against the Bankruptcy Estates.

> ii. <u>Resolution of Claims against the SRP Bankruptcy Estate</u>. Stone Street, King, and Porter shall execute a consent order in the form attached hereto as Exhibit 3, which shall provide for the disallowance of any and all claims asserted by Stone Street, King, and/or Porter against SRP's bankruptcy estate, which consent order shall only be filed with the Bankruptcy Court after an Order approving this Settlement is a final order that is no longer subject to appeal and all other conditions to the effectiveness of this Agreement have occurred.

> iii. <u>Resolution of Claims against the Siskey Estate</u>. Stone Street shall have an allowed general unsecured claim against the Siskey Estate in the amount of $17,383,847.00; *provided, however*, that the Stone Street claim shall be subordinated to other general unsecured claims and only paid on the terms set forth in this Agreement. King and Porter shall take any and all action deemed reasonably necessary by the Administrator to withdraw, reject or

# EXHIBIT A

otherwise disallow the claims filed by King and Porter against the Siskey Estate. In addition, and without limiting the foregoing, the Stone Street Claimants shall file a Notice of Dismissal with Prejudice in the pending civil action captioned *Stone Street Partners, LLC f/k/a Siskey Capital, LLC, et al. v. F. Lane Williamson, Administrator for the Estate of Richard C. Siskey, et al.* (Case No. 17-CVS-15265, Mecklenburg County, North Carolina Superior Court).

      iv.   <u>Release of Claims Against Siskey Industries</u>.  In exchange for the non-cash assets to be transferred from Siskey Industries to Stone Street pursuant to Section 4.e below and other consideration, Stone Street, King, and Porter shall release any and all claims against Siskey Industries as more particularly set forth in Section 6.b below.

      d.   <u>Consideration from the Trustee</u>.

      i.   <u>Equality of Distributions</u>.  The Trustee acknowledges that a primary goal of this Settlement is to ensure that the Bankruptcy Investors, the Probate Investors, and the Orphaned Investors have the opportunity to realize as equal of a total percentage recovery on their Base Claims as reasonably possible.  To further this objective, the Trustee agrees to subordinate the Bankruptcy Estates' claim(s) against the Siskey Estate to the extent necessary to equalize anticipated distributions among Bankruptcy Investors, Probate Investors, and Orphaned Investors.

      ii.   <u>Treatment of the SEC Claim</u>.  The terms and provisions of this Agreement, including the Parties' obligations hereunder, shall be subject to the condition precedent of the U.S. Securities and Exchange Commission (the "SEC") withdrawing the claim(s) made by the SEC in the Bankruptcy Case and the SRP bankruptcy case upon the Bankruptcy Court order authorizing the Trustee to execute this Agreement becoming a final, non-appealable order.

      iii.   <u>Release of Funds to the Administrator</u>.  On July 25, 2017, the Bankruptcy Court entered an Order in the Bankruptcy Case [D.E. 85] directing the United States to remit $24,164.76 to the Trustee, reflecting funds seized from a deposit account owned by Rick Siskey (the "Seized Funds").  The Seized Funds are currently held by the Trustee in escrow.  The Trustee shall return the Seized Funds to the Administrator.

      e.   <u>Consideration from the Administrator and Siskey Industries</u>.

      i.   <u>Assignment of Non-Cash Assets</u>.  Siskey Industries shall transfer, assign, or otherwise convey to Stone Street or its designees all of Siskey Industries' interest in: (i) Stone Street; (ii) Level Brands, Inc. and/or Level Beauty Group; (iii) Social Reality, Inc.; and (iv) Isodiol International, Inc. and/or Kure Corp.

      ii.   <u>Distribution of Siskey Estate Assets</u>.  After reserving for any and all reasonably incurred or anticipated costs of administration and government claims, the Administrator shall from time to time distribute available cash in the Siskey Estate to the Siskey Settlement Fund; *provided* that the Administrator is authorized, under applicable law, to make such distribution(s).  Notwithstanding anything herein to the contrary, the Administrator shall retain the full power and authority to pay any and all reasonable costs of administration of, and allowed claims against, the Siskey Estate in accordance with applicable law.

# EXHIBIT A

iii.  Treatment of the SEC Claim.  The Administrator shall work with the SEC to resolve the SEC's claim against the Siskey Estate in a manner designed to maximize the recoveries contemplated under this Agreement.  Furthermore, this Agreement shall be conditioned upon the SEC agreeing (or the entry of a Court order providing) that all funds the SEC recovers on any allowed claims against the Siskey Estate shall be paid over to the Disbursing Agent to be paid pursuant to the waterfall set forth in the Siskey Settlement Fund set forth in Section 4. a. of this Agreement.

iv.  Equality of Distributions.  The Administrator acknowledges that a primary goal of this Settlement is to ensure that the Bankruptcy Investors, the Probate Investors, and the Orphaned Investors have the opportunity to realize as equal of a total percentage recovery on their Base Claims as reasonably possible.

4.  Distributions from the Disbursing Agent.  Notwithstanding any of the provisions in this Agreement to the contrary, funds contributed to the Siskey Settlement Fund, the Siskey Settlement Facility, and the MetLife Settlement Facility shall be distributed, managed, and otherwise administered by American Legal Claims Services LLC, as disbursing agent (the "Disbursing Agent"), in accordance with the provisions of this Section.

a.  Siskey Settlement Fund Distributions.  The Disbursing Agent shall disburse cash contributed to the Siskey Settlement Fund pursuant to the following payment waterfall:

i.  first, the Disbursing Agent shall distribute $600,000.00 to Stone Street, *provided, however*, in lieu of a direct payment from the Disbursing Agent, the Trustee shall transfer $600,000.00 to Stone Street out of the House Proceeds;

ii.  second, the Disbursing Agent shall distribute $200,000.00 to Porter, *provided, however*, in lieu of a direct payment from the Disbursing Agent, the Trustee shall transfer $200,000.00 to Porter out of the House Proceeds;

iii.  third, the Disbursing Agent shall distribute $200,000.00 to King, *provided, however*, in lieu of a direct payment from the Disbursing Agent, the Trustee shall transfer $200,000.00 to King out of the House Proceeds;

iv.  fourth, the Trustee shall transfer the remaining $898,221.29 of the House Proceeds in escrow to the Bankruptcy Estates, to be held by the Trustee for the purpose of satisfying administrative expenses in the Bankruptcy Case;

v.  fifth, the Disbursing Agent shall distribute $295,149.42 to the Trustee to be held by the Trustee for the purpose of satisfying administrative expenses in the Bankruptcy Case;

vi.  sixth, the Disbursing Agent shall distribute to Probate Investors and Orphaned Investors a catch-up payment in an amount necessary to satisfy 27.58%—the same percentage distributed to Bankruptcy Investors pursuant to the Interim Distribution—of each investor's Base Claim(s), in accordance with the schedules attached hereto as Exhibit 4;

# EXHIBIT A

vii.    seventh, the Disbursing Agent shall distribute available funds pro rata to the Bankruptcy Investors, the Probate Investors, and the Orphaned Investors based on Base Claims up to the Stone Street Distribution Threshold;

viii.   eighth, upon reaching the Stone Street Distribution Threshold, the Disbursing Agent shall distribute 50% of available funds pro rata to the Bankruptcy Investors, the Probate Investors, and the Orphaned Investors based on Adjusted Base Claims (defined below) and the remaining 50% of available funds shall be distributed to Stone Street, up to the Stone Street Payment Cap; and

ix.    ninth, upon reaching the Stone Street Payment Cap, the Disbursing Agent shall distribute available funds pro rata to the Bankruptcy Investors, the Probate Investors, and the Orphaned Investors based on Adjusted Base Claims (defined below).

b.   <u>Siskey Investor Settlement Facility</u>.

i.    <u>Eligibility to Participate in Settlement Facility</u>.   Any and all Bankruptcy Investors, the Probate Investors, and the Orphaned Investors holding Base Claims (collectively, the "Qualified Investors") shall be eligible to participate in the Siskey Settlement Facility.

ii.    <u>Optional Siskey Release</u>.   In order to participate in the Siskey Settlement Facility, any and all Qualified Investors must execute a voluntary release of any and all claims against Mrs. Siskey and Mrs. Siskey's Children per the form attached hereto as Exhibit 5 (the "Optional Siskey Release").

iii.    <u>Investor Settlement Facility Distributions</u>.   The Disbursing Agent shall distribute to all Qualified Investors who execute the Optional Siskey Release such investor's pro rata share of the Siskey Settlement Facility Contribution.

c.   <u>MetLife Investor Settlement Facility</u>.

i.    <u>Eligibility to Participate in Settlement Facility</u>.   Any and all Qualified Investors shall be eligible to participate in the MetLife Settlement Facility.

ii.    <u>Optional MetLife Release</u>.   In order to participate in the MetLife Settlement Facility, any and all Qualified Investors must execute a voluntary release of any and all claims against MetLife per the form attached hereto as Exhibit 5 (the "Optional MetLife Release").

iii.    <u>Investor Settlement Facility Distributions</u>.   The Disbursing Agent shall distribute to all Qualified Investors who execute the Optional MetLife Release such investor's pro rata share of both Mrs. Siskey's MetLife Settlement Facility Contribution and MetLife's Settlement Facility Contribution.

d.   <u>Distributions to Bankruptcy Investors</u>.   Notwithstanding any of the foregoing to the contrary, all amounts payable from the Siskey Settlement Fund to Bankruptcy Investors pursuant to this Agreement shall be disbursed to the Trustee, who shall then pass-along such distributions as property of the Bankruptcy Estates to Bankruptcy Investors.

## EXHIBIT A

e. <u>Equality of Distributions</u>.  Subject to Section 4.f below, the Disbursing Agent, to the fullest extent possible, shall ensure that the Bankruptcy Investors, the Probate Investors, and the Orphaned Investors realize as equal of a total percentage recovery on their Base Claims as reasonably possible.  For example, if at any time, a certain subset of holders of Base Claims have received a greater percentage recovery than others (excluding or ignoring any payments received from the Siskey Settlement Facility and/or MetLife Settlement Facility), then the Disbursing Agent shall distribute available funds pro rata to the holders of Base Claims who have received a lesser percentage recovery than others until all holders of Base Claims have received the same percentage recovery on Base Claims.

f. <u>Payment of an Interest Component After Base Claims Paid in Full</u>. Notwithstanding anything herein to the contrary, upon reaching the Stone Street Distribution Threshold, further pro rata distributions to the Bankruptcy Investors, the Probate Investors, and the Orphaned Investors—regardless of whether any particular investor executed the Optional Siskey Release or the Optional MetLife Release—shall be calculated using claims based on the Net Investment Method plus an interest component variable dependent on the actual timing of contributions to and distributions from the Ponzi Scheme ("Adjusted Base Claims").  When it becomes apparent to the Trustee that the Stone Street Distribution Threshold will be reached, the Trustee shall submit a recommendation to the Bankruptcy Court, and shall seek Bankruptcy Court approval, of a particular interest component calculation for each of the Bankruptcy Investors.  The Administrator agrees to follow an approach wholly consistent with the Bankruptcy Court's determination regarding interest with respect to the claims of Probate Investors and Orphaned Investors once the Stone Street Distribution Threshold has been reached. For the avoidance of doubt, nothing contained herein is intended to dilute the distributions to Stone Street after the Stone Street Distribution Threshold has been reached.

g. <u>Compensation to the Disbursing Agent</u>.  Notwithstanding anything herein to the contrary, as compensation for administering the Siskey Settlement Fund, the Siskey Settlement Facility, and the MetLife Settlement Facility in accordance with this Agreement, the Disbursing Agent shall receive compensation and reimbursement of expenses pursuant to the provisions of Exhibit 6, attached hereto and incorporated herein by reference.  Costs associated with the Disbursing Agent administering the Siskey Settlement Fund, the Siskey Settlement Facility, and the MetLife Settlement Facility shall be paid ratably from each of the same.

h. <u>Administration of Optional Investor Releases</u>.  Within five (5) days after the Implementation Date, the Trustee will mail the Exhibit 5 form (Optional Siskey Release / Optional MetLife Release) to all Qualified Investors.  Each Qualified Investor wishing to participate in the Siskey Settlement Facility or the MetLife Settlement Facility shall return such Qualified Investor's fully-executed Optional Siskey Release and/or Optional MetLife Release to the Trustee via mail (101 N. Tryon Street, Suite 1240, Charlotte, North Carolina), email (tsiholdings@grierlaw.com), or facsimile (704/332.0215) on or before the sixtieth (60th) day following the Implementation Date (the "Opt-In Deadline").  The Trustee, in the Trustee's sole discretion, may extend the Opt-In Deadline for one or more Qualified Investors for a period not to exceed twenty-one (21) days following the initial Opt-In Deadline.  Within five (5) business days of the expiration of the Opt-In Deadline, the Trustee shall deliver copies of all Optional Siskey Releases received by the Trustee to Mrs. Siskey's counsel and the Disbursing Agent and all Optional MetLife Releases received by the Trustee to MetLife's counsel and the Disbursing

# EXHIBIT A

Agent. The Trustee shall also file and serve a list of the names of the releasors in the Bankruptcy Case within five (5) business days of the expiration of the Opt-In Deadline.

      i.   <u>Timing of Distributions</u>.

      i.   <u>Timing of Siskey Settlement Fund Distributions</u>. Mrs. Siskey and Negrelli shall transfer, or cause to be transferred, to the Disbursing Agent the portion of the Siskey Settlement Payment attributable to the Siskey Settlement Fund, including the House Proceeds, within ten (10) business days of the Implementation Date. Likewise, on or before the tenth (10th) business day following the Implementation Date, MetLife shall transfer the portion of the MetLife Settlement Payment attributable to the Siskey Settlement Fund (*i.e.*, $250,000.00) to the Disbursing Agent. Whenever funds in the Siskey Settlement Fund exceed $500,000.00, the Disbursing Agent shall disburse funds available in the Siskey Settlement Fund to the Trustee (on behalf of Bankruptcy Investors), Probate Investors, and Orphaned Investors within ten (10) days of the Siskey Settlement Fund exceeding the $500,000.00 threshold.

      ii.   <u>Timing of Investor Settlement Facility Distributions</u>. On or before the tenth (10th) business day following the expiration of the Opt-In Deadline (including any extension approved by the Trustee), Mrs. Siskey shall transfer her Siskey Settlement Facility Contribution and Siskey MetLife Settlement Facility Contribution to the Disbursing Agent and MetLife shall transfer MetLife's Settlement Facility Contribution to the Disbursing Agent. Within ten (10) days of receiving the Siskey Settlement Facility Contribution, Siskey's MetLife Settlement Facility Contribution, and MetLife's Settlement Facility Contribution, the Disbursing Agent shall distribute such funds in accordance with this Agreement.

      j.   <u>Administration of Distributions</u>. Whenever the Disbursing Agent is prepared to make a distribution from the Siskey Settlement Fund, Siskey Settlement Facility, or MetLife Settlement Facility, the Disbursing Agent, the Trustee, and the Administrator shall use good faith efforts to reach a consensus on the timing, amounts, and structure of each and every distribution in a manner complying with all provisions of this Agreement. Written notice of the timing, amounts, and structure of every distribution from the Siskey Settlement Fund shall be provided to Mrs. Siskey's counsel and Stone Street. In the event a dispute arises between the Trustee and the Administrator regarding the proper form of any distribution, the Trustee and the Administrator shall first attempt to resolve the dispute informally and then through mediation. If the Trustee and the Administrator fail to resolve the dispute at mediation, then such dispute shall be settled pursuant to binding arbitration by a single arbitrator in Charlotte, North Carolina, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

     5.   <u>Representations and Warranties</u>.

      a.   <u>Representations and Warranties by the Trustee</u>.

      i.   Subject to the approval of the Bankruptcy Court, the Trustee represents and warrants to the other Parties that the Trustee has not conducted any act or omission that would impair the Bankruptcy Estates' title to any cash, assets, or other property interests that the Trustee is committing to contribute, pay, or otherwise transfer in connection with the Settlement. Similarly, the demands, claims, actions, and liabilities which the Trustee is agreeing to release in

# EXHIBIT A

the Settlement have not been assigned, sold, transferred, encumbered, or otherwise conveyed by the Trustee to any other party, by agreement, by operation of law, or otherwise.

ii.    The Trustee represents and warrants to the other Parties that, subject to the approval of the Bankruptcy Court:  (a) he has full legal capacity and authority to enter into the Settlement; (b) he has freely, voluntarily, and without duress or coercion of any kind whatsoever, entered into this Agreement under the advice of counsel or with the opportunity to seek the advice of counsel; and (c) this Agreement, in all respects, has been voluntarily and knowingly executed by the Trustee with the express intention of creating the legal consequences thereof.

b.    <u>Representations and Warranties by the Administrator</u>.

i.    Subject to any necessary court approval, the Administrator represents and warrants to the other Parties that the Administrator has not conducted any act or omission that would impair the Siskey Estate's or Siskey Industries' title to any cash, assets, or other property interests that the Administrator is committing to contribute, pay, or otherwise transfer in connection with the Settlement.  Similarly, the demands, claims, actions, and liabilities which the Administrator is agreeing to release in the Settlement have not been assigned, sold, transferred, encumbered, or otherwise conveyed by the Administrator to any other party, by agreement, by operation of law, or otherwise.

ii.    The Administrator represents and warrants to the other Parties that, subject to any necessary court approval:  (a) he has full legal capacity and authority to enter into the Settlement; (b) he has freely, voluntarily, and without duress or coercion of any kind whatsoever, entered into this Agreement under the advice of counsel or with the opportunity to seek the advice of counsel; and (c) this Agreement, in all respects, has been voluntarily and knowingly executed by the Administrator with the express intention of creating the legal consequences thereof.

c.    <u>Representations and Warranties by Mrs. Siskey and Negrelli</u>.

i.    Mrs. Siskey acknowledges that she has provided the Trustee detailed financial information and sworn testimony under oath regarding her financial affairs, her knowledge of potential assets of the Bankruptcy Estates and/or the Siskey Estate, and her knowledge of Rick Siskey's financial affairs.    Mrs. Siskey represents and warrants that, to the best of her knowledge, the financial information and testimony given to the Trustee is true, accurate, and complete in all material respects. Mrs. Siskey acknowledges that the Trustee is relying upon the truthfulness and accuracy of such financial information and testimony in agreeing to, and entering into, the Settlement.

ii.    Mrs. Siskey and Negrelli each represents and warrants to the other Parties that Mrs. Siskey and Negrelli each respectively has good and marketable title to any cash, assets, or other property interests that each of Mrs. Siskey and Negrelli is committing to contribute, pay, or otherwise transfer in connection with the Settlement, and the recipient(s) thereof shall receive good and marketable title thereto, free and clear of any and all liens and encumbrances, upon transfer.  Similarly, the demands, claims, actions, and liabilities which each of Mrs. Siskey and Negrelli is agreeing to release in the Settlement have not been assigned, sold, transferred,

<u>**EXHIBIT A**</u>

encumbered, or otherwise conveyed to any other party, by agreement, by operation of law, or otherwise.

iii.    Mrs. Siskey and Negrelli each respectively represents and warrants to the other Parties that: (a) she has full legal capacity and authority to enter into the Settlement; (b) she has freely, voluntarily, and without duress or coercion of any kind whatsoever, entered into this Agreement under the advice of counsel or with the opportunity to seek the advice of counsel; (c) prior to the execution of this Agreement, she was fully apprised of sufficient relative data, in order to intelligently exercise judgment in deciding whether or not to execute this Agreement and in evaluating the contents of the same; (d) the decision to execute this Agreement was not predicated on or influenced by any declarations or representations made by any other Party other than as set forth herein; and (e) this Agreement, in all respects, has been voluntarily and knowingly executed by Mrs. Siskey and Negrelli with the express intention of creating the legal consequences thereof.

d.    <u>Representations and Warranties by Stone Street</u>.

i.    Stone Street acknowledges and agrees that Stone Street has provided to the Trustee unaudited balance sheets, income statements, and statements of cash flows reflecting Stone Street's financial condition as of the date stated in such balance sheets, income statements, and statements of cash flows (collectively, the "financial information"). Stone Street represents and warrants to the Trustee that, to the best of its knowledge,  the financial information is true and correct in all material respects. Stone Street acknowledges that the Trustee is relying upon the foregoing representation and warranty in entering into the Settlement.

ii.    Stone Street represents and warrants to the other Parties that the demands, claims, actions, and liabilities which Stone Street is agreeing to release in the Settlement have not been assigned, sold, transferred, encumbered, or otherwise conveyed to any other party, by agreement, by operation of law, or otherwise.

iii.    Stone Street represents and warrants to the other Parties that: (a) Stone Street has full legal capacity and authority to enter into the Settlement; (b) Stone Street has freely, voluntarily, and without duress or coercion of any kind whatsoever, entered into this Agreement under the advice of counsel or with the opportunity to seek the advice of counsel; (c) prior to the execution of this Agreement, Stone Street was fully apprised of sufficient relative data, in order to intelligently exercise judgment in deciding whether or not to execute this Agreement and in evaluating the contents of the same; (d) the decision to execute this Agreement was not predicated on or influenced by any declarations or representations made by any other Party other than as set forth herein; (e) this Agreement, in all respects, has been voluntarily and knowingly executed by Stone Street with the express intention of creating the legal consequences thereof; and (f) the execution and delivery of this Agreement, and the consummation of the Settlement, or other transactions contemplated herein, have been duly and validly authorized, and no other proceedings or approvals on the part of Stone Street are necessary to authorize the Settlement, or other transactions contemplated herein, and this Agreement constitutes a legal, valid, and binding obligation of Stone Street.

e.    <u>Representations and Warranties by King and Porter</u>.

# EXHIBIT A

i.   King and Porter each represent and warrant to the other Parties that the demands, claims, actions, and liabilities which they are agreeing to release in the Settlement have not been assigned, sold, transferred, encumbered, or otherwise conveyed to any other party, by agreement, by operation of law, or otherwise.

ii.   King and Porter each respectively represents and warrants to the other Parties that: (a) she/he has full legal capacity and authority to enter into the Settlement; (b) she/he has freely, voluntarily, and without duress or coercion of any kind whatsoever, entered into this Agreement under the advice of counsel or with the opportunity to seek the advice of counsel; (c) prior to the execution of this Agreement, she/he was fully apprised of sufficient relative data, in order to intelligently exercise judgment in deciding whether or not to execute this Agreement and in evaluating the contents of the same; (d) the decision to execute this Agreement was not predicated on or influenced by any declarations or representations made by any other Party other than as set forth herein; (e) this Agreement, in all respects, has been voluntarily and knowingly executed by each of King and Porter with the express intention of creating the legal consequences thereof.

f.   <u>Representations and Warranties by MetLife</u>.

i.   MetLife represents and warrants to the other Parties that MetLife has good and marketable title to any cash, assets, or other property interests that MetLife is committing to contribute, pay, or otherwise transfer in connection with the Settlement, and the recipient(s) thereof shall receive good and marketable title thereto, free and clear of any and all liens and encumbrances, upon transfer.  Similarly, the demands, claims, actions, and liabilities which MetLife is agreeing to release in the Settlement have not been assigned, sold, transferred, encumbered, or otherwise conveyed to any other party, by agreement, by operation of law, or otherwise.

ii.   MetLife represents and warrants to the other Parties that: (a) MetLife has full legal capacity and authority to enter into the Settlement; (b) MetLife has freely, voluntarily, and without duress or coercion of any kind whatsoever, entered into this Agreement under the advice of counsel or with the opportunity to seek the advice of counsel; (c) prior to the execution of this Agreement, MetLife was fully apprised of sufficient relative data, in order to intelligently exercise judgment in deciding whether or not to execute this Agreement and in evaluating the contents of the same; (d) the decision to execute this Agreement was not predicated on or influenced by any declarations or representations made by any other Party other than as set forth herein; (e) this Agreement, in all respects, has been voluntarily and knowingly executed by MetLife with the express intention of creating the legal consequences thereof; and (f) the execution and delivery of this Agreement, and the consummation of the Settlement, or other transactions contemplated herein, have been duly and validly authorized, and no other proceedings or approvals on the part of MetLife are necessary to authorize the Settlement, or other transactions contemplated herein, and this Agreement constitutes a legal, valid, and binding obligation of MetLife.

g.   <u>Breach of Representations and Warranties</u>.  In the event of a breach of any of the foregoing representations and warranties, any non-breaching Party adversely affected by such breach in a material degree shall be excused from performance under this Agreement to the

## EXHIBIT A

extent of any obligations owed to the breaching Party; otherwise, any and all other remaining terms and provisions of this Agreement shall remain in full force and effect.

6.   Releases.

a.   Releases of the Trustee and the Bankruptcy Estates.   Except as to those obligations agreed to by the Trustee in this Agreement, the Administrator, Siskey Industries, Mrs. Siskey, Negrelli, Stone Street, King, Porter, and MetLife each hereby releases the Trustee, the Bankruptcy Estates, the SRP bankruptcy estate, and any of their respective representatives, agents, predecessors, successors, assigns, attorneys, employees, and insurers, from any and all liability, losses, expenses, claims, demands, actions, and any and all causes of action whatsoever, arising from or related to the Ponzi Scheme, the Bankruptcy Case, and any and all claims that have been or could be raised in the Bankruptcy Case.

b.   Releases of the Administrator, the Siskey Estate, and Siskey Industries.  Except as to those obligations agreed to by the Administrator in this Agreement, the Trustee, Mrs. Siskey, Negrelli, Stone Street, King, Porter, and MetLife each hereby releases the Administrator (in his individual capacity and as fiduciary for the Siskey Estate), the Siskey Estate, Siskey Industries, and any of their respective representatives, agents, predecessors, successors, assigns, attorneys, employees, and insurers, from any and all liability, losses, expenses, claims, demands, actions, and any and all causes of action whatsoever, arising from or related to the Ponzi Scheme, the administration of the Siskey Estate, the winding down of Siskey Industries, and any and all claims that have been or could be raised therein or with respect thereto.

c.   Releases of Mrs. Siskey and Mrs. Siskey's Children.

i.   The Trustee, on behalf of the Bankruptcy Estates and the SRP bankruptcy estate, hereby releases, remises, acquits, satisfies, waives, and forever discharges Mrs. Siskey, Mrs. Siskey's Children, and any of their respective heirs, successors, and assigns, from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative, whether owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Bankruptcy Estates, the SRP bankruptcy estate, or their creditors, including, without limitation:   (A) causes of action under chapter 5 or any other chapter of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of, relating to, or in connection with acts or omissions by any of Mrs. Siskey or Mrs. Siskey's Children that allegedly injured the Ponzi Debtors and/or SRP and, therefore, allegedly injured generally creditors of one or more of the Bankruptcy Estates or the SRP bankruptcy estate; *provided, however*, that this release shall not limit or otherwise affect causes of action against Mrs. Siskey or Mrs. Siskey's Children (if any) owned by individual creditors based on alleged misconduct directed specifically toward only such creditor and causing an injury unique only to such creditor (*i.e.*, an injury other than the

# EXHIBIT A

generalized harm to Bankruptcy Estates' creditors caused by a loss of invested funds as a result of the Ponzi Scheme).

ii.   The Administrator, on behalf of the Siskey Estate, and Siskey Industries each hereby releases, remises, acquits, satisfies, waives, and forever discharges Mrs. Siskey, Mrs. Siskey's Children, and any of their respective heirs, successors, and assigns, from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative.

iii.   Stone Street, King, Porter, and MetLife each hereby releases, remises, acquits, satisfies, waives, and forever discharges Mrs. Siskey, Mrs. Siskey's Children, and any of their respective heirs, successors, and assigns, from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative, including, without limitation, any claims for indemnification or contribution; *provided, however*, that this release excepts and does not include a release of any contractual or statutory claims of MetLife against Mrs. Siskey related to benefits under any life insurance policy, retirement plan, medical/dental plan or former employee plan provided by Metropolitan Life Insurance Company or any of its parents or subsidiaries.

d.   Releases of Stone Street, King, and Porter.

i.   The Trustee, on behalf of the Bankruptcy Estates and the SRP bankruptcy estate, hereby releases, remises, acquits, satisfies, waives, and forever discharges Stone Street, King, Porter, and any of their respective parent companies, subsidiaries, affiliates predecessors, successors, assigns, present and former officers, directors, employees, agents, attorneys, advisors, consultants, and insurers (collectively, the "Stone Street Released Parties"), from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative, whether owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Bankruptcy Estates, the SRP bankruptcy estate, or their creditors, including, without limitation:  (A) causes of action under chapter 5 or any other chapter of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of or relating to or in connection with acts or omissions by any of the Stone Street Released Parties that allegedly injured the Ponzi Debtors and/or SRP and, therefore, allegedly injured generally creditors of one or more of the Bankruptcy Estates or the SRP bankruptcy estate; *provided, however*, that this release shall not limit or otherwise affect causes of action against the Stone Street Released Parties (if any) owned by individual creditors based on alleged misconduct directed specifically toward only such

# EXHIBIT A

creditor and causing an injury unique only to such creditor (*i.e.*, an injury other than the generalized harm to Bankruptcy Estates' creditors caused by a loss of invested funds as a result of the Ponzi Scheme).

ii.     The Administrator, on behalf of the Siskey Estate, and Siskey Industries each hereby releases, remises, acquits, satisfies, waives, and forever discharges the Stone Street Released Parties from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative.

iii.     Mrs. Siskey, Negrelli, and MetLife each hereby releases, remises, acquits, satisfies, waives, and forever discharges the Stone Street Released Parties from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative, including, without limitation, any claims for indemnification or contribution.  Notwithstanding anything in this Agreement to the contrary, no release is being provided by any party to this Agreement to (or any release obtained from) Martin A. Sumichrast acting in his individual capacity.

e.     Releases of MetLife.

i.     The Trustee, on behalf of the Bankruptcy Estates and the SRP bankruptcy estate, hereby releases, remises, acquits, satisfies, waives, and forever discharges MetLife and any of MetLife's respective past and present parent companies, subsidiaries, affiliates predecessors, successors, assigns, present and former officers, directors, employees, agents (including affiliated agents), third party administrators, attorneys, advisors, consultants, and insurers (collectively, the "MetLife Released Parties"), from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative, whether owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Bankruptcy Estates, the SRP bankruptcy estate, and, with respect to the Bankruptcy Estates and the SRP bankruptcy estate, any of their creditors, including, without limitation:   (A) causes of action under chapter 5 or any other chapter of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of or relating to or in connection with acts or omissions by any of the MetLife Released Parties that allegedly injured the Ponzi Debtors and/or SRP and, therefore, allegedly injured generally creditors of one or more of the Bankruptcy Estates or the SRP bankruptcy estate; *provided, however*, that this release shall not limit or otherwise affect causes of action against the MetLife Released Parties (if any) owned by individual creditors based on alleged misconduct directed specifically toward only such creditor

**EXHIBIT A**

and causing an injury unique only to such creditor (*i.e.*, an injury other than the generalized harm to Bankruptcy Estates' creditors caused by a loss of invested funds as a result of the Ponzi Scheme).

ii.    The Administrator, on behalf of the Siskey Estate, and Siskey Industries each hereby releases, remises, acquits, satisfies, waives, and forever discharges the MetLife Released Parties from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative.

iii.    Mrs. Siskey, Negrelli, Stone Street, King, and Porter each hereby releases, remises, acquits, satisfies, waives, and forever discharges the MetLife Released Parties from any and all claims, demands, losses, liabilities, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative, including, without limitation, any claims for indemnification or contribution; *provided, however*, that this release excepts and does not include a release of any contractual or statutory claims of Mrs. Siskey to benefits under any life insurance policy, retirement plan, medical/dental plan or former employee plan provided by Metropolitan Life Insurance Company or any of its parents or subsidiaries.

f.    *Munford* Style Bar Order.  As a condition to the occurrence of the effectiveness of this Agreement and the mutual covenants contained herein, the Trustee agrees to seek entry of a Bankruptcy Court order barring any contribution or indemnity claims against Mrs. Siskey (or Mrs. Siskey's Children) by third-party defendants sued by the Trustee for tort liability arising out of or in connection with the Ponzi Scheme; *provided, however*, that, in exchange for such a bar order, such third-party defendants shall receive a "dollar-for-dollar" credit against any monetary judgment entered in favor of the Trustee to the extent of Mrs. Siskey's settlement payment contributed to the Bankruptcy Estates (*i.e.*, $27,317,725.49 plus whatever funds are ultimately leftover for Bankruptcy Estates from the Holdback).  *See, e.g.*, *In re Munford, Inc.*, 97 F.3d 449, 454–56 (11th Cir. 1996).   In the event that the Bankruptcy Court declines to enter the aforementioned bar order, Mrs. Siskey shall have the right to terminate this Agreement, which right she may waive in her sole discretion.

g.    Reservation of Rights.   Notwithstanding anything in this Agreement to the contrary, the Parties specifically reserve, and do not waive the right to assert, any and all defenses to any claims asserted against such Party (*i.e.*, the releases of affirmative claims contained in this Agreement shall not prejudice the right of Parties to raise as a defense the same factual, legal, or equitable positions which serve as the basis for any released affirmative claim); *provided*, that it is understood and agreed that no claim, suit, action, or cause of action may be asserted against any party released under this Agreement as it may relate to asserting such defenses.

7.    No Admission of Liability.  The entry into this Agreement reflects the compromise of doubtful and disputed claims; therefore, notwithstanding any representation, term, or condition herein, or any inference or implication thereof to the contrary, nothing herein is, nor may be

**EXHIBIT A**

construed as, an admission of liability on the part of any or all of the Parties, liability being explicitly denied by each Party.

8. <u>Attorneys' Fees and Costs</u>.  Each Party shall bear such Party's own expenses incurred in connection with the Settlement, including, without limitation, all expenses incidental to the negotiation, preparation, and performance of the Settlement and each Party's pro rata share of the mediator's fees and expenses; *provided, however*, that (a) the Administrator and Siskey Industries shall be deemed one party for purposes of such pro rata calculation, (b) Mrs. Siskey and Negrelli shall be deemed one party for purposes of such pro rata calculation, (c) Stone Street, King, and Porter shall be deemed one party for purposes of such pro rata calculation, (d) MetLife shall be deemed one party for purposes of such pro rata calculation, and (e) the Bankruptcy Estates and the SRP bankruptcy estate shall be deemed one party for purposes of such pro rata calculation.  In the event that legal or other action is required to enforce a Party's rights under this Agreement, the non-prevailing party agrees to reimburse the prevailing party upon demand for the prevailing party's reasonable attorneys' fees and other related costs and expenses incurred in connection with such enforcement.

9. <u>Counterparts</u>.  This Agreement may be executed by the Parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the 30th day of November, 2018.

*/signature page follows/*

# EXHIBIT A

**AGREED AND ACCEPTED:**

_____

**Joseph W. Grier, III**, as and only as the Trustee for TSI Holdings, LLC, WSC Holdings, LLC, SouthPark Partners, LLC, and Sharon Road Properties, LLC

_____

**F. Lane Williamson**, as and only as Administrator for the Richard C. Siskey decedent's estate

**Siskey Industries, LLC**

By:      _____
Name:   F. Lane Williamson
Title:    Manager

_____

**Diane M. Siskey**

_____

**Jenna Marie Negrelli**

**Stone Street Partners, LLC**

By:      _____
Name:   Martin A. Sumichrast
Title:    Managing Member

_____

**Dawn E. King**

_____

**Paul G. Porter**

**Metropolitan Life Insurance Company**

By:      _____
Name:   _____
Title:    _____

**MSI Financial Services, Inc. (f/k/a MetLife Securities, Inc. n/k/a MML Investors Services, LLC)**

By:      _____
Name:   _____
Title:    _____

**Massachusetts Mutual Life Insurance Company**

By:      _____
Name:   _____
Title:    _____

**Brighthouse Life Insurance Company**

By:      _____
Name:   _____
Title:    _____

**EXHIBIT A**

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| In re: | CASE NO. 17-30132 |
| TSI Holdings, LLC[1] et al., | CHAPTER 7 |
| | Jointly Administered |
| DEBTORS. | |

## MOTION FOR (I) AUTHORITY TO ENTER INTO SETTLEMENT AND (II) BAR ORDER

Joseph W. Grier, III, the duly-appointed trustee (the "Trustee") in the above-captioned, jointly-administered bankruptcy cases (collectively, this "Case"), through counsel, hereby presents this *Motion for (I) Authority to Enter into Settlement and (II) Bar Order* (this "Motion") and, in support hereof, respectfully represents as follows:

### ESSENTIAL ECONOMIC TERMS OF THE SETTLEMENT[2]

- Diane Siskey and Jenna Negrelli pay the total sum of approximately $41,376,196.46.[3]

- MetLife pays $1,000,000.00.

- All creditors in this Case have previously received a 27.58% interim distribution.

- Upon settlement approval, all creditors in this Case will receive an immediate interim distribution of an additional approximately 40.64%.

- Any creditors willing to release their individuals claims against Diane Siskey and her children will receive an additional approximately 18.07% payment from Diane Siskey.

---

[1] These jointly administered cases are those of the following debtors:  TSI Holdings, LLC ("TSI"), Case No. 17-30132 (the "TSI Case"); WSC Holdings, LLC ("WSC"), Case No. 17-30338 (the "WSC Case"); and SouthPark Partners, LLC ("SPP"), Case No. 17-30339 (the "SPP Case").

[2] These figures are subject to the assumptions, estimations, and additional details shown on "Schedule 1" attached to this Motion.  **The information contained herein has not been subject to a certified audit or other independent review.  Any values of assets and liabilities contained herein (including Schedule 1) have been estimated by the Trustee based on the best information currently available to the Trustee.  Although substantial efforts have been made to be complete and accurate, the Trustee is unable to warrant or represent the full and complete accuracy of the information contained herein (including Schedule 1).**

[3] The total amount will depend on the value of an escrow account at Regions Bank, which fluctuates from month to month.

# EXHIBIT A

# EXHIBIT 1

- Any creditors willing to release their individuals claims against MetLife will receive an additional approximately 3.63% payment from MetLife and Diane Siskey.

- In exchange for the Stone Street claimants receiving an upfront payment of $1,000,000.00, the Stone Street claimants consent to investors receiving a 100% distribution on base claims before any additional distributions to Stone Street from bankruptcy estate property, and Stone Street will thereafter share in any additional distributions after the full repayment (without interest) of base claims up to a maximum total payment of $4,000,000.00 (inclusive of the immediate $1,000,000 upfront payment).

## INTRODUCTION

1.     This Case arises in the aftermath of a Ponzi scheme (the "Ponzi Scheme") orchestrated by the late Richard C. Siskey ("Rick Siskey").  The Trustee has reached an agreement in principle (the "Settlement") with:  Rick Siskey's widow, Diane M. Siskey ("Diane Siskey"); Jenna Marie Negrelli ("Negrelli"); F. Lane Williamson (the "Administrator"), the Administrator CTA of the Estate of Richard C. Siskey (the "Siskey Estate"); Siskey Industries, LLC ("Siskey Industries"); Stone Street Partners, LLC f/k/a Siskey Capital, LLC ("Stone Street"); Dawn E. King ("King"); Paul G. Porter ("Porter"); and Metropolitan Life Insurance Company, MSI Financial Services, Inc. (f/k/a MetLife Securities, Inc. n/k/a MML Investors Services, LLC), Massachusetts Mutual Life Insurance Company, and Brighthouse Life Insurance Company (collectively, "MetLife").  If ultimately approved and implemented, the Settlement: (a) secures an immediate distribution to all investors and similarly-situated creditors (collectively, "investors") in an amount sufficient to satisfy approximately **68%** of claims, (b) offers the opportunity to investors to immediately receive an additional approximately **22%** recovery on their claims in exchange for providing certain voluntary releases, (c) provides a mechanism by which investors may receive as much as 100+% of their base claims pending the administration of the Siskey Estate; and (d) provides for the full and final resolution of complex litigation claims by, among, and between the Trustee, Diane Siskey, Negrelli, the Siskey Estate, Siskey Industries, Stone Street, King, Porter, and MetLife.

# EXHIBIT A

# EXHIBIT 1

2.      In addition to the foregoing payments (funded primarily by Diane Siskey, Negrelli, and MetLife), there are substantial assets in the Siskey Estate.  The Administrator will need to determine when, under state law, he can distribute funds and other assets in the Siskey Estate; however, the Trustee hopes that, ultimately, the Settlement will enable victims of the Ponzi Scheme to receive at least another approximately $4,700,000 by way of the Siskey Estate, resulting in a 100% recovery on base claims plus some interest factor.  In other words, if approved, **the Settlement could pay victims up to 90% of their claims following settlement approval, plus the possibility for an eventual recovery of more than 100%,** subject to certain variables primarily concerning the Siskey Estate.

3.      Because of its global nature, various aspects of the Settlement do not directly impact the bankruptcy estates in this Case.  This Motion seeks Court approval only of those certain portions of the Settlement that affect the bankruptcy estates and authority for the Trustee to enter into the settlement agreement.

## PROCEDURAL BACKGROUND AND JURISDICTION

4.      On January 27, 2017 (the "Petition Date"), an involuntary bankruptcy petition pursuant to chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), was filed against TSI, initiating the above-captioned lead case.  On February 2, 2017, the Court held an emergency hearing on the petitioning creditors' emergency motion to appoint an interim trustee for TSI.  On February 8, 2017, the Court entered an Order appointing the Trustee.  An *Order For Relief* was subsequently entered on February 22, 2017.  Similar involuntary petitions, emergency motions, orders for relief, and orders appointing the Trustee

# EXHIBIT A

# EXHIBIT 1

were filed and entered against WSC and SPP (collectively, with TSI and WSC, the "Ponzi Debtors").[4]

5.        This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).  Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a).  The predicates for the relief requested in this Motion are § 105 of the Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule" and, collectively, the "Bankruptcy Rules").

## FACTUAL BACKGROUND

### THE PONZI SCHEME

6.        Based on the Ponzi Debtors' records, and other evidence, the Trustee and his professionals are of the opinion that TSI, WSC, and SPP were each operated as part of the Ponzi Scheme.   However, the Trustee also believes that the Ponzi Scheme was not limited to investments of money made directly to the Ponzi Debtors.

7.        For example, Rick Siskey purported to sell equity interests in SRP to six investors, whom Rick Siskey qualified as "Outside Investors" in SRP (the "SRP Outside Investors"); however, the SRP Outside Investors were not properly admitted as members to SRP and the funds invested by the SRP Outside Investors were instead diverted by Rick Siskey into the Ponzi Scheme.

8.        In addition, Rick Siskey credited certain investors (the "Premier Fund Investors") who contributed cash into deposit accounts owned by two investment funds known variously[5] as

---

[4]        A similar involuntary petition, emergency motion, order for relief, and order appointing the Trustee were filed and entered against Sharon Road Properties, LLC ("SRP"), another entity controlled by Rick Siskey, initiating case number 17-30363 (the "SRP Case").  Although the SRP Case was initially jointly administered with this Case, the Trustee eventually formed the belief that SRP is a legitimate business enterprise that existed independently from the Ponzi Scheme.  The Court agreed and entered an Order finding and concluding that "SRP is not part of a Ponzi scheme."  *See* D.E. 177, at 3–4.  On July 27, 2018, the Court entered an Order terminating the joint administration of the SRP Case with this Case.  *See* D.E. 312, at 4–5.

# EXHIBIT A

# EXHIBIT 1

Premier Funds One, LLC and Premier Funds II, LLC (collectively, the "Premier Fund") with "rollover" investments in SPP and/or SRP (as an "Outside Investor").[6]  Although the Premier Fund Investors did not contribute cash directly into deposit accounts owned by the Ponzi Debtors, the Trustee believes that the Premier Fund Investors were victims of the Ponzi Scheme.

9.      Rick Siskey deposited Ponzi Scheme investments into—and moved money back and forth between—bank accounts in the name of:  the Ponzi Debtors; the Premier Fund; Rick Siskey; Rick Siskey and Diane Siskey; and Siskey Industries.  The Trustee believes that funds invested in the Ponzi Debtors were typically used by Rick Siskey to pay for his lavish lifestyle, to make distributions to other investors in the Ponzi Scheme, and to pay premiums on life insurance policies owned by Rick Siskey insuring his life and the lives of others.[7]

## LEGITIMATE INVESTMENT VENTURES

10.      Not all of Rick Siskey's investment ventures were part of the Ponzi Scheme or otherwise operated fraudulently.  For example, as previously determined by this Court,[8] SRP is a legitimate business enterprise that existed independently from the Ponzi Scheme.  In addition, throughout the time period that the Ponzi Scheme existed in some form or fashion, Rick Siskey opened and closed various investment deals that appear isolated from the Ponzi Scheme and otherwise legitimate based on the information currently available to the Trustee.  Of particular note, Rick Siskey's involvement in a securities offering pertaining to Carolina Beer & Beverage

---

[5]      Additional names used by Siskey for the Premier Funds include "The Premier Fund," "Premier Fund, LLC," "Premier Fund I, LLC," "Premier One," "Premier Fund One, LLC" "Premier Two," "Premier Fund II, LLC."

[6]      Upon information and belief, Rick Siskey had solicited investments into the Premier Fund since at least the early 2000s.

[7]      Diane Siskey, Negrelli, and possibly other parties to the Settlement contest the Trustee's position that Rick Siskey used stolen funds to pay premiums on life insurance policies.  The existence and scope of any such activities is a matter of dispute between the settling parties (and is part of what is being settled through the Settlement).

[8]      *See supra* n. 3.

# EXHIBIT A

# EXHIBIT 1

Holdings, LLC ("CB&B") returned at least $19,059,438.39 to him.[9]  Similarly, the Trustee's investigation did not disclose any evidence that Stone Street, or its investment portfolio, was operated as part of the Ponzi Scheme.

## THE CLAIMS REPORT

11.    On November 1, 2017, the Trustee filed the *Trustee's First Omnibus Report of Claims, Objections to Claims, and Recommendations Regarding Claims as to TSI Holdings, LLC, WSC Holdings, LLC, SouthPark Partners, LLC, and Sharon Road Properties, LLC* (D.E. 112) (the "Claims Report").[10]  In general, the Claims Report recommended that the Court allow claims against the Ponzi Debtors based on the "Net Investment Method," (*i.e.*, crediting the amount of cash deposited by an investor less any cash paid to the investor, regardless of whether the payments were categorized as a return of principal, profits, interest, or anything else at the time they occurred) (the "Net Investment Method").

12.    Given the number of claimants affected and number of nuanced legal issues implicated, the Claims Report resulted in five (5) hearings[11] and nine (9) orders (collectively, the "Claims Order").[12]  In general, the Claims Report adopted the Net Investment Method for treating claims against the Ponzi Debtors.  However, the Claims Report disallowed any claim against the Ponzi Debtors' bankruptcy estates for Ponzi Scheme investments that were not made

---

[9]     All or a portion of Rick Siskey's earnings and/or investment return from the CB&B venture have come from an entity called "Home Run Holdings, LLC."

[10]     Duplicates of the Claims Report's substantive text were filed in the WSC Case, the SPP Case, and the SRP Case.  The only difference in the various versions of the Claims Report is the "Exhibit A" attached thereto, which proposes treatment of claims submitted specifically against the debtor-entity in the corresponding bankruptcy case. For purposes of this Motion, the various versions will be referred to collectively as the "Claims Report."

[11]     The Claims Report hearings were held on December 11, 2017, January 8, 2018, January 24, 2018, February 5, 2018, and March 12, 2018.

[12]     *See* D.E. 134, D.E. 69 (in the WSC case), D.E. 67 (in the SPP case), D.E. 61 (in the SRP case), D.E. 138, D.E. 152, D.E. 176, D.E. 177, and D.E. 194.

# EXHIBIT A

# EXHIBIT 1

directly into the Ponzi Debtors, including, without limitation, claims by the SRP Outside Investors and the Premier Fund Investors.

13.    Stone Street, King, and Porter (collectively, the "Stone Street Claimants") submitted claims in the aggregate amount of $26,383,847.00 against each of the Ponzi Debtors (and also SRP).   The Trustee filed an objection to the Stone Street Claimants' claims, recommending that the Court disallow those claims in their entirety. Thereafter, the Stone Claimants and the Trustee agreed to continue resolution of the allowance of the Stone Street Claimants' claims indefinitely off-docket.

## ASSETS OF THE PONZI DEBTORS' BANKRUPTCY ESTATES

14.    Upon Rick Siskey's death, Diane Siskey, Negrelli (the daughter of Rick Siskey and Diane Siskey), and two of Rick Siskey's former employees[13] received an aggregate of approximately $49,525,000.00 in life insurance proceeds from four separate life insurance policies (the "Life Ins. Proceeds").  The primary asset of the Ponzi Debtors' bankruptcy estates is a litigation claim for the imposition of a constructive trust on some or all of the Life Ins. Proceeds, based on the theory that, if investor money deposited with the Ponzi Debtors was misappropriated to pay the life insurance premiums, the beneficiaries of the Life Ins. Proceeds hold bare legal title to the Life Ins. Proceeds and have a duty to return the Life Ins. Proceeds to the Ponzi Debtors.[14]

---

[13]    Rick Siskey's former employees, Denise Rhodes and Ben Lowder, who received a portion of the Life Ins. Proceeds ($250,008.58 each), returned $220,000.00 each to the Trustee pursuant to settlements approved by the Court earlier in this Case.

[14]    As described above, Rick Siskey commingled investments among the Ponzi Debtors' deposit accounts, Rick Siskey's personal deposit accounts, and deposit accounts owned by Siskey Industries (among others).  Thus, there is no clean or clear trail of payments from the Ponzi Debtors directly to MetLife for life insurance premiums; rather, most of the money flowed from the Ponzi Debtors to Rick Siskey or Siskey Industries and then to MetLife. Accordingly, the Administrator—on behalf of the Siskey Estate, Siskey Industries, or both—and/or individual investors who have claims against the Siskey Estate but not the Ponzi Debtors, arguably have similar arguments for the imposition of a constructive trust against the Life Ins. Proceeds.

# EXHIBIT A

# EXHIBIT 1

15.     In addition, the Trustee theoretically could assert tort claims against Diane Siskey, Stone Street, King, Porter, MetLife, and others (including professionals, advisers, and referral sources) for their alleged roles in furthering the Ponzi Scheme.  Indeed, individual creditors in this Case have been filing their own actions against some of these parties in state court while this Case has been pending (discussed in further detail below).

16.     Similarly, the Trustee could sue certain investors who received more in distributions from the Ponzi Scheme than investments made into the Ponzi Scheme ("Net Winners").  Without opining on the collectability of such judgments, the Trustee anticipates that he could obtain judgments against Net Winners in the aggregate amount of approximately $1,200,000.00.

17.     Other than the foregoing litigation claims, the Ponzi Debtors' only other assets as of each of their respective petition dates were:  various securities that have since all been liquidated in the aggregate amount of $138,438.23; a general claim against the Siskey Estate; and WSC's 25% membership interest in Ballantyne Clubdominium, LLC, which, based on various factors (such as the allegations made by Ballantyne Clubdominium, LLC's management), the Trustee estimates could produce between approximately $100,000.00 and $300,000.00 for WSC's bankruptcy estate.

## ADMINISTRATION OF THE SISKEY ESTATE

### Liabilities of the Siskey Estate

18.     The Ponzi Debtors' bankruptcy estates have an allowed general claim in the Siskey Estate's state court estate administration proceeding.  The Trustee's claim is derivative of the claims asserted in this Case based on the Net Investment Method.[15]  Some Ponzi Scheme

---

[15]     For purposes of this Motion, claims based on the Net Investment Method held by victims of the Ponzi Scheme will be referred to as "Base Claim(s)."

# EXHIBIT A

# EXHIBIT 1

investors who ultimately did not have allowed claims in this Case, including investors whose money was deposited with Siskey Industries, submitted, or were otherwise allowed, claims against the Siskey Estate separate from the Trustee's claim (the "Probate Investors").  However, some of the SRP Outside Investors and the Premier Fund Investors relied on the Trustee's claim as a surrogate for their claims against the Siskey Estate and did not independently submit, and were not otherwise allowed, claims against the Siskey Estate (the "Orphaned Investors").  As it currently stands, the Orphaned Investors have neither allowed claims in this Case nor allowed claims against the Siskey Estate.

19.     Allowed Probate Investor Base Claims against the Siskey Estate total **$4,204,459.00**,[16] in the aggregate.

20.     The Orphaned Investors' Base Claims total **$835,946.81**, in the aggregate.

21.     Other than Base Claims and those claims specifically identified below, the only other claims made against the Siskey Estate (including claims against Siskey Industries) are: (a) a claim for unpaid rent by Bissell Porter Siskey, LLC in the maximum amount of $237,623; and (b) miscellaneous outstanding bills and invoices totaling less than $10,000.[17]

22.     More importantly, the Siskey Estate is potentially subject to certain governmental liabilities that, if allowed, would be entitled to an absolute priority in payment over the general claims allowed against the Siskey Estate.[18]  For example, the Securities and Exchange

---

[16]     Technically, the allowed claims against the Siskey Estate held by Probate Investors exceeds $4,204,459 by approximately $883,000, which figure reflects the allowed amount of claims held by Michael Salamone in this Case. To avoid double-counting the claims of Michael Salamone allowed both in this Case and against the Siskey Estate, the total Probate Investor claims was adjusted downward accordingly, for purposes of this Motion.

[17]     The Administrator also entered into a tolling agreement with MetLife relating to purported contribution and/or indemnification claim(s) that MetLife may have against the Siskey Estate.

[18]     Pursuant to North Carolina law, in an estate administration proceeding, "[a]ll dues, taxes, and other claims with preference under the laws of the United States" are entitled to priority ahead of general claims.  *See* N.C. GEN. STAT. § 28A-19-6(a).  SEC and IRS claims are entitled to priority in estate administration proceedings pursuant to federal law.  *See* 31 U.S.C. § 3713(a)(1)(B).

# EXHIBIT A

# EXHIBIT 1

Commission ("SEC") submitted a claim for monetary remedies that may be imposed for potential violations of federal securities laws.  Also, the Internal Revenue Service ("IRS") might pursue the Siskey Estate to the extent Rick Siskey failed to pay income taxes on certain "Ponzi income," which obligation, if allowed, would also be entitled to priority over other unsecured claimants, including the allowed claims of the Ponzi Debtors.

23.   Furthermore, the Stone Street Claimants submitted claims against the Siskey Estate, presumably totaling $26,383,847.00.  The Administrator disputed the Stone Street Claimants' claims, and now the Administrator and the Stone Street Claimants are engaged in state court litigation designed to resolve the Stone Street Claimants' claims for purposes of the estate administration.

## Assets of the Siskey Estate

24.   Based on the best information currently available to the Trustee, the Siskey Estate has the following assets:

(a)   cash existing in a bank account owned by Rick Siskey at the time of his death, cash distributed to the Siskey Estate based on stock connected to the CB&B deal, and cash generated from the sale of personal property owned by Rick Siskey at the time of his death, including a wine collection, a car collection, a guitar collection, and jewelry and household furnishings (of which, after deducting expenses incurred in the administration of the Siskey Estate to date, **approximately $5,550,000** remains);

(b)   a lien against the real property owned by Ballantyne Clubdominium, LLC (**$170,000 estimated value**);

(c)   cash value in life insurance policies insuring the lives of third parties (**$100,000 estimated value**);

(d)   a **$2,500,000** holdback from a distribution to the Siskey Estate based on stock connected to the CB&B deal, which is subject to further reduction beyond the control of the Administrator (the "CB&B Holdback");

(e)   a 21.38% interest in SRP (valued at approximately **$536,540.00**); and

# EXHIBIT A

# EXHIBIT 1

    (f)   shares in Guarantee Insurance Company and unsecured notes payable, including related litigation claims (minimal estimated value).

25.    In addition to the foregoing assets, the Siskey Estate also owns 98% of Siskey Industries. Siskey Industries has substantial assets, including the following stock interests (the "Siskey Industries Stock"): an approximately 25% equity interest in Stone Street; 51,526 shares in Level Brands Inc.; 4,000 shares in Social Reality Inc.; 47,896 shares in Isodiol International; and 269,334 shares in Level Beauty Group.

## Prior Interim Distribution

26.    The aggregate amount of allowed Base Claims in this Case totals **$36,252,107.75**.

27.    On July 13, 2018, the Court entered an Order authorizing the Trustee to make an interim distribution on allowed Base Claims in this Case in the aggregate amount of $10,000,000.00, out of $11,000,000.00 in Life Ins. Proceeds contributed by Diane Siskey to the bankruptcy estates in this Case. *See* D.E. 295. The interim distribution enabled the Trustee to pay approximately 27.58% of all allowed Base Claims in this Case.

28.    The remaining $1,000,000.00 contributed by Diane Siskey was reserved by the Trustee to help cover administrative expenses. After satisfying all outstanding administrative expenses approved by the Court, the Trustee has $806,820.38 in cash remaining. If this Motion is approved, the Trustee estimates that the Ponzi Debtors' bankruptcy estates will incur, from and after June 1, 2018, another $2,000,000.00 in administrative expenses.[19]

---

[19]    The allowance and payment of any and all expenses of administering the Ponzi Debtors' bankruptcy estates are subject to approval of the Court, after providing parties in interest notice and an opportunity for hearing.

# EXHIBIT A

# EXHIBIT 1

## STATE COURT LITIGATION AGAINST METLIFE

29.     Since the Petition Date, several victims of the Ponzi Scheme have filed state court lawsuits against MetLife (and others) for the return on investment promised by Rick Siskey and other alleged injuries arising out of the Ponzi Scheme (the "Investor Lawsuits").[20]

30.     On September 5, 2018, some of the plaintiffs in the Investor Lawsuits filed an objection to the Trustee's motion seeking certain relief from the Court in connection with a mediation contemplated by the Trustee, the Administrator, Diane Siskey, the Stone Street Claimants, and MetLife.  The objection expressed concern that the mediation motion requested an order from the Court that would allow the Trustee to settle the plaintiffs' individual claims.

31.     During a hearing on the mediation motion on September 10, 2018, the Court requested that any motion to approve a settlement arising out of the mediation ". . . be as specific as possible and identify the causes of action" that the Trustee proposes to release in the mediated settlement.

## PROPOSED SETTLEMENT

32.     After several days of mediation and subsequent detailed, arm's-length settlement discussions over the course of several weeks, a tentative Settlement was reached by the Trustee, the Administrator, Diane Siskey, Negrelli, the Stone Street Claimants, and MetLife.  If approved by the Court, the Settlement would resolve a litany of complex disputes by and among the aforementioned parties arising out of the Ponzi Scheme.

---

[20]     The Trustee is currently aware of the Investor Lawsuits initiated by the following plaintiffs:  Evelyn Laynette Robinson (17-CVS-5843 (Mecklenburg)); James Aldridge (18-CVS-1050 (Union)); Andrew Peterson (18-CVS-528 (Lincoln)); John "Kris" Kelly, Paul Leite, Randy J. Reittinger, Dana Lemons, and Herbert Lee Lemons (18-CVS-4978 (Guilford)); Katherine Aldridge (18-CVS-1124 (Union)); James Williams and William Van Williams (18-CVS-307 (Yadkin)); Adam Goulet (18-CVS-12201 (Mecklenburg)); and Donald B. Olin (18-CVS-19512 (Mecklenburg)).  On September 26, 2018, many (perhaps most) of the plaintiffs filed amended complaints in the Investor Lawsuits.

# EXHIBIT A

# EXHIBIT 1

33.    The terms of the Settlement are more particularly described in the settlement agreement attached hereto as Exhibit A and incorporated herein by reference (the "Settlement Agreement").  The basic provisions of the Settlement are summarized in the chart below.

| CONSIDERATION FLOWING BETWEEN SETTLING PARTIES | | | | | |
|---|---|---|---|---|---|
| → → → | Trustee | Administrator | Diane Siskey/Negrelli | Stone Street Parties | MetLife |
| Trustee | | ● Release of claims to all Life Ins. Proceeds ●Subordination of bankruptcy estates' claim(s) as necessary to provide equal treatment of all victims | ●Release of all claims by the bankruptcy estates ●Consent to equal treatment of all victims | ●Upfront payment of $1,000,000.00 ●Split Siskey Settlement Fund 50/50 after Base Claims paid in full, max of $3,000,000 ●Release of all claims by the bankruptcy estates | ●Release of all claims by the bankruptcy estates |
| Administrator | ● Release of claims to all Life Ins. Proceeds ●Consent to equal treatment of all victims ●Pays 100% of Siskey Estate—net of gov't and non-investor claims—to Settlement Fund | | ●Release of all claims by the Siskey Estate ●Consent to equal treatment of all victims ●Pays 100% of Siskey Estate—net of gov't and non-investor claims—to Settlement Fund | ●Immediate transfer of Siskey Industries Stock ●Release of all claims by the Siskey Estate | ●Release of all claims by the Siskey Estate |
| Diane Siskey & Negrelli | ● $33,165,916.29 paid to Siskey Settlement Fund[21] ●Consent to equal treatment of all victims | ● $33,165,916.29 paid to Siskey Settlement Fund ●Consent to equal treatment of all victims | | ●Release all claims | ●Release all claims |
| Stone Street Parties | ●Subordination of Stone Street claim ●Withdraw/release of King & Porter claims ●Withdraw/release of all claims vs. SRP | ●Withdraw/release of all claims | ●Release of all claims | | ●Release all claims |
| MetLife | ●Pays $250,000.00 to Siskey Settlement Fund | ●Pays $250,000.00 to Siskey Settlement Fund ●Release of all claims | ●Release of all claims | ●Release all claims | |

---

[21]    The $33,165,916.29 includes the $11,000,000.00 interim distribution already paid to the Trustee and a litigation holdback/reserve of $2,050,000.00.

# EXHIBIT A

# EXHIBIT 1

34.     The epicenter of the multitude of claims and disputes between the settling parties

is the question of who has superior legal and/or equitable title to the Life Ins. Proceeds—the

Trustee, the Administrator, Diane Siskey (or Negrelli), or some other party(ies).  As part of the

effort to resolve those competing claims to the Life Ins. Proceeds, the Settlement provides for

equal, pro rata treatment of all investor victims of the Ponzi Scheme, regardless of whether the

victim is the holder of an allowed claim in this Case, a Probate Investor, or an Orphaned

Investor.

35.     Pursuant to the Settlement, Diane Siskey and Negrelli will contribute

$33,165,916.29 and MetLife will contribute $250,000.00 to a settlement fund (the "Siskey

Settlement Fund")[22] to be disbursed and applied as follows:

(a)  first, Diane Siskey has already contributed $11,000,000.00 to the Ponzi
Debtors' bankruptcy estates;

(b)  second, the Trustee proposes to reserve for incurred and future
administrative expenses from and after June 1, 2018, which the Trustee
estimates to be $2,000,000.00,[23] such that the Trustee needs set aside
another $1,193,370.71 to supplement the current administrative reserve;

(c)  third, Stone Street will receive an immediate payment of $600,000.00,
King will receive an immediate payment of $200,000.00, and Porter will
receive an immediate payment of $200,000.00;

(d)  fourth, while holders of allowed Base Claims in this Case have received a
27.58% recovery per the interim distribution, the Probate Investors and
Orphaned Investors have received no recovery to date and, therefore, will
receive a catch-up payment to the 27.58% level, $1,159,783.32 and
$230,592.61, respectively;

---

[22]     Pursuant to the Settlement, the Siskey Settlement Fund will be distributed, managed, and otherwise
administered by American Legal Claims Services LLC, as the designated disbursing agent.

[23]     For the sake of clarity, the Trustee estimates that total administrative expenses in this Case after June 1,
2018 will total $2,000,000.00.  The Trustee currently has $510,538.86 in the deposit accounts for the Ponzi Debtors'
bankruptcy estates, but has also satisfied $296,090.43 in post-June 1 administrative expenses.  Therefore, the
Trustee needs an additional $1,193,370.71 from the Siskey Settlement Fund to fund what the Trustee believes to be
a sufficient administrative expense reserve in this Case.

# EXHIBIT A

# EXHIBIT 1

(e) fifth, $16,782,169.65 will be paid, pro rata, to holders of allowed Base Claims in this Case, the Probate Investors, and Orphaned Investors, resulting in the satisfaction of an additional 40.64% of all Base Claims; and

(f) sixth, Diane Siskey will "holdback" or reserve from the distribution (the "Holdback") the minimum, base amount of $2,050,000.00, which Diane Siskey will be able to spend to defend against and/or settle (i) governmental investigations or litigation and (ii) private litigation against her arising out of or in any way related to the Ponzi Scheme, with any unspent Holdback funds eventually reverting to Siskey Settlement Fund.

36.    In addition, Diane Siskey will contribute up to an additional $7,460,280.17 into an individual investor settlement facility (the "Siskey Settlement Facility"), which funds will be paid to victims of the Ponzi Scheme who voluntarily agree to release all of their individual claims (if any) against Diane Siskey (and her children) (the "Optional Siskey Release") in exchange for an increased recovery from the Settlement.

37.    Any Ponzi Scheme victim holding Base Claims wishing to participate in the Siskey Settlement Facility must execute the Optional Siskey Release and, in exchange, will receive his or her pro rata share of $7,460,280.17, which is tantamount to an additional 18.07% recovery.  In other words, any investor who participates in the Siskey Settlement Facility will recover at least 86% on their Base Claims from the Settlement.

38.    Similarly, Diane Siskey will contribute up to an additional $750,000.00 and MetLife will contribute up to an additional $750,000.00 into a separate individual investor settlement facility (the "MetLife Settlement Facility"), which funds will be paid to victims of the Ponzi Scheme who voluntarily agree to release all of their individual claims (if any) against MetLife (the "Optional MetLife Release") in exchange for an increased recovery from the Settlement.

# EXHIBIT A

# EXHIBIT 1

39.     Any Ponzi Scheme victim holding Base Claims wishing to participate in the MetLife Settlement Facility must execute the Optional MetLife Release and, in exchange, will receive his or her pro rata share of $1,500,000.00, which is tantamount to an additional 3.6% recovery.

40.     The Siskey Settlement Facility and the MetLife Settlement Facility are entirely optional; investors may choose to participate in (i) both facilities, (ii) one facility but not the other, or (iii) neither facility.

41.     **Any investor who participates in both the Siskey Settlement Facility *and* the MetLife Settlement Facility will recover approximately 90% on their Base Claims from the Settlement**.

42.     Any investor who does not participate in the Siskey Settlement Facility or the MetLife Settlement Facility will recover 68% on their Base Claims immediately following approval of the Settlement.

43.     For any investor electing not to execute the Optional Siskey Release, an amount equal to his or her pro rata share of $7,460,280.17 will be added to the Holdback.  Likewise, for any investor electing not to execute the Optional MetLife Release, an amount equal to his or her pro rata share of $750,000.00 will be added to the Holdback, and MetLife's Settlement payment will be reduced by an amount equal to his or her pro rata share of $750,000.00.

44.     If the Settlement is approved, in exchange for the various consideration provided to the bankruptcy estates by the Administrator, Diane Siskey, Negrelli, the Stone Street Claimants, and MetLife, the Trustee would release any and all claims owned or controlled by the Ponzi Debtors' bankruptcy estates against Diane Siskey (and her two children), the Stone Street Claimants, and MetLife.

# EXHIBIT A

# EXHIBIT 1

### RELIEF REQUESTED

45.     Through this Motion, the Trustee seeks entry of an Order:  (a) approving the portions of the Settlement directly affecting the Ponzi Debtors' bankruptcy estates as being fair, equitable, reasonable, and in the best interests of the Ponzi Debtors' bankruptcy estates; (b) authorizing the Trustee to take any and all actions necessary to carry out the terms of the Settlement without further confirmation by the Court, including the Trustee's execution of the Settlement Agreement; and (c) enjoining any person sued by the Trustee for tort liability arising out of or in connection with the Ponzi Scheme from pursuing any contribution or indemnity claims against Diane Siskey (or her children) but mandating that any enjoined defendant receive a credit against any monetary judgment entered in favor of the Trustee in the amount of $27,317,725.49[24] plus whatever funds are ultimately leftover for the Ponzi Debtors' bankruptcy estates from the Holdback.

46.     In the opinion of the Trustee, an exclusive list of the Settlement terms that would materially affect the Ponzi Debtors' bankruptcy estates is as follows:

> (a) in exchange for the Administrator providing a comparable release, the settlement payments made by Diane Siskey, Negrelli, and MetLife, and other consideration, the Trustee would release the Ponzi Debtors' bankruptcy estates' legal and/or equitable claim to the Life Ins. Proceeds;

> (b) the Trustee would voluntarily subordinate the claims held against the Siskey Estate by the Ponzi Debtors' bankruptcy estates to the extent

---

[24]     This figure is intended to reflect the amount of money contributed by Diane Siskey and Negrelli that flows directly to the Ponzi Debtors' bankruptcy estates, and is calculated by the Trustee as follows:  (a) of the $41,376,196.46 payable by Diane Siskey and Negrelli through the Settlement, (i) $2,050,000.00 is being reserved in a Holdback, and (ii) an aggregate of $8,210,280.17 is going to the Siskey Settlement Facility or MetLife Settlement Facility, leaving a subtotal of $31,115,916.29 in funds from Diane Siskey and Negrelli to be distributed through the Siskey Settlement Fund; (b) of the total amount of Base Claims across all of the victim constituencies (*i.e.*, Probate Investors, Orphaned Investors, and "bankruptcy" investors), which totals $41,292,513.56 in the aggregate, the aggregate amount of allowed Base Claims in this Case ($36,252,107.75) represents approximately 87.79% of all Base Claims (and, therefore, 87.79% of all Siskey Settlement Fund contributions should be allocated as benefitting the Ponzi Debtors' bankruptcy estates); and (c) $27,317,725.49 (approximately 87.79% of $31,115,916.29) represents the portion of Diane Siskey and Negrelli Settlement funds that will directly benefit the Ponzi Debtors' bankruptcy estates pursuant to the Settlement.

# EXHIBIT A

# EXHIBIT 1

necessary to equalize recoveries among claimants in this Case and the Probate Investors and Orphaned Investors;

(c) in exchange for a payment from Diane Siskey and Negrelli to the bankruptcy estate and other consideration, the Trustee would release Diane Siskey and her children from any and all causes of action of any nature whatsoever owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Ponzi Debtors' bankruptcy estates, including, without limitation: (A) causes of action under chapter 5 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of common acts or omissions by Diane Siskey (or her children) that injured the Ponzi Debtors and, therefore, derivatively injured all of the Ponzi Debtors' creditors, generally;

(d) in exchange for a payment from MetLife to the bankruptcy estate and other consideration, the Trustee would release MetLife from any and all causes of action of any nature whatsoever owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Ponzi Debtors' bankruptcy estates, including, without limitation: (A) causes of action under chapter 5 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of common acts or omissions by MetLife that injured the Ponzi Debtors and, therefore, derivatively injured all of the Ponzi Debtors' creditors, generally;

(e) in exchange for the subordination and disallowance of the Stone Street Claimants' claims (as detailed in the Agreement), an immediate payment to the Stone Street Claimants by the Trustee of $1,000,000.00, plus Stone Street shall receive 50% of recoveries by the Ponzi Debtors' bankruptcy estates—up to an additional $3,000,000.00—once 100% of Base Claims have been satisfied;

(f) the Trustee would also release the Stone Street Claimants from any and all causes of action of any nature whatsoever owned or controlled by the Trustee or that the Trustee has standing to pursue on behalf of the Ponzi Debtors' bankruptcy estates, including, without limitation: (A) causes of

18

# EXHIBIT A

# EXHIBIT 1

action under chapter 5 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*; (B) causes of action seeking the imposition of a constructive trust; and (C) causes of action for actual fraud, constructive fraud, negligent misrepresentation, breach of duty, unjust enrichment, restitution, negligence, unfair and deceptive trade practices, civil conspiracy, private causes of action based on state or federal insurance or securities laws violations, vicarious liability, respondeat superior, aiding and abetting, and/or punitive damages arising out of common acts or omissions by the Stone Street Claimants that injured the Ponzi Debtors and, therefore, derivatively injured all of the Ponzi Debtors' creditors, generally;

(g) the SEC withdrawing the SEC's claim in this Case; and

(h) the Trustee's transfer of $24,164.76[25] to the Administrator.

## BASIS FOR RELIEF REQUESTED

47.     Pursuant to § 105 of the Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105(a).

48.     Pursuant to Bankruptcy Rule 9019, the Court may—upon a motion by a trustee, notice to creditors and the Bankruptcy Administrator, and a hearing—approve a compromise or settlement. FED. R. BANKR. P. 9019(a).

49.     In bankruptcy proceedings, "compromises are favored in order to minimize litigation and expedite the administration of the bankruptcy estate." *In re Energy Future Holding Corp.*, 527 B.R. 157, 163 (Bankr. D. Del. 2015).  In order to approve a settlement, a bankruptcy court must find that the settlement is fair, equitable, and does not fall "below the lowest point in the range of reasonableness." *Id.*; *Hinson v. Bank of America, N.A. (In re Broughton)*, 2017 WL 6373977, at *4 (E.D.N.C. Dec. 13, 2017).

---

[25]     On July 25, 2017, the Court entered an Order in this Case [D.E. 85] directing the United States to remit $24,164.76 to the Trustee, reflecting funds seized from a deposit account owned by Rick Siskey.  The Trustee is currently holding those funds in an escrow account separate and apart from any bankruptcy estate funds.  These escrowed funds, at least legally, are more accurately characterized as property of the Siskey Estate.

# EXHIBIT A

# EXHIBIT 1

50.     A bankruptcy court has subject matter jurisdiction to approve a settlement so long as there is some nexus between the bankruptcy proceedings and the claims disposed by the settlement. *See In re Land Resource, LLC*, 505 B.R. 571, 582–84 (M.D. Fla. 2014).  Similarly, a bankruptcy court has the constitutional authority to approve settlements affecting bankruptcy estates, partially because a settlement is not tantamount to a final adjudication on the merits of any of the claims disposed by the settlement. *Id.*, at 578–82.

51.     Similarly, a bankruptcy court has subject matter jurisdiction to enter "bar orders" integral to a proposed settlement that enjoin prosecution of third-party contribution and/or indemnification claims derivative of bankruptcy estate claims to be resolved by the proposed settlement. *See In re Munford, Inc.*, 97 F.3d 449, 453–54 (11th Cir. 1996).

## ARGUMENT

52.     The Settlement is premised on Diane Siskey, Negrelli, and MetLife making substantial cash payments in exchange for receiving a release from claims owned or controlled by the Ponzi Debtors' bankruptcy estates.  Unlike the previous settlement agreed to by the Trustee and Diane Siskey,[26] **the Settlement involves no non-consensual third-party releases, waivers, or injunctions impacting any investor victims' claims against Diane Siskey or any other party**.[27]

53.     There are several reasons why the Trustee believes the Settlement benefits all creditors in this Case and otherwise serves the best interests of the bankruptcy estates.  First and

---

[26]     The previous settlement was embodied by the "Settlement Term Sheet" attached to the Trustee's *Motion for Order (I) Terminating Joint Administration of Sharon Road Properties, LLC Case, (II) Converting Remaining Cases to Chapter 11, and (III) Providing Miscellaneous Related Relief* (D.E. 253).

[27]     Admittedly, the Settlement seeks entry of a bar order, but the injunction(s) sought would only prevent contribution/indemnification claims between joint tortfeasors responsible for the Ponzi Scheme; such a bar order would have no impact on investor/victim litigation.  More specifically, the bar order would merely prevent contributions/indemnification suits against Diane Siskey and her children by defendants that the Trustee sues in tort for some responsibility related to furthering the Ponzi Scheme.

# EXHIBIT A

# EXHIBIT 1

foremost, the Settlement will provide a substantial distribution on Base Claims.  Holders of allowed Base Claims in this Case that choose to participate in the Siskey Settlement Facility and the MetLife Settlement Facility would receive an approximately 90% recovery from the Settlement.  Holders of allowed Base Claims in this Case that elect not to execute the Optional Siskey Release and Optional MetLife Release would still receive an approximately 68% recovery from the Settlement.  Thereafter, depending on a number of variables,[28] by the end of this Case, there could be additional distributions totaling as much as another approximately 10%–20% of Base Claims to all investor victims, regardless of whether the victim elects to participate in the individual investor settlement facilities.

54.    Moreover, the Settlement quickly and comprehensively resolves complicated and vehemently disputed issues that would be extremely costly and time consuming to litigate and secures an immediate distribution to investor-victims and other creditors.  If litigation with Diane Siskey and the Administrator is necessary, there is no guaranty that the Trustee will succeed in obtaining a monetary judgment against Diane Siskey or in imposing a constructive trust on the Life Ins. Proceeds in favor of the Ponzi Debtors' bankruptcy estates.  Not only is North Carolina law and federal common law unsettled on the extent to which the Life Ins. Proceeds could be burdened with a constructive trust, but also there are competing tracing methodologies—all of which are complex—that necessitate a review of financial records dating back 20+ years that may no longer be available.  The tracing analysis is further complicated by the fact that substantial amounts of Rick Siskey's income—particularly the $19,059,438.39 earned on the

---

[28]    The most significant of these variables include:  (1) whether the IRS dilutes Siskey Estate assets otherwise available for distribution on Base Claims; (2) how much of the Holdback will ultimately be released back to pay Base Claims; (3) how much of the CB&B Holdback will ultimately be released back to the Administrator and thereafter made available to pay Base Claims; (4) the administrative expenses to be incurred by the Siskey Estate and the Ponzi Debtors' bankruptcy estates; and (5) whether, and the extent to which, the Trustee is able to collect on judgments obtained via future litigation arising out of the Ponzi Scheme.

# EXHIBIT A

# EXHIBIT 1

CB&B deal—came from sources independent of the Ponzi Scheme. Diane Siskey also had her own income independent of the Ponzi Scheme. Thus, the outcome of the Trustee's litigation against Diane Siskey, the Administrator, and others is uncertain. Should the Trustee's litigation to acquire the Life Ins. Proceeds fail, only a very small fraction of Base Claims would be paid. In light of this risk, the Settlement unquestionably provides a fair, equitable, and reasonable outcome for victims of Rick Siskey's fraud and the bankruptcy estates more generally.

55.    In addition to litigation uncertainty, the litigation against Diane Siskey, the Administrator, and others would be extraordinarily expensive. From the Trustee's perspective alone, fully litigating the estates' claims against Diane Siskey, the Administrator, and others— and all related appeals—would cost the bankruptcy estates substantial amounts in attorneys' fees and litigation costs. Likewise, Diane Siskey's costs of litigating will limit her ability to pay any judgment the Trustee might obtain against her. The Trustee is informed that, if forced to litigate, Diane Siskey is prepared to vigorously defend any claims asserted against her or her children.

56.    In addition to the uncertainty and cost of litigation, perhaps the most troubling aspect such a strategy is the delay that would result. This Case has been pending for twenty-two (22) months. Litigation with Diane Siskey, the Administrator, and others would take years to reduce to a final, non-appealable judgment, thereby pushing back any additional distributions to investor-victims and other creditors by at least several years. Even assuming for the sake of argument that the Trustee ultimately would prevail, there are many benefits to the bankruptcy estates, creditors, and the Court of distributing the vast majority of the Life Ins. Proceeds today through the Settlement as opposed to attempting to recover all of the Life Ins. Proceeds years from now through protracted litigation.

# EXHIBIT A

# EXHIBIT 1

57.    The Settlement also resolves the impediment to paying Base Claims created by the Stone Street Claimants' claims, which, if allowed as asserted, would comprise approximately 42% of the claims in this Case.  In exchange for a release and an upfront payment totaling $1,000,000.00, the Stone Street Claimants have agreed to subordinate their claims to the extent necessary to pay all Base Claims in full and thereafter share in any recovery 50/50 with the Base Claims up to a maximum payment to Stone Street of $4,000,000.00 (inclusive of the $1,000,000.00 upfront payment).[29]   Much like the resolution with Diane Siskey (and the Administrator) regarding access to the Life Ins. Proceeds, the compromise with the Stone Street Claimants avoids substantial litigation-related costs, delay, and uncertainty.

58.    The Trustee has also agreed to release the bankruptcy estates' claims against MetLife in exchange for a payment from MetLife in the amount of $1,000,000.00.  Under North Carolina law, when "all creditors of an insolvent or bankrupt corporation share an injury based on a common act, only a receiver or trustee has standing to assert the creditors' collective claim . . . on behalf of the corporation." *Associated Hardwoods, Inc. v. Lail*, 2018 WL 3747439, at *6, 18-CVS-329 (Caldwell County) (N.C. Bus. Ct. Aug. 6, 2018) (quoting *Angell v. Kelly*, 336 F.Supp.2d 540, 544–45 (M.D.N.C. 2004) (internal quotations omitted)).[30]   For example, in the bankruptcy proceedings arising in the aftermath of the Madoff Ponzi scheme, the U.S. Bankruptcy Court for the Southern District of New York, the U.S. District Court for the Southern District of New York, and the U.S. Court of Appeals for the Second Circuit all agreed that claims against Madoff's "co-conspirator(s)" were property of the bankruptcy estate and individual

---

[29]    The Stone Street Claimants have also agreed to immediately withdraw their claims in the SRP Case.

[30]    "Indeed, a review of North Carolina cases and federal cases applying North Carolina law reveals that an individual creditor typically only has standing to sue directors of a debtor corporation where some misconduct was directed specifically at plaintiff or the directors were alleged to have misappropriated funds that were earmarked for plaintiff." *Associated Hardwoods*, 2018 WL 3747439, at *6.

# EXHIBIT A

# EXHIBIT 1

creditors would be enjoined from pursuing duplicate or derivate claims after the Madoff trustee

had settled the same or similar claims in the name of the debtor's bankruptcy estate.  *See In re*

*Madoff*, 848 F.Supp.2d 469, 472–73, 479–81 (S.D.N.Y. 2012) (*aff'd* 740 F.3d 81 (2d Cir. 2014)).

Rick Siskey (and potentially others) owed the Ponzi Debtors an obligation to spend funds

invested into those entities for legitimate investment purposes; every dollar diverted from the

Ponzi Debtors for the illegitimate purpose of furthering the Ponzi Scheme caused injury to the

Ponzi Debtors and, derivatively, ***all*** creditors and equity interest holders of the Ponzi Debtors.  It

therefore follows that, under North Carolina law, the Ponzi Debtors own, and have exclusive

standing to assert, any claims against MetLife based on alleged acts or omissions that generally

facilitated the Ponzi Scheme.

59.    As indicated above, the Settlement is contingent upon entry of a "*Munford* style"

bar order.  *See Munford*, 97 F.3d at 454–56.  Such a bar order would have absolutely zero effect

on the Investor Lawsuits or on any other claims held by victims of the Ponzi Scheme against

Diane Siskey or others.  The bar order sought would: (a) enjoin any contribution or indemnity

claims against Diane Siskey (or her children) by third-party defendants sued by the Trustee for

tort liability arising out of or in connection with the Ponzi Scheme; and, in exchange for such

injunction, (b) mandate that any enjoined third-party defendant(s) receive a "dollar-for-dollar"

credit against any monetary judgment entered in favor of the Trustee to the extent of Diane

Siskey's settlement payment contributed to the Ponzi Debtors' bankruptcy estates (*i.e.*,

$27,317,725.49 plus whatever funds are ultimately leftover for the Ponzi Debtors' bankruptcy

estates from the Holdback).

60.    Ultimately, the Settlement resolves the most vexing problems plaguing this Case

and expedites a swift resolution of an otherwise complicated drove of litigation involving the

# EXHIBIT A

# EXHIBIT 1

Ponzi Debtors' bankruptcy estates.  The Trustee, in the exercise of his discretion and business

judgment, believes the Settlement to be fair, equitable, reasonable, and otherwise in the best

interests of the Ponzi Debtors' bankruptcy estates.

**WHEREFORE**, the Trustee respectfully prays that the Court will enter an Order:

1)    GRANTING this Motion;

2)    approving the portions of the Settlement directly affecting the Ponzi Debtors' bankruptcy estates as being fair, equitable, reasonable, and in the best interests of the Ponzi Debtors' bankruptcy estates;

3)    authorizing the Trustee to take any and all actions necessary to carry out the terms of the Settlement without further confirmation by the Court, including executing the Settlement Agreement;

4)    enjoining any person sued by the Trustee for tort liability arising out of or in connection with the Ponzi Scheme from pursuing any contribution or indemnity claims against Diane Siskey (or her children) but mandating that any enjoined defendant receive a credit against any monetary judgment entered in favor of the Trustee in the amount of $27,317,725.49 plus whatever funds are ultimately leftover for the Ponzi Debtors' bankruptcy estates from the Holdback; and

5)    granting such other and further relief as may be just and proper.

This is the 30th day of November, 2018.

_/s/ Michael L. Martinez_
Joseph W. Grier, III (N.C. Bar No 7764)
Anna S. Gorman (N.C. Bar No 20987)
Michael L. Martinez (N.C. Bar No. 39885)
Grier Furr & Crisp, PA
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Phone:  704/375.3720; Fax:  704/332.0215
Email:  mmartinez@grierlaw.com

*Attorneys for Joseph W. Grier, III, Trustee*

# EXHIBIT A

# EXHIBIT 1

# SCHEDULE 1

## Distribution Estimations

| Assets | | Liabilities | |
|---|---|---|---|
| **Settlement Funds (Available on "Day 1")** | | **Claims** | |
| Diane Siskey - Siskey Settlement Fund Contribution (1) | $33,165,916.29 | Total Bankruptcy Claims | $36,252,107.75 |
| Diane Siskey - Siskey Settlement Facility Contribution (2) | $7,460,280.17 | Total Probate Investor Claims | $4,204,459.00 |
| Diane Siskey - MetLife Settlement Facility Contribution (3) | $750,000.00 | Total Outside Investor Claims | $835,946.81 |
| **Total Diane Siskey Settlement Payment** | **$41,376,196.46** | **Reserves** | |
| MetLife - Siskey Settlement Fund Contribution (1) | $250,000.00 | Reserve for Bankruptcy Estate Administrative Expenses | $2,000,000.00 |
| MetLife - MetLife Settlement Facility Contribution (3) | $750,000.00 | Less admin expenses post June 1, 2018 | $296,090.43 |
| **Total MetLife Settlement Payment** | **$1,000,000.00** | Less bankruptcy bank balance | $510,538.86 |
| **Probate Estate Assets in Hand (Potentially Available on "Day 2")** | | Additional reserve needed | $1,193,370.71 |
| Cash in Probate Estate Account (1) | $5,543,040.92 | Diane Siskey Holdback | $2,050,000.00 |
| 21.38% interest in SRP (estimate) (1) | $536,540.00 | Estimated Unpaid Probate Estate Administrative Expenses | $500,000.00 |
| Bank Account Proceeds in Escrow (1) | $24,164.76 | **Settlement Payments Owed by Bankruptcy Estate** | |
| **Total Probate Estate Assets** | **$6,103,745.68** | Upfront Settlement Payment to Stone Street / Porter / King | $1,000,000.00 |
| **Speculative/Estimated Probate Estate Assets (Potentially Available on "Day 3")** | | | |
| Ballantyne Clubdominium Lien (1) | $170,000.00 | | |
| C&B Holdback (Speculative) (1) | $2,500,000.00 | | |
| **Total speculative/estimated Probate assets** | **$2,670,000.00** | | |
| **Speculative Bankruptcy Estate Assets (Potentially Available on "Day 3")** | | | |
| WSC 25% Ballantyne Clubdominium, LLC (Speculative) (1) | $180,000.00 | | |
| Net Winner Actions (Speculative) (1) | $250,000.00 | | |
| Unused Portion of Diane Siskey Holdback (Speculative) (1) | $2,050,000.00 | | |
| **Total Speculative Bankruptcy Estate Assets** | **$2,480,000.00** | | |
| **TOTAL---ALL ASSETS (some speculative)** | **$53,629,942.14** | **TOTAL---ALL LIABILITIES** | **$45,035,884.00** |

| | | | $33,415,916.29 |
|---|---|---|---|

| Siskey Settlement Fund "Day 1" Waterfall (1) | | | | | | |
|---|---|---|---|---|---|---|
| Prior Interim Distribution to Bankruptcy Investors | $10,000,000.00 | Balance of "Day 1" Waterfall Available | $23,415,916.29 | from Siskey Settlement Fund on Day 1 | 27.58% | 27.58% |
| Prior Interim Distribution to Bankruptcy Admin | $1,000,000.00 | Balance of "Day 1" Waterfall Available | $22,415,916.29 | | | |
| Diane Siskey Holdback | $2,050,000.00 | Balance of "Day 1" Waterfall Available | $20,365,916.29 | | | |
| Additional Funds for Bankruptcy Estate Admin Reserve | $1,193,370.71 | Balance of "Day 1" Waterfall Available | $19,172,545.58 | | | |
| Upfront Settlement Payment to Stone Street / Porter / King | $1,000,000.00 | Balance of "Day 1" Waterfall Available | $18,172,545.58 | | | |
| Catch-up Payment to Probate Investors (27.58%) | $1,159,783.32 | Balance of "Day 1" Waterfall Available | $17,012,762.26 | | | |
| Catch-up Payment to Outside Investors (27.58%) | $230,592.61 | Balance of "Day 1" Waterfall Available | $16,782,169.65 | | | |
| Day 1 Siskey Settlement Fund Distribution to All Investors | $16,782,169.65 | Balance of "Day 1" Waterfall Available | $0.00 | from Siskey Settlement Fund on Day 1 | 40.64% | 68.23% |
| **Optional Siskey Settlement Facility (2)** | | | | | | |
| Siskey Settlement Facility Distribution IF 100% Participation | $7,460,280.17 | Optional "Day 1" Distribution | | $ from Siskey Settlement Facility | 18.07% | 86.29% |
| **Optional MetLife Settlement Facility (3)** | | | | | | |
| MetLife Settlement Facility Distribution IF 100% Participation | $1,500,000.00 | Optional "Day 1" Distribution | | $ from MetLife Settlement Facility | 3.63% | 89.93% |
| **Estimated Siskey Settlement Fund "Day 2" Waterfall Based on Assets in Hand (1)** | | | $6,103,745.68 | | | |
| Additional Funds for Probate Estate Admin Reserve | $500,000.00 | Balance of "Day 2" Waterfall Available | $5,603,745.68 | | | |
| Payment Necessary to Pay Base Claims in Full | $4,159,687.81 | Balance of "Day 2" Waterfall Available | $1,444,057.87 | % Up to Stone Street "Kick-In" | 10.07% | 100.00% |
| Estimated Stone Street Backend Payment | $722,028.93 | Balance of "Day 2" Waterfall Available | $722,028.93 | | | |
| Estimated Payment to Investors | $722,028.93 | Balance of "Day 2" Waterfall Available | $0.00 | | | |
| **Possible Siskey Settlement Fund "Day 3" Waterfall Based on Speculative Assets (1)** | | | $5,150,000.00 | | | |
| Balance to Stone Street on Backend Payment | $2,277,971.07 | Balance of "Day 3" Waterfall Available | $2,872,028.94 | | | |
| Estimated Payment to Investors | $2,872,028.94 | Balance of "Day 3" Waterfall Available | $0.00 | | | |

The information contained herein has not been subject to a certified audit or other independent review. Any values of assets and liabilities contained herein have been estimated by the Trustee based on the best information currently available to the Trustee. Although substantial efforts have been made to be complete and accurate, the Trustee is unable to warrant or represent the full and complete accuracy of the information contained herein.

# EXHIBIT A

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| In re: | **CASE NO. 17-30132** |
| **TSI Holdings, LLC[1] et al.,** | **CHAPTER 7** |
|  | Jointly Administered |
| **DEBTORS.** | |

## CONSENT ORDER RESOLVING STONE STREET CLAIMS

**THIS MATTER** comes before the Court on the consent of the following interested parties (the "Parties") in the above-captioned, jointly-administered bankruptcy cases (this "Case"), through counsel: (a) Joseph W. Grier, III, the duly-appointed chapter 7 trustee in this Case (the "Trustee"); (b) Stone Street Partners, LLC f/k/a Siskey Capital, LLC ("Stone Street"); (c) Dawn E. King ("King"); and (d) Paul G. Porter ("Porter"). The Parties hereby stipulate and consent as follows:

WHEREAS, on August 22, 2017, Stone Street, King, and Porter submitted claims in this Case (collectively, the "Stone Street Claims") as follows: (a) Stone Street filed Proof of Claim Number 87 in the TSI Case, Proof of Claim Number 65 in the WSC Case, and Proof of Claim Number 36 in the SPP Case; (b) King filed Proof of Claim Number 88 in the TSI Case, Proof of

---

[1]     These jointly administered cases are those of the following debtors: TSI Holdings, LLC ("TSI"), Case No. 17-30132 (the "TSI Case"); WSC Holdings, LLC ("WSC"), Case No. 17-30338 (the "WSC Case"); and SouthPark Partners, LLC ("SPP"), Case No. 17-30339 (the "SPP Case").

# EXHIBIT A

# EXHIBIT 2

Claim Number 66 in the WSC Case, and Proof of Claim Number 34 in the SPP Case; and
(c) Porter filed Proof of Claim Number 89 in the TSI Case, Proof of Claim Number 67 in the
WSC Case, and Proof of Claim Number 35 in the SPP Case.

WHEREAS, on November 1, 2017, the Trustee filed the *Trustee's First Omnibus Report
of Claims, Objections to Claims, and Recommendations Regarding Claims as to TSI Holdings,
LLC, WSC Holdings, LLC, SouthPark Partners, LLC, and Sharon Road Properties, LLC*
(D.E. 112) (the "Claims Report"),[2] proposing that the Court disallow the Stone Street Claims.

WHEREAS, on November 30, 2017, Stone Street, King, and Porter filed a response to
the Claims Report (D.E. 126).

WHEREAS, on November ██, 2018, the Trustee filed a *Motion for (I) Authority to Enter
into Settlement and (II) Bar Order* (D.E. ████) (the "Settlement Motion"), which seeks Court
approval of a settlement agreement attached thereto (the "Settlement Agreement") resolving
various issues pertinent to this Case, including the Stone Street Claims.

WHEREAS, on December ██, 2018, the Court entered an Order approving the Settlement
Motion (D.E. ████).

WHEREAS, in furtherance of the settlement, the Parties have agreed to the treatment of
the Stone Street Claims as set forth herein.

**IT IS, THEREFORE, ORDERED** THAT:

1.    Capitalized terms not otherwise defined herein shall have the meanings set forth
in the Settlement Agreement.

2.    Claim No. 87 in the TSI Case, Claim No. 65 in the WSC Case, and Claim No. 36

---

[2]    Duplicates of the Claims Report's substantive text were filed in the WSC Case and the SPP Case. The only
difference in the various versions of the Claims Report is the "Exhibit A" attached thereto, which proposes treatment
of claims submitted specifically against the debtor-entity in the corresponding bankruptcy case. For purposes of this
Order, the various versions will be referred to collectively as the "Claims Report."

# EXHIBIT A

# EXHIBIT 2

in the SPP Case of Stone Street Partners, LLC f/k/a Siskey Capital, LLC is ALLOWED as a general unsecured claim in the amount of $17,383,847.00 (the "Allowed Stone Street Claim").

3.    As set forth specifically in the Settlement Agreement, the Allowed Stone Street Claim shall be subordinated in this Case to the extent necessary to pay Base Claims of Bankruptcy Investors, Probate Investors, and Orphaned Investors in full; *provided, however*, that (A) Stone Street, Porter, and King shall receive an immediate aggregate payment of $1,000,000.00 as more thoroughly set forth in the Settlement Agreement, (B) once Qualified Investors who executed the Optional Siskey Release and Optional MetLife Release have received distributions equal to 100% of their Base Claims, factoring in any and all payments received from (1) the Interim Distribution, (2) the Siskey Settlement Fund, (3) the Siskey Settlement Facility, (4) the MetLife Settlement Facility, and (5) the Siskey Estate (the "Stone Street Distribution Threshold") then further Siskey Settlement Fund distributions shall be split between Stone Street and the Bankruptcy Investors, Probate Investors, and Orphaned Investors, with fifty percent (50%) of such distributions going to Stone Street (capped at $3,000,000.00 (the "Stone Street Payment Cap")) and fifty percent (50%) going toward the claims of Bankruptcy Investors, Probate Investors, and Orphaned Investors; *provided, further*, that, for the sake of clarity, in no event shall the Stone Street Claimants receive more than $4,000,000.00 from the Siskey Settlement Fund.

4.    Claim No. 88 in the TSI Case of Dawn E. King is DISALLOWED.

5.    Claim No. 66 in the WSC Case of Dawn E. King is DISALLOWED.

6.    Claim No. 34 in the SPP Case of Dawn E. King is DISALLOWED.

7.    Claim No. 89 in the TSI Case of Paul G. Porter is DISALLOWED.

8.    Claim No. 67 in the WSC Case of Paul G. Porter is DISALLOWED.

# EXHIBIT A

# EXHIBIT 2

9.       Claim No. 35 in the SPP Case of Paul G. Porter is DISALLOWED.

10.     Nothing contained herein is intended to, nor does the entry of this consent order, impact the rights of the Stone Street Claimants under the Settlement Agreement, nor does anything contained herein impact or prejudice the rights of the Stone Street Claimants in any other state, federal, or local proceeding or action.

APPROVED FOR ENTRY BY:

By: */s/ Michael L. Martinez*
Grier Furr & Crisp, PA
Michael L. Martinez (Bar No. 39885)
101 North Tryon Street, Suite 1240
Charlotte, NC  28246
Phone:  (704) 332-0207
Fax:  (704) 332-0215
Email: mmartinez@grierlaw.com

*Attorneys for the Trustee*

By: */s/ Andrew T. Houston*
Moon Wright & Houston, PLLC
Andrew T. Houston (Bar No. 36208)
121 West Trade Street, Suite 1950
Charlotte, NC  28202
Phone:  (704) 944-6560
Fax:  (704) 944-0380
Email: ahouston@mwhattorneys.com

*Attorneys for Stone Street Partners, LLC*

_____

Dawn E. King

_____

Paul G. Porter

**SO ORDERED.**

**This Order has been signed
electronically.  The Judge's
signature and Court's seal
appear at the top of the Order.**

**United States Bankruptcy Court**

# EXHIBIT A

# EXHIBIT 3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| In re: | **CASE NO. 17-30363** |
| **Sharon Road Properties, LLC,** | **CHAPTER 7** |
| **DEBTOR.** | |

## CONSENT ORDER RESOLVING STONE STREET CLAIMS

**THIS MATTER** comes before the Court on the consent of the following interested parties (the "Parties") in the above-captioned bankruptcy case (this "Case"), through counsel: (a) Joseph W. Grier, III, the duly-appointed chapter 7 trustee in this Case (the "Trustee"); (b) Stone Street Partners, LLC f/k/a Siskey Capital, LLC ("Stone Street"); (c) Dawn E. King ("King"); and (d) Paul G. Porter ("Porter," and together with Stone Street and King, the "Stone Street Claimants"). The Parties hereby stipulate and consent as follows:

WHEREAS, on August 22, 2017, Stone Street, King, and Porter submitted claims in this Case (collectively, the "Stone Street Claims") as follows: (a) Stone Street filed Proof of Claim Number 41; (b) King filed Proof of Claim Number 42; and (c) Porter filed Proof of Claim Number 43.

WHEREAS, on November ▮▮, 2018, the Trustee filed a *Motion to Approve Settlement* (D.E. ▮▮) (the "Settlement Motion"), which seeks Court approval of a settlement agreement

# EXHIBIT A

# EXHIBIT 3

attached thereto resolving various issues pertinent to this Case, including the Stone Street

Claims.

    WHEREAS, on December ▮, 2018, the Court entered an Order approving the Settlement

Motion (D.E. ▮▮▮).

    WHEREAS, in furtherance of the settlement, the Parties have agreed to the treatment of

the Stone Street Claims as set forth herein.

    **IT IS, THEREFORE, ORDERED** THAT:

    1.    Claim No. 41 in this Case of Stone Street Partners, LLC f/k/a Siskey Capital, LLC

is DISALLOWED.

    2.    Claim No. 42 in this Case of Dawn E. King is DISALLOWED.

    3.    Claim No. 43 in this Case of Paul G. Porter is DISALLOWED.

    4.    Nothing contained herein is intended to, nor does the entry of this consent order,

impact the rights of the Stone Street Claimants under the Settlement Agreement, nor does

anything contained herein impact or prejudice the rights of the Stone Street Claimants in any

other state, federal, or local proceeding or action.

# EXHIBIT A

# EXHIBIT 3

APPROVED FOR ENTRY BY:

By: */s/ Michael L. Martinez*

Grier Furr & Crisp, PA
Michael L. Martinez (Bar No. 39885)
101 North Tryon Street, Suite 1240
Charlotte, NC  28246
Phone:  (704) 332-0207
Fax:  (704) 332-0215
Email: mmartinez@grierlaw.com

*Attorneys for the Trustee*

By: */s/ Andrew T. Houston*

Moon Wright & Houston, PLLC
Andrew T. Houston (Bar No. 36208)
121 West Trade Street, Suite 1950
Charlotte, NC  28202
Phone:  (704) 944-6560
Fax:  (704) 944-0380
Email: ahouston@mwhattorneys.com

*Attorneys for Stone Street Partners, LLC*

Dawn E. King

Paul G. Porter

**SO ORDERED.**

**This Order has been signed
electronically.  The Judge's
signature and Court's seal
appear at the top of the Order.**

**United States Bankruptcy Court**

# EXHIBIT A

# EXHIBIT 4

**Orphaned Investors**

| Claimant Name | Base Claim | 27.58% Catch-Up | |
|---|---|---|---|
| Thomas J. Crozier, Jr.  (Traditional IRA) | $175,862.98 | $48,511.10 | 27.58% |
| Kent Kalina (Traditional IRA) | $190,000.00 | $52,410.75 | 27.58% |
| Melissa Danette Spiers | $53,905.56 | $14,869.63 | 27.58% |
| Melvin McCullough | $64,844.78 | $17,887.18 | 27.58% |
| Brian J. Spiers Bk Estate | $68,094.44 | $18,783.58 | 27.58% |
| Daisy Couch | $97,718.64 | $26,955.30 | 27.58% |
| Nalini Doshi | $159,700.00 | $44,052.61 | 27.58% |
| Theodore Hawley III | $25,820.41 | $7,122.46 | 27.58% |

**Probate Investors**

| Claimant Name | Base Claim | 27.58% Catch-Up | |
|---|---|---|---|
| James Michael Aldridge | $95,000.00 | $26,205.37 | 27.58% |
| James Michael Aldridge | $25,000.00 | $6,896.15 | 27.58% |
| Donald Corey | $300,000.00 | $82,753.81 | 27.58% |
| William & Rose Cummings | $500,000.00 | $137,923.01 | 27.58% |
| William Dancer | $300,000.00 | $82,753.81 | 27.58% |
| Robert B. and April Frazer | $245,000.00 | $67,582.28 | 27.58% |
| Teresa Hawkins & Michael Burkhard | $130,000.00 | $35,859.98 | 27.58% |
| Scott T. Hicks | $300,000.00 | $82,753.81 | 27.58% |
| Scott Jernigan | $500,000.00 | $137,923.01 | 27.58% |
| Shelley F. and Beverly Martin | $99,000.00 | $27,308.76 | 27.58% |
| Michael L. Salamone | $1,277,000.00 | $352,255.38 | 27.58% |
| William & Beverly Sergent | $195,835.00 | $54,020.31 | 27.58% |

# EXHIBIT A

# EXHIBIT 5

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| In re: | **CASE NO. 17-30132** |
| **TSI Holdings, LLC[1] et al.,** | **CHAPTER 7**<br>Jointly Administered |
| **DEBTORS.** | |

### OPTIONAL INVESTOR RELEASE FORM

#### *Overview*

This form is being sent to you in connection with a settlement in these jointly administered bankruptcy cases (as more fully described below).  You are permitted, but not required, to give a release of any and all claims you may have related to Diane Siskey and her children and/or MetLife and its affiliates in exchange for certain additional payments.  You may give releases to Diane Siskey and her children, MetLife and its affiliates, both or neither.  *Your recovery from the bankruptcy cases will not be impacted in any way if you give or don't give these additional releases.  However, by giving this release, you will be entitled to receive additional amounts; and if you chose not to provide this release, you will not receive the additional payments.*

#### *Background*

On _____, 2018, the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court") entered an order [Doc. ___] approving a Settlement and Release Agreement (the 'Settlement') between (among other parties) Joseph W. Grier, III, as Trustee for TSI Holdings, LLC, WSC Holdings, LLC, SouthPark Partners, LLC, and Sharon Road Properties, LLC (the "Trustee"), F. Lane Williamson, as Administrator for the Richard S. Siskey decedent's estate (the "Administrator"), Siskey Industries, LLC, Diane M. Siskey ("Mrs. Siskey"), Jenna Marie Negrelli ("Negrilli"), Stone Street Partners, LLC, Dawn E. King, Paul G. Porter, Metropolitan Life Insurance Company ("MLIC"), MSI Financial Services, Inc. (f/k/a MetLife Securities, Inc. n/k/a MML Investor Services, LLC) ("MSI"), Massachusetts Mutual Life Insurance Company ("MassMutual") and Brighthouse Life Insurance Company ("Brighthouse", and collectively with MLIC, MSI and MassMutual, "MetLife").

Pursuant to the terms of the Settlement, Mrs. Siskey has agreed to contribute the sum of $7,460,280.17 to a settlement facility (the "Siskey Settlement Facility").  In addition, Mrs. Siskey has agreed to contribute $750,000, and MetLife has also agreed to contribute an additional $750,000, to a separate settlement facility (the "MetLife Settlement Facility", and together with the Siskey Settlement Facility, the "Settlement Facilities").  The funds placed into the Settlement Facilities are available for distribution on a pro rata basis to Qualified Investors (as defined in the Settlement).

---

[1]     These jointly administered cases are those of the following debtors:  TSI Holdings, LLC ("TSI"), Case No. 17-30132 (the "TSI Case"); WSC Holdings, LLC ("WSC"), Case No. 17-30338 (the "WSC Case"); and SouthPark Partners, LLC ("SPP"), Case No. 17-30339 (the "SPP Case").



# EXHIBIT A

# EXHIBIT 5

*Instructions*

If you are a Qualified Investor and wish to opt-in and participate in either (or both) of the Settlement Facilities, you must complete this form and return it to the Trustee **no later than _____, _____**.  You are not required to opt-in to both of the Settlement Facilities, but can choose to enter into either one (or both).  **Failure to complete and return this form means that you have chosen not to opt-in to either of the Settlement Facilities.** *If you fail to complete and timely return this form, you will not share in any pro rata distributions from the Settlement Facilities.*  (However, failure to complete and return this form will <u>not</u> affect the right of Qualified Investors to receive distributions from the separate Siskey Settlement Fund).

If you want to receive an additional payment for giving a release to Mrs. Siskey and her children, please fill in your name and execute Section 1.  If you want to receive an additional payment for giving a release to MetLife and its affiliates, please fill in your name and execute Section 2.

Once you have completed and executed this form, return **all pages of the form** to the Trustee (Joseph Grier) via mail (101 N. Tryon Street, Suite 1240, Charlotte, North Carolina 28246), email (tsiholdings@grierlaw.com), or facsimile (704/332.0215).  The executed form must be timely returned no later than _____, _____

2



# EXHIBIT A

# EXHIBIT 5

**NOTE: YOU SHOULD READ THE ENTIRE SETTLEMENT AGREEMENT CAREFULLY. YOU MAY WISH TO CONSULT WITH AN ATTORNEY REGARDING THE SETTLEMENT AGREEMENT AND THIS OPTIONAL INVESTOR RELEASE FORM. BY OPTING-IN TO THE SISKEY SETTLEMENT FACILITY, YOU WILL BE RELEASING ANY CLAIMS OR CAUSES OF ACTION (IF ANY) WHICH YOU MIGHT HAVE AGAINST MRS. SISKEY, JENNA MARIE NEGRELLI AND RELATED ENTITIES LISTED IN THE OPTIONAL SISKEY RELEASE STATED BELOW.**

_____

## Section 1 – Siskey Settlement Facility

*If you wish to opt into (and receive distributions from) the Siskey Settlement Facility, write your name (or names if a claim is held by more than one person) in the space below and then execute in the space(s) provided below.  **If you do not execute this section, you will not be entitled to receive any distributions from the Siskey Settlement Facility.***

I / We _____ (print name(s)) do hereby OPT-INTO and elect to receive distributions from the Siskey Settlement Facility.  By opting into the Siskey Settlement Facility, I / we do hereby release, remise, acquit, satisfy, waive, and forever discharge Diane M. Siskey, Jenna Marie Negrelli, Richard Christopher Siskey, Jr and any of their respective heirs, successors, and assigns (the "Siskey Released Parties"), from any and all claims, demands, liabilities, losses, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative which I / we have as of the date of this Release (the "Claims").  I / we further warrant that I / we have not sold or transferred any Claims against the Siskey Released Parties and are the owners of all such Claims (if any).

AGREED to this _____ day of _____, _____.

_____
(Signature)

_____
(Signature – if more than one claimant)



3

# EXHIBIT A

# EXHIBIT 5

**NOTE: YOU SHOULD READ THE ENTIRE SETTLEMENT AGREEMENT CAREFULLY. YOU MAY WISH TO CONSULT WITH AN ATTORNEY REGARDING THE SETTLEMENT AGREEMENT AND THIS OPTIONAL INVESTOR RELEASE FORM. BY OPTING-IN TO THE METLIFE SETTLEMENT FACILITY, YOU WILL BE RELEASING ANY CLAIMS OR CAUSES OF ACTION (IF ANY) WHICH YOU MIGHT HAVE AGAINST METLIFE AND THE RELATED ENTITIES LISTED IN THE OPTIONAL METLIFE RELEASE STATED BELOW.**

_____

## Section 2 – MetLife Settlement Facility

*If you wish to opt into (and receive distributions from) the MetLife Settlement Facility, write your name (or names if a claim is held by more than one person) in the space below and then execute in the space(s) provided below.  **If you do not execute this section, you will not be entitled to receive any distributions from the MetLife Settlement Facility.***

I / We _____ (print name(s) do hereby OPT-INTO and elect to receive distributions from the MetLife Settlement Facility.  By opting into the MetLife Settlement Facility, I / we do hereby release, remise, acquit, satisfy, waive, and forever discharge Metropolitan Life Insurance Company, MSI Financial Services, Inc. (f/k/a MetLife Securities, Inc. n/k/a MML Investor Services, LLC), Massachusetts Mutual Life Insurance Company, Brighthouse Life Insurance Company and, with respect to each of the foregoing, any and all of their respective past and present parent companies, subsidiaries, affiliates predecessors, successors, assigns, present and former officers, directors, employees, agents, affiliated agents, third party administrators, attorneys, advisors, consultants, and insurers (collectively, the "MetLife Released Parties"), from any and all claims, demands, liabilities, losses, obligations, expenses, damages, judgments, executions and causes of action of any nature whatsoever, whether at law or in equity, either now accrued or hereafter maturing and whether known or unknown, whether future, nonpossessory, contingent, speculative or derivative which I / we have as of the date of this Release (the "Claims").  I / we further warrant that I / we have not sold or transferred any Claims against the MetLife Released Parties and are the owners of all such Claims (if any).  This release excepts and does not include a release of any contractual claims (if any) to life insurance benefits under any existing life insurance policy issued by any of the MetLife Released Parties on which I / we are an owner or beneficiary.

AGREED to this _____ day of _____, _____.

_____
(Signature)

_____
(Signature – if more than one claimant)



# EXHIBIT A


American Legal
Claim Services LLC

**Administration Services Estimate**
**Siskey Distribution Plan Cost Estimate**
**November 13, 2018**
**Jeff Pirrung**
jeff.pirrung@americanlegal.com

# EXHIBIT 6

| Key Assumptions Used in Estimate | | What type of web site is required: | N/A |
|---|---|---|---|
| Size of class: | 23 | What type of web site is required: | N/A |
| Length of case in months: | 6 | What type of Call Center | N/A |
| # of electronic files expected: | 1 | What % of Class Members will Call Call Center | N/A |
| Claims response rate: | N/A | What % of Disbursements will be FOE: | 3% |
| Are address searches required: | Yes | What % of Disbursements will be RU: | 10% |

### *Disbursement of Payments*

| | Rate of Response | Quantity | Rate Per Unit | Estimated Cost | Total |
|---|---|---|---|---|---|
| Case Setup- including data import, check layout and design | | 1 | $3,500.00 | $3,500 | |
| Management Hours for Reporting/Follow-up | | 45 | $185.00 | $8,325 | |
| Distributions, including bank account setup, bank fees, | | | | | |
| distributions, sub-account reconciliation and Tax Reporting (if applicable) | | 1 | $3,000.00 | $3,000 | |
| **SUBTOTAL - DISBURSEMENT ADMINISTRATION** | | | | | **$14,825** |
| **Plus Estimated Postage and Expenses** | | | | $500 | |
| | | | | | |
| ***TOTAL ESTIMATED COSTS including postage*** | | | | | **$15,325** |

### *Subsequent Distributions*

| | | Quantity | Rate Per Unit | Estimated Cost | |
|---|---|---|---|---|---|
| Bank Fees- for each month the distribution account is open after 1 year | | 24 | $150.00 | $3,600.00 | |
| Each subsequent distribution | | 2 | $5,000.00 | $10,000.00 | |

### *Other Services and Out of Pocket Expenses*

| | Standard Hourly |
|---|---|
| All additional services and reporting as needed | Rates |
| Other Charges and Out of Pocket Costs | Actual |

This Administration Services Estimate and all attached documents including scope of services ("The Proposal") is valid for 60 days from 11/9/18.  After this period ALCS reserves the right to amend or withdraw The Proposal.

All fees and services that are set forth in The Proposal are subject to the terms, assumptions, specifications and conditions that are set forth in The Proposal and the Terms and Conditions attached.  By signing below, The Client acknowledges and agrees that they have read and understand the Terms and Conditions, which are incorporated by reference as if fully set herein and agree to be bound by them.

American Legal Claim Services LLC                                                    The Client

_____   _____        _____ _____
By:                                                   Date:                        By:                                            Date:
Title:                                                                                 Title:

# EXHIBIT A

AMERICAN LEGAL
Claim Services LLC

TERMS AND CONDITIONS

# EXHIBIT 6

All services to be provided to _____("Client") by American Legal Claim Services, LLC (together with its affiliates, "ALCS") are subject to the following Terms and Conditions:

**1. SERVICES.** ALCS agrees to provide Client with the services set forth in the Proposal attached hereto (the "Services"). Client acknowledges and agrees that ALCS will often take direction from Client's representatives, employees, agents and/or professionals (collectively, the "Client Parties") with respect to the Services. The parties agree that ALCS may rely upon, and Client agrees to be bound by, any requests, advice or information provided by the Client Parties to the same extent as if such requests, advice or information were provided by Client. Client agrees and understands that ALCS shall not provide Client or any other party with any legal advice.

**2. PRICES, CHARGES AND PAYMENT.** ALCS agrees to charge and Client agrees to pay, subject to the terms herein, ALCS for its fees and expenses as set forth in the Proposal. Client acknowledges that any estimate in the Proposal is based on information provided by Client to ALCS and actual fees and expenses may vary depending on the circumstances and length of the case. Notwithstanding the foregoing, where total expenses are expected to exceed $1,000 in any single month, ALCS may require advance payment from Client due and payable upon demand and prior to the performance of services. ALCS's prices are inclusive of commission and other charges and are generally adjusted periodically to reflect changes in the business and economic environment. ALCS reserves the right to reasonably increase its prices, charges and rates annually. If any price increases exceed 10%, ALCS will give thirty (30) days written notice to Client. Client agrees to pay the reasonable out of pocket expenses incurred by ALCS in connection with Services, including, but not limited to, transportation, lodging, meals. ALCS agrees to submit its invoices to Client and Client agrees that the amount invoiced is due and payable upon receipt.

**3. FURTHER ASSURANCES.** Client agrees that it will use its best efforts to include provisions reasonably acceptable to ALCS in any relevant court order, settlement agreement or similar document that provide for the payment of ALCS's fees and expenses hereunder.

**4. RIGHTS OF OWNERSHIP.** The parties understand that the software programs and other materials furnished by ALCS to Client and/or developed during the course of the performance of Services are the sole property of ALCS. The term "program" shall include, without limitation, data processing programs, specifications, applications, routines, and documentation. Client agrees not to copy or permit others to copy the source code from the support software or any other programs or materials furnished to Client. Fees and expenses paid by Client do not vest in Client any rights in such property, it being understood that such property is only being made available for Client's use during and in connection with the Services provided by ALCS.

**5. CONFIDENTIALITY.** Each of ALCS and Client, on behalf of themselves and their respective employees, agents, professionals and representatives, agrees to keep confidential all non-public records, systems, procedures, software and other information received from the other party in connection with the Services; provided, however, that if either party reasonably believes that it is required to produce any such information by order of any governmental agency or other regulatory body it may, upon not less than five (5) business days' written notice to the other party, release the required information. These provisions shall survive termination of Services.

**6. BANK ACCOUNTS.** At Client's request, ALCS shall be authorized to establish accounts with financial institutions as agent for Client or as otherwise agreed by the parties. All Client accounts established by ALCS shall be deposit accounts of commercial banks with capital exceeding $1 billion. In some cases, ALCS may derive financial benefits from financial institutions resulting from settlement funds and other moneys on deposit or invested with them. These benefits include, for example, discounts provided on certain banking services and service fees.

**7. TERMINATION.** The Services may be terminated by either party (i) upon thirty (30) days' written notice to the other party or (ii) immediately upon written notice for Cause (defined herein). As used herein, the term "Cause" means (i) gross negligence or willful misconduct of ALCS that causes serious and material harm to Client, (ii) the failure of Client to pay ALCS invoices for more than sixty (60) days from the date of invoice, or (iii) the accrual of invoices or unpaid services where ALCS reasonably believes it will not be paid. Termination of Services shall not relieve Client of its obligations to pay all fees and expenses incurred prior to such termination. In the event that the Services are terminated, regardless of the reason for such termination, ALCS shall reasonably coordinate with Client to maintain an orderly transfer of data, programs, storage media or other materials furnished by Client to ALCS or received by ALCS in connection with the Services. Client agrees to pay for such services in accordance with ALCS's then existing prices for such services.

**8. LIMITATIONS OF LIABILITY AND INDEMNIFICATION.** Client shall indemnify and hold ALCS, its affiliates, members, directors, officers, employees, consultants, subcontractors and agents (collectively, the "Indemnified Parties") harmless, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, judgments, liabilities and expenses (including reasonable counsel fees and expenses) (collectively, "Losses") resulting from, arising out of or related to ALCS's performance of Services, including in its reliance upon a settlement agreement or Client direction with respect to tax characterization or allocation of a distribution. Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third-parties against any Indemnified Party. Client shall notify ALCS in writing promptly upon the assertion, threat or commencement of any claim, action, investigation or proceeding that Client becomes aware of with respect to the Services provided by ALCS.

Except as provided herein, ALCS's liability to Client or any person making a claim through or under Client for any Losses of any kind, even if ALCS has been advised of the possibility of such Losses, whether direct or indirect and unless due to gross negligence or willful misconduct of ALCS, shall be limited to the total amount billed or billable to Client for the portion of the particular work which gave rise to the alleged Loss. In no event shall ALCS's liability to Client for any Losses, whether direct or indirect, arising out of the Services exceed the total amount billed to Client and actually paid to ALCS for the Services. In no event shall ALCS be liable for any indirect, special or consequential damages such as loss of anticipated profits or other economic loss in connection with or arising out of the Services. Client agrees that except as expressly set forth herein, ALCS makes no representations or warranties, express or implied, including, but not limited to, any implied or express warranty of merchantability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity. The provisions of this Section 8 shall survive termination of Services.

**9. FORCE MAJEURE.** Whenever performance hereunder is materially prevented or impacted by reason of any act of God, strike, lock-out or other industrial or transportation disturbance, fire, lack of materials, law, regulation or ordinance, war or war condition, or by reason of any other matter beyond the performing party's reasonable control, then such performance shall be excused and shall be deemed suspended during the continuation of such prevention and for a reasonable time thereafter.

**10. INDEPENDENT CONTRACTORS.** ALCS is and shall be an independent contractor of Client and no agency, partnership, joint venture or employment relationship shall arise, directly or indirectly, as a result of the Services or these Terms and Conditions.

**11. NOTICES.** All notices and requests hereunder shall be given or made upon the respective parties in writing and shall be deemed as given as of the third day following the day it is deposited in the U.S. Mail, postage pre-paid or on the day it is given if sent by facsimile or on the day after the day it is sent if sent by overnight courier to the appropriate address set forth in the Proposal or to such other address as the party to receive the notice or request so designates by written notice to the other.

**12. APPLICABLE LAW.** These Terms and Conditions will be governed by and construed in accordance with the laws of the State of Florida, without giving effect to any choice of law principles.

**13. ENTIRE AGREEMENT; MODIFICATIONS; SEVERABILITY; BINDING EFFECT.** These Terms and Conditions, together with the Proposal delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersede all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof. If any provision herein shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby. These Terms and Conditions may be modified only by a written instrument duly executed by the parties. All of the terms, agreements, covenants, representations, warranties and conditions of these Terms and Conditions are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors and permitted assigns.

_____   _____
American Legal Claim Services LLC          Date


_____   _____
Client                                     Date

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| In re: | **CASE NO. 17-30132** |
| **TSI Holdings, LLC[1] et al.,** | **CHAPTER 7**<br>Jointly Administered |
| **DEBTORS.** | |

## NOTICE OF HEARING AND REQUEST FOR ENTRY OF BAR ORDER

TAKE NOTICE that on **Tuesday, January 8, 2019, at 9:30 A.M. in Bankruptcy Courtroom 1-4 in the United States Courthouse, 401 West Trade Street, Charlotte, North Carolina**, this Court will conduct a hearing on the Trustee's *Motion for (I) Authority to Enter into Settlement and (II) Bar Order* filed on November 21, 2018 (the "Settlement Motion"). You may obtain a copy of the Settlement Motion from the Bankruptcy Court's website at www.ncwb.uscourts.gov or by contacting the undersigned counsel.

The Settlement Motion seeks Court approval of the Trustee entering into a settlement agreement resolving various claims among the Trustee, the administrator of Rick Siskey's decedent's estate, Diane Siskey, MetLife, Stone Street Partners, LLC f/k/a Siskey Capital, LLC, and others. If victims of Rick Siskey's Ponzi Scheme are willing to sign voluntary releases of their claims against Diane Siskey, MetLife, and certain others, then the proposed settlement will result in an immediate distribution of approximately 90% to victims, plus an opportunity to eventually receive 100% plus interest.

TAKE FURTHER NOTICE that the Settlement Motion seeks entry of a "**Bar Order**" that would enjoin any person sued by the Trustee for tort liability arising out of or in connection with the Ponzi Scheme from pursuing any contribution or indemnification claims against Diane Siskey (or her children) but mandating that any enjoined defendant receive a credit against any monetary judgment entered in favor of the Trustee in an amount no less than $27,317,725.49. **If you are not a claimant in any of the above-captioned, jointly-administered bankruptcy cases but are receiving this Notice, then you might potentially be subject to the proposed Bar Order**.

YOUR RIGHTS MAY BE AFFECTED. YOU SHOULD READ THIS NOTICE CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY, IF YOU HAVE ONE IN THIS CASE. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

If you do not want the Court to approve the Trustee's proposed settlement and/or the Bar Order, or if you otherwise want the Court to consider your views on the Settlement Motion, then on or before **December 26, 2018**, you or your attorney must do three (3) things…

---

[1]    These jointly administered cases are those of the following debtors:  TSI Holdings, LLC ("TSI"), Case No. 17-30132 (the "TSI Case"); WSC Holdings, LLC ("WSC"), Case No. 17-30338 (the "WSC Case"); and SouthPark Partners, LLC ("SPP"), Case No. 17-30339 (the "SPP Case").

1.  File with the Court your response and any supporting documents at:

> U.S. Bankruptcy Court
> 401 W. Trade St.
> Charlotte, NC 28202

If you mail your response to the Court for filing, you must mail it early enough so the Court will receive it on or before the date stated above.

2.  On or before the date stated above for filing your written response, you must also mail, email, or fax a copy of your written response to:

> Michael L. Martinez
> 101 N. Tryon Street, Suite 1240
> Charlotte, NC 28246
> Fax:  704/332.0215
> Email:  mmartinez@grierlaw.com

3.  If you submit a response, you or your attorney must attend a hearing which would be held at **9:30 a.m.** on **January 8, 2019** in Bankruptcy Courtroom 1-4 in the United States Courthouse, 401 West Trade Street, Charlotte, North Carolina.

If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief requested in the Settlement Motion and may enter an order approving the Settlement Motion and entry of the Bar Order.

This, the 3d day of December, 2018.

> */s/  Michael L. Martinez*
> Michael L. Martinez (N.C. State Bar No. 39885)
> Grier Furr & Crisp, PA
> 101 North Tryon Street, Suite 1240
> Charlotte, NC  28246
> Telephone:  (704) 332-0209
> Facsimile:  (704) 332-0215
> *mmartinez@grierlaw.com*
>
> *Attorneys for Joseph W. Grier, III, Trustee*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| In re: | **CASE NO. 17-30132** |
| **TSI Holdings, LLC et al.,** | **CHAPTER 7** |
| | Jointly Administered |
| **DEBTORS.** | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Notice of Hearing and Request for Entry of Bar Order* were served on those parties requesting notice in this case via ECF, on any party for whom the Trustee has a valid electronic mail address by electronic mail, by online publication, and via U.S. mail, postage prepaid on the following parties at the following addresses.

Rick Dawson
Richard N. Dawson CPA PA
4521 Sharon Road, #430A
Charlotte, NC  28211

Mark A. Whitaker, CPA
8101 Middleton Cir.
Harrisburg, NC  28075

William "Bill" Webb
C/O David R. Badger, Esq
325 Arlington Ave., #550
Charlotte, NC  28203

Gary W. Hammonds
240 Birdie Dr.
Stanley, NC  28164

4th Floor Properties, LLC
C/O Mark R. Kutney
Hamilton Stephens Steele & Martin PLLC
525 N. Tryon St. Suite 1400
Charlotte, NC  28202

This, the 3d day of December, 2018.

/s/  Michael L. Martinez
Michael L. Martinez (N.C. State Bar No. 39885)
Grier Furr & Crisp, PA
101 North Tryon Street, Suite 1240
Charlotte, NC  28246
Telephone:  (704) 332-0209
Facsimile:  (704) 332-0215
*mmartinez@grierlaw.com*

*Attorneys for Joseph W. Grier, III, Trustee*